# Theodore R. Wilson

## v.

# Timothy Cox, Chief Operating Officer, Armed Forces Retirement Home -Washington et al., Civil Action No. 06-1585 (HHK)

# Exhibit A

UNITED STATES OF AMERICA

MERIT SYSTEMS PROTECTION BOARD

WASHINGTON REGIONAL OFFICE

- - - - - - - - - - - - - - - x

ORIGINAL

                    :

THEODORE R. WILSON,          :

                    :

      Appellant,        :

                    :

     v.              :

                    : Docket No.:

ARMED FORCES RETIREMENT HOME,  : DC-0752-06-0831-I-1

                    :

      Agency.         : Judge Cook

                    :

- - - - - - - - - - - - - - - x

                Merit Systems Protection Board

                1800 Diagonal Road, Suite 205

                Hearing Room

                Alexandria, Virginia

                Friday, March 16, 2007

THE HEARING in the above-entitled matter

commenced at 9:30 a.m., pursuant to notice.

BEFORE:

        THOMAS P. COOK, Administrative Judge

Page 2

APPEARANCES:

On Behalf of the Appellant:

THEODORE R. WILSON, PRO SE
3700 North Capitol Street, NW,
Number 128
Washington, DC  20374

On Behalf of the Agency:

THERESE ROY
Armed Forces Retirement Home
c/o Department of the Navy
614 Sicard Street, SE
Suite 100
Washington Navy Yard
Washington, DC  20374

* * *

Page 3

C O N T E N T S

|                    |        |       |          |         | VOIR |
| WITNESSES:         | DIRECT | CROSS | REDIRECT | RECROSS | DIRE |
|--------------------|--------|-------|----------|---------|------|
| Timothy Cox        | 11     | 27    |          |         |      |
| Steve Fowler       | 39     | 46    |          |         |      |
| Eric Brown         | 50     | 55    |          |         |      |
| Charles Dickerson  | 61     | 66    | 70       |         |      |
| Rubin Rodriguez    | 74     | 77    |          |         |      |
| Theodore Wilson    | 79     |       |          |         |      |

Page 4

1              JUDGE COOK:  This is March 16 at approximately

2    9:30 a.m.  My name is Thomas P. Cook, and I'm the

3    administrative judge from the Merit Systems Protection

4    Board Washington Regional Office.  I have been assigned

5    to hear the appeal of Theodore R. Wilson versus the

6    Armed Forces Retirement Home.

7              The agency, Armed Forces Retirement Home is

8    represented by Therese Roy, Esquire, who is an attorney

9    for the Department of the Navy -- who is representing

10   the agency.  Mr. Theodore Wilson, the appellant is

11   present and will represent himself and he is accompanied

12   at the table by his friend.

13             Mr. Wilson, would you please identify your

14   friend for the record?

15             MR. WILSON:  My friend here is Mr. Julius

16   Victor.

17             JUDGE COOK:  Okay.  Spell that, please.

18             MR. WILSON:  J-u-l-i-u-s  V-i-c-t-o-r, Julius

19   Victor.

20             JUDGE COOK:  Thank you very much, Mr. Wilson.

21             Before we came on the record today we spent a

22   few minutes talking about some of the procedural issues

23   that were still pending on the appeal.  One issue is

24   Mr. Wilson has proposed and I have accepted that he

Diversified Reporting Services
202-467-9200

Page 5

1    redesignate his exhibits from -- as Appellant's Exhibits

2    1 and 2, and we will change that.  Those become

3    Appellant's A and B.  The proposed Exhibit Number 3 was

4    not admitted as an exhibit, but as I said, I would

5    accept it into the record, but it's just not considered

6    and entry exhibit.

7         The agency has withdrawn its proposed Exhibit

8    Number 1.  That was the retention register created based

9    on some of the records, and I said I would defer ruling

10   on that until the hearing until I heard the evidence,

11   and the agency has withdrawn that exhibit.  So that is

12   withdrawn and will not be considered.

13        Before we went on the record we also discussed

14   the agency's proposed stipulations of fact.  We've had

15   some discussion and the agency proposed stipulations of

16   fact in its February 27, 2007 prehearing submission and

17   the appellant states that he agreed to stipulations 1,

18   2, 3, 7 and 8.

19        We've had some discussion, and we've clarified

20   some of the other proposed stipulations.  Stipulation

21   number 4, the appellant does not stipulate to.  That's a

22   contested issue as to whether Mr. Wilson's status

23   changed from competitive to accepted service.  That is

24   not subject to a stipulation, I will have to decide

25   that.

Page 6

1          Stipulation number 5, the parties agreed to

2     that stipulation with the following change.  It will now

3     read, Stipulation of Fact Number 5, "appellant resigned

4     his position effective November 30, 2002."

5          Stipulation number 6 has been agreed to by the

6     parties with the following changes and it will now read

7     as follows, Stipulation of Fact Number 6, "on

8     November 4, 2003, the agency provided appellant with a

9     letter stating that his security position would be

10    abolished on or about January 4, 2004."

11         With that discussion, does either party have

12    any objection or comments about the stipulations of fact

13    1 through 3?

14         MR. WILSON:  No.

15         JUDGE COOK:  Okay, when I ask you, for

16    example, you're going to have -- especially with this

17    noise, I would appreciate -- say like, "no objection,"

18    or "the agency agrees to that."

19         MS. ROY:  The agency agrees.

20         JUDGE COOK:  And Mr. Wilson, do you agree to

21    those conditions.

22         MR. WILSON:  I agree, Your Honor.

23         JUDGE COOK:  Thank you very much.  Okay, and I

24    apologize to the parties.  We have this obnoxious

25    jackhammer going on that we're going to have to try to

Page 7

1   deal with.  My apologies about that.

2           The other thing we addressed before we went on

3   the record was the agency proposed a stipulation of

4   expected testimony from a witness I approved for

5   Mr. Wilson.  That was Ms. Patty Adams.  And after some

6   discussion the parties have reached an agreement on

7   stipulation of expected testimony and it would be as

8   follows.

9           If Patty Adams were called to testify she

10  would testify under oath as follows, that she completed

11  the counseling report, dated June 25, 2004, which is

12  found at the agency file, tab 3, subtab 1.  She would

13  also testify that the comments she attributed to

14  Mr. Cox -- I note that it's incorrectly identified as

15  Mr. Fox in the report, but she would testify that the

16  comments she attributed to Mr. Cox are paraphrased,

17  except that -- she would also testify that the comments

18  in quotes were the actual words used by Mr. Cox.

19          Does either party have any comments, concerns,

20  or do you agree to that stipulation of expected

21  testimony?

22          MR. WILSON:  I agree to it, Your Honor.

23          MS. ROY:  The agency agrees.

24          JUDGE COOK:  And I note that I have informed

25  Mr. Wilson that if, based on the testimony of Mr. Cox or

Page 8

1    another witness, he believes that Ms. Adams actual live

2    testimony is significant to his appeal, that he can

3    renew his request and I will consider it at that time.

4            I think I mentioned on those stipulations

5    Mr. Wilson, one, does not agree that he's accepted

6    service employee.  He also, I would point out that in

7    agreeing to those stipulations he was clear that he does

8    not agree that his security guard position was actually

9    abolished.  I forgot to mention that.

10            Okay.  And at this time, the agency call its

11    first witness.  Before you go -- how this is going to

12    work, Mr. Wilson, is since Mr. Cox, I believe, is a

13    joint witness, correct?

14            MR. WILSON:  Yes, he is, Your Honor.

15            JUDGE COOK:  Okay.  I'm going to allow you

16    both a fair amount of leeway with questionings but

17    normally when the agency calls their witnesses, she'll

18    ask her questions first.  Then you can ask questions.  I

19    don't know how much experience you have doing this in

20    other forms.

21            Just a caution; you seem that you're a very

22    intelligent, articulate person based on what I read and

23    my discussions with you, so I don't think you should

24    have any problem with this.  And it's not really an

25    opportunity to argue or debate the case with the

Page 9

1    witness.

2              MR. WILSON:  Yes, Your Honor.

3              JUDGE COOK:  I'm going to give you your chance

4    to testify and then you can also make arguments so that

5    if you think a witness testifies to something that you

6    disagree with you certainly are going to have the

7    opportunity to respond to that.

8              MR. WILSON:  Yes, Your Honor.

9              JUDGE COOK:  But it's basically you're

10   opportunity to get information from that witness.  And

11   some of it you may just disagree with, but it's not your

12   time to argue, just to point that out.

13             With that, let's call Mr. Cox.

14             Can we go off the record for a second?

15             (A brief recess was taken.)

16   Whereupon,

17                     TIMOTHY COX

18   was called as a witness and, having been first duly

19   sworn, was examined and testified as follows:

20             JUDGE COOK:  Please state and spell your full

21   name.

22             THE WITNESS:  My name is Timothy Cox; that's

23   T-i-m-o-t-h-y  C-o-x.

24             JUDGE COOK:  And what is your present position

25   Mr. Cox?

1          THE WITNESS:  My present position is the chief

2   operating officer of the Armed Forces Retirement Home.

3          JUDGE COOK:  And how long have you held that

4   position?

5          THE WITNESS:  For four years.

6          JUDGE COOK:  And you started when?

7          THE WITNESS:  I started in September of '02 as

8   a result of the National Defense Authorization Act of

9   '02 that created the position I hold.

10         JUDGE COOK:  And what kind of a civilian -- do

11  you have a civilian grade or are you SES or is it a

12  different system?

13         THE WITNESS:  Actually appointed by the

14  Secretary of Defense.

15         JUDGE COOK:  Okay.

16         THE WITNESS:  An appointee, I serve at the

17  Secretary's pleasure.

18         JUDGE COOK:  At the Secretary's pleasure.  And

19  are you aware of the basic circumstances of the appeal?

20         THE WITNESS:  Yes, I am.

21         JUDGE COOK:  Okay.  And you know Mr. Wilson?

22         THE WITNESS:  I do.

23         JUDGE COOK:  Okay.  And you were -- from your

24  dates here, you were present and you were the chief

25  operating officer at the time that Mr. Wilson was

Diversified Reporting Services
202-467-9200

Page 11

1    separated from his position?

2              THE WITNESS:  Yes.

3              JUDGE COOK:  Okay.  Ms. Roy, questions.

4                    DIRECT EXAMINATION

5              BY MS. ROY:

6       **Q    Can you describe your position as chief**

7    **operating officer?**

8       A    Yes.  One of the main reasons why I was hired

9    is the home was run -- in the '90s we run off of a trust

10   fund.  So we don't take appropriations.  My budget goes

11   through the Office of Management and Budget to get

12   approved, but it is just authorized for us to spend

13   money out of the trust fund.  And the trust fund had

14   gone from $156 million down to $94 million over a period

15   of about nine years.

16             So Congress stepped in and said we need to

17   reevaluate how the home is operating.  We need someone

18   with retirement housing background.  They have to have

19   fiscal -- proven themselves fiscally in turnaround

20   situations and they have to know how to run a retirement

21   home.

22             So the Secretary's office actually hired

23   Kornferry International.

24             JUDGE COOK:  Say that again.  Who is that?

25             THE WITNESS:  The Secretary of Defense's

Page 12

1    office hired a search firm, Kornferry.

2           JUDGE COOK:  Spell that name.

3           THE WITNESS:  It's K-o-r-n-f-e-r-r-y.

4           JUDGE COOK:  Okay.  And that's a search firm?

5           THE WITNESS:  A search firm, yes,

6    international search firm.

7           So my background of now 22 years in retirement

8    housing, I've done everything from nonprofit to for-

9    profit, running continuing care retirement communities,

10   which is what the Armed Forces Retirement Home is, and

11   was elected to take the job.

12          JUDGE COOK:  And at this point there's

13   still -- there's no appropriated funds that support the

14   Armed Forces Retirement Home?

15          THE WITNESS:  No, no.  We are funded through

16   fines and forfeitures from the branches of service, 50

17   cents from all active duty enlisted.  We receive what

18   our residents pay, which is 35 percent of their income

19   up to a cap, and then it's interest off the trust fund.

20          JUDGE COOK:  Just, without going into a lot of

21   detail, where was that -- was that trust fund originally

22   established by Congress or where did it come from?

23          THE WITNESS:  It's actually booty from the

24   Mexican-American War back in the 1850s.

25          JUDGE COOK:  Really?

Diversified Reporting Services
202-467-9200

Page 13

1                    THE WITNESS:  Yes.

2                    JUDGE COOK:  Very interesting.

3                    THE WITNESS:  $150,000, GEN Winfield Scott,

4    who is our founder, brought back money.  Instead of

5    burning Mexico City he brought back booty because he

6    knew most of his soldiers were immigrants and they would

7    have family here to take care of.  So that's how long

8    the home in D.C. has been around.

9                    JUDGE COOK:  What year was that when the

10   Mexican-American War?  My history is --

11                   THE WITNESS:  That was late 1840s.  The home

12   was established in 1851.

13                   JUDGE COOK:  And it had a different name

14   before, right?

15                   THE WITNESS:  It was the Soldiers' Asylum way

16   back then, then Soldiers' and Airmen's Home and then in

17   1991 Congress brought together the Naval Home that was

18   in Mississippi and the Soldiers' Home as one entity

19   called the Armed Forces Retirement Home.

20                   JUDGE COOK:  Okay.  Thank you.  Go ahead.

21                   THE WITNESS:  You're welcome.

22                   JUDGE COOK:  Appreciate it.

23                   BY MS. ROY:

24        Q    **Upon taking your position what was the**

25   **financial situation at the home?**

Diversified Reporting Services
202-467-9200

Page 14

1      A      Financial situation was we receive qualified

2    audit opinions in the past, we only did, which are bad.

3     You want to get an unqualified opinion because it means

4    the auditor can't stand on the numbers.

5           We had an accounting system that for six weeks

6    I couldn't find what our profit and loss was, where we

7    were against our budget.  You know, and I was told by

8    the Secretary's office that I had two years to turn

9    around the finances to stop the bleeding.

10           JUDGE COOK:  Which Secretary of Defense

11    selected you?

12           THE WITNESS:  Secretary Donald Rumsfeld.

13           JUDGE COOK:  Mr. Rumsfeld, okay.  Go ahead.

14           THE WITNESS:  And with that, we also have --

15    we've been inspected by Inspector Generals every three

16    years, and that rotates among the branches of service,

17    so I reviewed those reports.

18           Once of the things that they talked about was

19    we had a category of resident employees at D.C. that

20    were paid fair market wage, which is a different

21    category than civil servant, and we had a category of

22    resident employee in Gulfport that was a stipend

23    program.  And the recommendation from that 99 report was

24    you need to be consistent since you're one agency

25    operating as one model, which should be the same on how

Page 15

1    you treat different classifications of jobs, whether

2    it's in D.C. or Mississippi.

3         BY MS. ROY:

4         Q    **Can you explain the stipend program, please?**

5         A    Yes.

6              JUDGE COOK:  Before you answer that, when did

7    the stipend program start in Gulfport, do you know?

8              THE WITNESS:  Gulfport?  Way before '91.  But

9    when they came together in '91, the stipend program was

10   there in '91 as a resident employment process, resident

11   stipend program.

12             JUDGE COOK:  All right.  So it existed a long

13   time in the Naval --

14             THE WITNESS:  Right, and they were

15   independent, so they didn't really share information

16   until '91.  They didn't share very well after '91

17   either.

18             JUDGE COOK:  Go ahead, thanks.

19             THE WITNESS:  So with that, the stipend

20   program is run where residents are -- pay $120 a month

21   and they do various jobs to really help support the life

22   of the other residents, whether it's in activities,

23   whether it's in resident services, whether it's in

24   health care.  There are various spots that we look at

25   that don't replace civil servants but that they add and

Diversified Reporting Services
202-467-9200

Page 16

1    they also are a way to help keep residents busy,

2    occupied if they want to do something else.

3           BY MS. ROY:

4      **Q    Will you describe the resident employee**

5    **program in the Washington home when you took over?**

6      A    Yes.  The resident employee program here was,

7    again, not civil servants.  They were paid an hourly

8    wage, but they didn't receive benefits like a regular

9    civil servant would because they weren't considered

10   that.  So -- and we also didn't include that income in

11   their 35 percent of what they have to pay to us.  You

12   know, it's a cap.  Now the cap is $1,144, but a resident

13   pays 35 percent of their income.  It excluded that

14   payment to the resident from their income.

15          So I began to evaluate where our resident

16   employee program was in D.C., which costs us over a

17   million dollars a year compared to the couple hundred

18   thousand that we were spending for -- in D.C.  It was

19   evaluated by me and my staff to say that, okay, one, we

20   have residents doing primary functions that civil

21   servants should be doing, so they should be civil

22   servants and getting benefits, so we want to evaluate

23   that and say, okay, we need to evaluate where we have

24   these positions because they're probably not as

25   appropriate to go to a resident category of employment

Page 17

1    as opposed to the stipend.  We preferred the stipend.

2    That was more of a supportive role.

3        **Q    Can you tell us the salaries of the resident**

4    **employees at the Washington home at the time you took**

5    **over or approximately?**

6        A    Probably ranged from $30,000s to -- we had

7    some that were doing it a long time, so they could have

8    been in the $60,000 and $70,000.  Obviously we spent a

9    million dollars a year, we were obviously paying decent

10   salaries.

11       **Q    And how did you -- when you decided to take**

12   **over the home, when you were appointed to take over the**

13   **home, what were some of the changes that you made to**

14   **address the financial situation?**

15       A    We addressed several things.  One, I looked at

16   how we operated just from a civil servant perspective.

17   We had 14s supervising and 13s supervising and 12s

18   supervising the 11s, who did the work.  So we had RIFs

19   throughout our organization really to right us.  For

20   close to 1,000 residents we had 877 employees.  We were

21   heavily overstaffed, and we also --

22       JUDGE COOK:  Okay.  Let me make sure I

23   understand what you just said.  You said you had 1,000

24   veteran residents who were lawful residents apart from

25   any employment and then 877 of those were actually

1   resident employees?

2          THE WITNESS:  No, no, no.  No, no, a thousand

3   residents but we had 877 employees.

4          JUDGE COOK:  Total?

5          THE WITNESS:  Total, correct.

6          JUDGE COOK:  Okay, got you.

7          THE WITNESS:  So what I'm saying is we almost

8   had one for one.  In the retirement home industry where

9   three-quarters of your population is independent you're

10  more like one to twenty on the independent side, and

11  then of course in nursing and assisted living you staff

12  according to your census.

13         JUDGE COOK:  Okay.  Go ahead.

14         THE WITNESS:  So we looked at not just the

15  resident employee program but we looked at what we

16  didn't do well, which transportation was an area.  We

17  had old buses, Bloomberg buses, that didn't have

18  bathrooms and the air conditioning didn't work.  We

19  evaluated that through a streamlined study to look at,

20  okay, we really want to concentrate on providing the

21  residential care for our residents.  What else do we

22  need to evaluate?

23         Transportation, we don't have to do well, we

24  just have to contract with somebody who does that well

25  if it gives us a better service and probably is in a

Page 19

1    better cost, which it was. So we've added many other

2    areas, and resident employees were not just in security.

3           We had resident employees who were the

4    equivalent of floor managers responsible for checking on

5    residents' well being. To me, as a retirement housing

6    specialist being in the field for 22 years, it really

7    wasn't appropriate to have a fellow resident have the

8    burden of checking on a resident, perhaps seeing that

9    person who had died the night before of a heart attack

10   in the room. That really is our responsibility as the

11   organization.

12           JUDGE COOK: How many resident employees did

13   you have when you were appointed?

14           THE WITNESS: At least -- I'm not sure, but

15   more than a few dozen because, again, we were spending

16   about a million dollars on that program.

17           BY MS. ROY:

18       Q    **And when you determined to -- your**

19   **determination to make the two programs consistent, to**

20   **cost savings, how did you go about doing that?**

21       A    Cost savings, but also to reply to findings in

22   our IG reports that said, you're inconsistent in how you

23   do this; we'd like you to be able to be able to evaluate

24   it and also look at why do you have a group that looks

25   like a civil servant but isn't treated like a civil

Page 20

1    servant because you already have a resident stipend

2    program.  And it's clearly a benefit to get residents to

3    be involved, to have some responsibility -- but yet

4    doesn't take away from their enjoyment of living in a

5    retirement home.

6             So when we evaluated all that we gave notice,

7    60-day notice.  So we tried to follow the best practice

8    that we had, which in other RIFs that we had -- we could

9    have given a 30-day; we chose to give a 60-day.  You

10   know, so looking at this, okay, not classified as a

11   civil servant, we don't have to follow that, we still

12   wanted to get all of our resident employees a 60-day

13   notice.

14        **Q    And if I understand your testimony correctly,**

15   **the entire resident employee program, as it was run in**

16   **Washington, was changed?**

17        A    That's correct.  The resident employee program

18   was effectively abolished as a wage -- current wage

19   payer.  We looked at those spots and said, are some of

20   them ones that we should have civil servants in?  Yes,

21   perhaps.  Are they things that we could contract out --

22   and that we wanted to adopt the resident stipend

23   program, which was effective.

24             We had a few hundred residents that were

25   participating in that in Gulfport.  They enjoyed it.

Page 21

1    The staff enjoyed that, and it also was very cost

2    effective for us to do that.

3            JUDGE COOK:  In January 2004 is when

4    Mr. Wilson was separated.  At that point or around that

5    time, how many resident employees remained, and how many

6    remain if any now?

7            THE WITNESS:  We don't have any resident

8    employees.  The whole program was abolished to go to the

9    resident stipend program.

10           JUDGE COOK:  It was abolished effective in

11   January?  When was the date you actually ended up with

12   no resident employees, do you know?

13           THE WITNESS:  Without -- here?

14           JUDGE COOK:  Not exact dates, but just around

15   that time?  Was it in the first of 2004?

16           THE WITNESS:  Probably around that time, too.

17    Yes, it was around that time, because we treated that

18   program not just for security purposes, we treated that

19   program since we had them throughout the campus,

20   resident employees, we treated them all the same.

21           JUDGE COOK:  Go ahead, Ms. Roy.

22           BY MS. ROY:

23       Q    Do you recall making a statement regarding

24   individuals having come to the retirement home to

25   retire?

Page 22

1    A    Yes, I did.  In fact, I was very up front with

2    all of the residents.  We had an all-resident meeting to

3    talk about why were changing this because, again, they

4    were affected from the post office to security to

5    resident services to health care.  And I told them, you

6    know, our primary function here is a retirement home.

7           What I don't want is to look at residents

8    working the equivalent of full time and, one, not

9    getting benefits, but also in jobs that really are the

10   responsibility of the agency to have as a civil servant

11   in them.  And that was some of the findings of the IG.

12   He said, you're using this but you're not paying

13   benefits; it's a way to pay a wage but not pay fully for

14   it, and could it be civil servant?"  So we really

15   righted what we needed to do.

16           I explained that to everyone, explained that

17   our job is really to be a retirement home and do the

18   best we can.  And if there's employment possibilities

19   that would be secondary as in the stipend program to us

20   rather than a primary function of what we're supposed to

21   be.

22   **Q    Do you recall about when you did that, about**

23   **when you had that meeting?**

24   A    I'm sure it was before we gave the notice or

25   it could have been right after the notice, but it was in

Page 23

1    that time frame of, I'm sure, the 60-day transition, so

2    it was all relevant to what was going on at the time.

3         Q    **Do you recall having a concern about security**

4    **guards sleeping at the gate?**

5         A    Yes, I had a concern about, whether it's

6    security, whether it's nursing, nursing assistants, any

7    person who's supposed to be part of their job that's

8    supposed to be alert and awake as their job, if they're

9    found asleep at their job that is a disciplinary action.

10    That's really the action of sleeping not an action of

11    anyone's age or function, but if they're supposed to be

12    awake and doing a job they need to be awake and doing

13    that job.

14         Q    **Can you state your age for the record?**

15         A    Yes, my age is 46.

16         JUDGE COOK:  Excuse me, Mr. Cox.  You said you

17    had concerns about this.  Why did you have specific

18    concerns about someone sleeping at the guard gate and so

19    forth?  What caused you to have this concern?

20         THE WITNESS:  Well, the concern is, first of

21    all, security is supposed to be awake at the guard gate

22    because it's our single point of access to where over

23    1,000 people live inside.

24         JUDGE COOK:  Did you have any experience that

25    caused you to be concerned about that?

Page 24

1          THE WITNESS:  Yes, we have gunshots right

2    outside our facility.  We have had people try to get on

3    the facility.

4          JUDGE COOK:  Well, how about with sleeping on

5    the job?  Had you had employees that had --

6          THE WITNESS:  Yes, it was reported to me that

7    we had a guard in the evening that had been found asleep

8    in the guard shed.

9          JUDGE COOK:  Okay, go ahead, Ms. Roy.

10         BY MS. ROY:

11   **Q   Were there any other circumstances about this**

12   **time that caused you to question the resident employee**

13   **program?**

14         A    Yes, as far as security.  One of the things

15   that I was concerned about is NORAD uses our site as a

16   place to put -- NORAD is the national defense program --

17   and NORAD uses our site when we go to level orange to

18   bring in hummer-launched missiles to protect everything

19   from the Capitol to the White House.

20         So knowing that there is actually ammunition

21   on our site and knowing that we have only one

22   penetration point, which is our gate that is manned by

23   security, it was also a concern to make sure that we had

24   the best trained individuals to be out there.  And they

25   needed to stay awake to be able to make sure that they

Page 25

1  could do that job appropriately.

2          JUDGE COOK:  How many acres is the --

3          THE WITNESS:  272 acres.

4          JUDGE COOK:  272, and that's all enclosed,

5  controlled access, one gate only?

6          THE WITNESS:  That's correct.

7          JUDGE COOK:  Go ahead, Ms. Roy.

8          BY MS. ROY:

9      Q    **Currently on the gate what type of employees**

10 **do you have?**

11     A    We did a study to look at our whole security

12 force and security internally.  It came out that it was

13 cost effective for us to still run but the gate it was

14 cost effective to have a private contractor do that.  So

15 at this time of transition we went to a private

16 contractor to run our gate for us, and to this point

17 still have a private contractor running that.

18     Q    **And at the time that you made those decisions**

19 **you had a resident employee program that was the stipend**

20 **program?**

21     A    That's correct.

22     Q    **So basically volunteers?**

23     A    Volunteers who get that $120, correct.

24     Q    **Correct.  So if I understand your testimony,**

25 **you determined that it perhaps made more sense to have**

1  **trained security guards on the gate, contractor guards**

2  **than volunteers basically?**

3      A      Correct. So we didn't look at looking at

4  stipend positions at the gate because we really thought

5  it was critical to have secured access and people who

6  are trained to do that.  And because we looked at our

7  main job is not security, our main job is to provide the

8  residential services for our residents, contracting that

9  out to a group that is trained to do that made economic

10  sense.

11          JUDGE COOK:  What's the contractor's name?

12          THE WITNESS:  I'm not sure.

13          JUDGE COOK:  Okay.  That's just the gate

14  guards?

15          THE WITNESS:  Those are just the gate guards.

16          JUDGE COOK:  So you still run security -- are

17  those civil service employees?

18          THE WITNESS:  Those are civil servants, yes.

19          JUDGE COOK:  And what other security do you

20  have?

21          THE WITNESS:  That's it.

22          JUDGE COOK:  No, I mean what -- you said you

23  have other security, what do they do?

24          THE WITNESS:  Security on campus?

25          JUDGE COOK:  Yes.

1          THE WITNESS:  They check the buildings.  They

2    roam in the car to make sure if someone is walking

3    outside that they have the correct badge.  They check

4    exterior doors to make sure they're stuck, to make sure

5    they're locked.

6          JUDGE COOK:  Are they armed?

7          THE WITNESS:  No.

8          JUDGE COOK:  So they don't have to qualify

9    them.  How many of them do you have approximately, do

10   you know?

11         THE WITNESS:  I think we have 12 to 15.

12         JUDGE COOK:  Thank you.  Go ahead.

13         MS. ROY:  I have no further questions.

14         JUDGE COOK:  Mr. Wilson, do you have any

15   questions?

16         MR. WILSON:  Yes, Your Honor.

17         JUDGE COOK:  Go ahead.

18                   CROSS EXAMINATION

19         BY MR. WILSON:

20    Q    Mr. Cox, just a moment ago I heard you say

21   that you gave the residents 60 days notice.

22    A    Yes.

23    Q    And that you didn't have to do that.  Why are

24   you saying that?

25    A    Well, we didn't have to do that because they

Page 28

1    weren't considered civil servants, so they weren't in

2    RIF procedure because they weren't considered civil

3    servants because they were resident employees.  That's a

4    special category.  My HR department told me that we

5    didn't have to give a notice, but we all felt that it

6    was appropriate to give a notice.

7        Q    Before you decided to dismiss the residents --

8    actually, you fired them, is that true?  You actually

9    fired the residents?

10       A    We did a reduction in force, the equivalent of

11   reduction in force.  So those positions were abolished.

12       Q    Well, did you check with your personnel, human

13   resources manager before you did that?

14       A    Yes.

15       Q    And he said it was okay?

16       A    Yes.

17       Q    Did he not advise you that you were supposed

18   to do a RIF, that you do a RIF, to do that?

19       A    They told me not to do a RIF, so we did the

20   equivalent of that with a 60-day notice because, again,

21   the resident employees weren't considered civil

22   servants.  You know, they didn't get the benefits, they

23   weren't classified as a civil servant.  It was a

24   separate category.

25       Q    Well, one of those resident employees had been

Page 29

1    **a civil servant and had been brought into the accepted**

2    **service, and the law said that he was supposed to remain**

3    **in the competitive service, in that case you would have**

4.   **had to do a RIF to remove him from the job.  Nobody told**

5    **you about that?**

6    MS. ROY:  Objection.  I'd like to object to

7    this line of questioning because the agency has conceded

8    that employees, that resident employees were in the

9    accepted service and that the agency should have

10   conducted a RIF and given them appeal rights.  There's

11   no argument about that.

12   JUDGE COOK:  Well, I think -- I think what

13   you're trying to just ask him though is -- and I think

14   I've already heard the answer, and that is he did not

15   consider those employees in the competitive service.

16   THE WITNESS:  That's correct.

17   JUDGE COOK:  Now whether that's a mistake or

18   not, that's for me to decide, but I think the record is

19 . pretty clear they didn't treat you as a competitive

20   service employee and that they considered you an

21   accepted service, as Ms. Roy just said, I think they

22   concede that they did not run a RIF.

23   So I get the result of that, but I don't think

24   asking -- he is certainly not the personnel expert.  He

25   runs the place, but he did rely on his guidance

Diversified Reporting Services
202-467-9200

Page 30

1  apparently, and if that guidance is wrong, then it's up

2  to me to decide what the result is, but I don't think he

3  can answer other than to say, no, he didn't consider

4  them competitive service.

5        MR. COX:  Correct, which I didn't.

6        JUDGE COOK:  And that's because of what he was

7  advised.

8        MR. WILSON:  Okay.

9        JUDGE COOK:  What he should have done is

10 probably for me to decide if that --

11       BY MR. WILSON:

12   Q    Okay.  Mr. Cox, the law that Congress passed

13 here, Title XXIV, 411 about the management of the

14 retirement home, did you say that it told you to operate

15 the two homes on the same principle, same model?

16   A    It told me to look for efficiencies and

17 ineffectiveness and to come up with how we should

18 operate the most consistency.  So yes, we actually do

19 operate under one model.

20   Q    I want to just read this one line here.  So

21 it's on this home here, and it says --

22       JUDGE COOK:  Would you identify where you're

23 reading from more specifically?

24       MR. WILSON:  I'm reading from Title XXIV.

25 Title XXIV, it's an except from Title XXIV.

Page 31

1          JUDGE COOK:  Is it in the record?

2          MR. WILSON:  Yes, sir.

3          JUDGE COOK:  Can you tell me --

4          MR. WILSON:  It's -- go to tab 4F on the first

5    page, paragraph C -- D, paragraph D2.

6          BY MR. WILSON:

7      **Q    It says, "each facility of the retirement home**

8    **shall be maintained as a separate establishment of the**

9    **retirement home for administrative purposes," and that**

10   **seems to contradict your statement that it asks you to**

11   **run them on the same model.**

12     A    Actually, I don't think it contradicts at all,

13   Mr. Wilson.  What it says is from a budgetary standpoint

14   that each one should have its own operating budget, it

15   should stand on its finances by itself, but that the

16   economy of scale is how we do admissions, how we hire.

17   The classification of employees shall be the same

18   because running a retirement in Mississippi vice running

19   a retirement home in D.C., there's no difference in

20   that.

21          So the homes were spending much more money

22   than they were bringing in.  All that's saying is they

23   have to be legally separate entities, which means they

24   have their own budget.  Yes, they have their own

25   classification system for an employee but by no means

Page 32

1    was that -- if you look back at the IG reports, at the

2    direction that I've received from the Secretary, there

3    were many forms of guidance to say programs at one home

4    were better and should be adopted at the other home and

5    vice versa as well.

6         Administratively it does not mean that they

7    should keep programs that were not as cost effective.

8    And if they had a better working program at one of the

9    homes, they should share that with their sister home.

10    Q    Okay.  Well, then in other words, I just

11    wanted to suggest that maybe the home in Washington,

12    D.C. had a better system in so much as you were paying

13    employees for their work.  So did you -- well, you did

14    not conduct a RIF, and you were required to conduct one.

15    But had you conducted a RIF, could you have abolished a

16    group of people as opposed to positions?

17         Is not a RIF supposed to abolish positions as

18    opposed to people?

19    A    The people are in those positions, so again,

20    like with security we abolished all of the resident

21    positions, the resident employee positions, just like we

22    did in transportation, we abolished all those positions

23    because it went out to contract.

24         So again, the point is that we did do it by

25    position, by each department, so it's not personal.  It

Page 33

1   was all of security.  There is no security at the gate

2   that's a civil servant anymore.  They're all contracted.

3    So it has been by the whole department.

4       **Q    The contractors on the gate, Mr. Cox, are the**

5   **same ones that were there when I was there.**

6          JUDGE COOK:  You have to ask a question,

7   though, okay?  You're starting to tell him things.

8   You've got to ask him.

9          BY MR. WILSON:

10      **Q    Okay.  Well, maybe I'll ask, did you -- the**

11  **civil service guards on the gate, did you hire more**

12  **contractors after I was let go, after the appellant,**

13  **myself, was let go?  Did you hire more contractors or**

14  **did you keep the same amount of contractors on the gate**

15  **down there?**

16      A    I don't recall because it's outsourced.  It's

17  a specific contract amount of money, and however they

18  use that, whether it's ten part-time people to get to

19  the equivalence, but they have to cover the gate 24/7.

20  So however the contractor does it for his performance-

21  based contract based on fee.

22      **Q    Okay.  But you didn't hire more contractors,**

23  **you didn't hire more contractors.  In other words, the**

24  **contract people who were on the gate has not changed,**

25  **has it?  Do you know if it has changed or not, the**

Page 34

1    **number of contractors you have on the gate?**

2         A     Not to my --

3               JUDGE COOK:  One contractor, right?

4               THE WITNESS:  Yes, that's right.

5               JUDGE COOK:  One contract, the number of

6    employees --

7               BY MR. WILSON:

8         Q     **So the same employees -- there are two**

9    **contractors down there, which is the same as it was**

10   **before.**

11        A     Okay --

12              JUDGE COOK:  It sounds like you want to tell

13   me that.  You have to ask him a question.

14              MR. WILSON:  Okay, I'll do that.  I'll do

15   that.

16              Did it cost more to hire -- we're talking

17   about the -- how much did you pay the people that you

18   replaced the appellant, myself with on the gate?  I was

19   replaced in the department of security services.  Did

20   you not hire some more people into civil service

21   positions?

22              MS. ROY:  Objection.  I object to that.

23              JUDGE COOK:  Okay.  Hold on a second.  What's

24   your objection?  He's saying if they saved money by

25   separating him, I think that's his question.

Diversified Reporting Services
202-467-9200

Page 35

1          MS. ROY:  If that's his question, that's fine.

2     If he's asking about replacing, we've already covered

3     that and he's assuming facts not in evidence.

4          JUDGE COOK:  I mean inferentially it's how did

5     you replace him, but what he's saying is, you cut me

6     loose and you have another method; did it save money?

7          THE WITNESS:  Is that the question?

8          JUDGE COOK:  I think that's your question, is

9     it not?

10          MR. WILSON:  Well, yes.  I'm asking, did

11     you -- did replacing me, since you were supposed to -- I

12     mean are you supposed to replace -- in other words, are

13     you supposed to replace the positions or are you

14     supposed to replace people?

15          THE WITNESS:  What we're doing, Mr. Wilson, is

16     the resident employee program was abolished.  It wasn't

17     just security, all right.  That was costing the home

18     over a million dollars a year, okay?  It's not just

19     security.  We did away with that resident employee

20     program and went to the stipend program, all right.

21          So security is a totally different issue than

22     the resident employee issue, and I don't want us to

23     confuse the two because at the gate you are not the only

24     resident employee.  We went through resident employee

25     program and in health care and residential service, all

Page 36

1   those residential employees at the same time.  Those

2   positions were abolished.

3           So that million dollars we saved because we

4   went to resident stipend program, okay.  And the stipend

5   program does not have spots at the gate because we

6   contracted that out because doing a streamlined A76

7   study it was more cost effective to have that gate done

8   by a contractor than by civil servants.

9           BY MR. WILSON:

10      Q    **But you have civil servants on the gate today.**

11  **Do you have civil servants on the gate today?**

12      A    No, we don't.  We do not.  They're all

13  contract employees.

14      Q    **Well --**

15          JUDGE COOK:  Again, Mr. Wilson, if you

16  disagree you have to do it another way.

17          MR. WILSON:  Okay, Your Honor.  That's good.

18  That's good.  I don't think I have any more questions

19  for Mr. Cox.

20          JUDGE COOK:  Anything else?

21          MS. ROY:  I have no further questions.

22          JUDGE COOK:  Thank you, Mr. Cox.  You're

23  excused.  I appreciate your testimony.

24          THE WITNESS:  My pleasure.

25          JUDGE COOK:  Don't discuss your testimony with

Page 37

1    any other witness until the hearing is completed.

2              THE WITNESS:  I won't.

3              JUDGE COOK:  Thank you.  Have a good day.

4              THE WITNESS:  You're welcome.  You, too.

5              (The witness was excused.)

6              JUDGE COOK:  Who's your next witness.  Let's

7    go ahead and take --

8              MS. ROY:  Mr. Fowler.

9              JUDGE COOK:  Pardon me?

10             MS. ROY:  Mr. Fowler.

11             JUDGE COOK:  Mr. Fowler, okay.  Let's call

12   Mr. Fowler.

13             Mr. Wilson, what I suggest is when a witness

14   makes a statement that you disagree with, a lot of times

15   it's better to write your notes, say, "I don't think

16   that's right," and you can cover it with your testimony

17   or if you think there's a document which conflicts, then

18   write yourself a little note and then you can point that

19   out to me.  That's the way to handle that.

20             MR. WILSON:  Okay, Your Honor.

21             JUDGE COOK:  I'm Judge Cook.  Mr. Fowler,

22   would you please step behind the chair for me.

23   Whereupon,

24                   STEVE FOWLER

25   was called as a witness and, having been first duly

Page 38

1    sworn, was examined and testified as follows:

2             JUDGE COOK:  Please state and spell your full

3    name for me.

4             THE WITNESS:  My full name is Steve Broxson

5    Fowler, S-t-e-v-e  B-r-o-x-s-o-n, Fowler, F-o-w-l-e-r.

6    Professionally I usually go by Brock Fowler, B-r-o-c-k

7    Fowler.

8             JUDGE COOK:  And what's your present position,

9    Mr. Fowler?

10            THE WITNESS:  Currently I work as a consultant

11   for consulting firms at two different agencies,

12   Transportation Security Administration and the Armed

13   Forces Retirement Home.

14            JUDGE COOK:  And you are not a federal

15   employee, you work for a federal contractor?

16            THE WITNESS:  That's right, I retired.

17            JUDGE COOK:  Okay.  And when did you retire

18   from federal service?

19            THE WITNESS:  January 3, 2006.

20            JUDGE COOK:  And what contractor do you work

21   for now?

22            THE WITNESS:  I work for this -- for the home

23   I work for PSA Incorporated in West Virginia,

24   Professional Services of America, Incorporated.

25            JUDGE COOK:  Okay.  And are you familiar with

Page 39

1    the basic issues of this appeal?

2              THE WITNESS:  Yes.

3              JUDGE COOK:  Were you employed at the Armed

4    Forces Retirement Home when Mr. Wilson was separated?

5              THE WITNESS:  I was.

6              JUDGE COOK:  And that's in January of 2004?

7              THE WITNESS:  Right.

8              JUDGE COOK:  What was your position then?

9              THE WITNESS:  Human resource analyst.

10             JUDGE COOK:  What was your grade?

11             THE WITNESS:  It was administratively

12   determined pay.

13             JUDGE COOK:  Okay.  Ms. Roy.

14                       DIRECT EXAMINATION

15             BY MS. ROY:

16        Q    **Your position was -- I'm sorry, could you --**

17        A    Human resources analyst.

18        Q    **Human resources analyst, at the time of the**

19   **separation of Mr. Wilson?**

20        A    Yes, ma'am.

21        Q    **Can you explain the resident employee program**

22   **and how they were categorized in terms of**

23   **classification?**

24        A    Yes, there was -- the resident employee

25   program was administered separately by our staffing

Page 40

1    section branch and they used different forms and

2    different procedures.  Jobs were posted.  They were not

3    posted on USA Jobs, they were posted within the home,

4    and they were classified as AN or AD positions rather

5    than GS -- they were on a different pay scale, and we

6    had different forms for referring a certificate and

7    different application forms and so forth.

8         Q    And what was the appointing authority for the

9    resident employees?

10        A    We used the Armed Forces Retiring Home Act as

11   the appointing authority.  It clearly says schedule A

12   OPM authority,.

13             JUDGE COOK:  Schedule A accepted service?

14             THE WITNESS:  Yes, sir.

15             BY MS. ROY:

16        Q    And where did you find that authority?

17        A    It was -- it's posted in the federal register

18   every year.  It originally was granted April 1, 1989.

19        Q    So resident employees were a schedule A

20   accepted service?

21        A    That's correct.

22        Q    Okay.  And at the time there was a

23   determination to abolish the resident employee program,

24   what was your understanding of the rights that they were

25   due?

Diversified Reporting Services
202-467-9200

Page 41

1      A    My understanding was that they were -- that

2  because they were in a different category -- they're

3  accepted service, but in addition to that, as being

4  residents of the institution, it was my understanding

5  that there were no appeal rights or RIF procedure

6  rights.

7      Q    **And how long had you been with the Armed**

8  **Forces retirement home?**

9      A    At that time, about maybe -- well, I left the

10  home twice.  I first went to work for the home in

11  February of 1982.  So I had been -- I had gone to work

12  elsewhere a couple times.  But I've worked there a total

13  of about 15 years.

14      Q    **And to your knowledge did Mr. Wilson apply for**

15  **a resident employee position?**

16      A    The records show that he did.

17      Q    **And when individuals working at the home moved**

18  **into the home what was the procedure to handle that?**

19      A    Well, there was -- because of the

20  classification act of 1949, somebody who was a resident

21  of the home, they couldn't hold a position of the

22  classification of general schedule wage grade.  So if

23  somebody was in the home that wanted to work for that

24  job, a job like that, they had to move off campus in

25  order to be selected.

Diversified Reporting Services
202-467-9200

Page 42

```
 1            And if they were off campus and they were

 2    working a GS job and they moved on campus, became

 3    residents or members of the home, then they had to --

 4    they would not be eligible to hold that GS job anymore

 5    and they could apply for a resident position.

 6        Q    And the resident positions were -- never mind.

 7    I'll withdraw the question.  I have no further

 8    questions.

 9            JUDGE COOK:  Are you familiar with RIF

10    procedures in general?

11            THE WITNESS:  Yes.

12            JUDGE COOK:  Have you ever been involved in

13    RIFs when you were there?

14            THE WITNESS:  Yes, we had a series of RIFs,

15    yes.

16            JUDGE COOK:  Okay.  The position that

17    Mr. Wilson held when he was separated, as I understand

18    the record was a security guard AD position?

19            THE WITNESS:  That's correct.

20            JUDGE COOK:  And that was a schedule A

21    accepted service position.  Do you happen to know what

22    if any other positions would have been in his

23    competitive level or how many other positions were in

24    his competitive level when he separated?

25            THE WITNESS:  Right.  There was -- the
```

Page 43

1  decision was made to abolish the resident employee

2  program and stop the program, and when that happened

3  there were some people who, you know, once they found

4  that out, resigned or some people who -- you know, their

5  jobs ended.  But there were a few people who were kept

6  on after the initial group.

7          As I recall, Mr. Wilson was one -- the only

8  one of two or three that were kept on after that time.

9          JUDGE COOK:  In total resident employees or

10  just security guards?

11          THE WITNESS:  Total resident employees.

12          JUDGE COOK:  Okay.  Go ahead.

13          THE WITNESS:  And so when -- at the time

14  Mr. Wilson went out there were no resident employees

15  left and the positions were abolished.

16          JUDGE COOK:  So there really was -- so you're

17  saying at the time he was separated there were no other

18  resident employee positions whatsoever?  Is that your

19  understanding?

20          THE WITNESS:  Right.

21          JUDGE COOK:  The positions were gone, but were

22  the people also gone?

23          THE WITNESS:  Yes.

24          JUDGE COOK:  As you understand it.

25          THE WITNESS:  The day after -- that's the day

Page 44

1    after he left.

2              JUDGE COOK:  Okay.  How about -- the exact

3    date, his separation date was January 4, 2004.  Were

4    there any other resident employees that also separated

5    that day?

6              THE WITNESS:  There might have been one other.

7     I'm not sure about that.

8              JUDGE COOK:  Do you happen to know -- and just

9    to the best of your recollection, if you don't know

10   that's fine.  Do you know if it was a security guard or

11   another position?  Do you happen to know?  If you don't

12   recall, I can understand that.  It's a few years.

13             THE WITNESS:  I talked to -- in trying to

14   figure it out, because we changed personnel data

15   systems.  So Some historical data that would be normally

16   easy to obtain is not available to us -- I talked to a

17   guy that I think may have left the same day to work at

18   the post office.

19             JUDGE COOK:  And again, as we've heard some

20   earlier testimony, and it's your understanding, too,

21   that as of that day, the day after Mr. Wilson left,

22   there was no resident employee program.  Is that your

23   understanding?

24             THE WITNESS:  Yes, that's correct.

25             JUDGE COOK:  And you were still an employee

Page 45

1    there, so you would have known?

2              THE WITNESS:  That's correct.

3              JUDGE COOK:  Was your position physically

4    located at the Armed Forces Retirement Home?

5              THE WITNESS:  Yes, it was, and I was in --

6              JUDGE COOK:  Was it like the personnel office

7    or human resources office or how is it?

8              THE WITNESS:  What happened was I came to work

9    there in September of 2002 again. You know, I'd worked

10   there along the way before that; I just came back, gone

11   away, came back.  So the first time -- when I came back

12   on that time I came back as the human resources officer

13   in September of 2000.

14             And then that was at the U.S. Soldiers' and

15   Airmen's Home level.  Then when a headquarters was

16   established over all of the homes, at that time I was

17   given a pay raise and the whole organization was -- HR

18   was of course elevated to corporate level.  I became a

19   human resource analyst and Ms. Essex became the human

20   resources officer handling day-to-day operations.  And

21   then there was a point in there where I took over

22   staff --

23             JUDGE COOK:  Okay.  Thank you.  Any questions

24   based on that?

25             Mr. Wilson.

Page 46

1                        CROSS EXAMINATION

2          BY MR. WILSON:

3          Q    You said you were a human resource analyst.

4    Didn't you, when you gave your statement to the EEO

5    investigators, Mr. Fowler, didn't they -- didn't you say

6    that you were the director of human resources?

7          A    I said I at one time had been.  I said at the

8    time I was -- the statement I was, at the time -- and I

9    explained about the split --

10         Q    Okay.  Did you -- whenever they decided to --

11   no, let's go to the date that I entered my first EEO

12   complaint.  Did you attend a meeting with Mr. Cox and

13   Ms. Blackwell and Ms. Essex regarding my complaint, my

14   EEO complaint?  Do you recall?  Did you attend those

15   meetings?

16         A    I don't recall a meeting.

17         Q    You never attended a meeting in regard to my

18   EEO complaint?

19         A    I'm not saying I didn't attend a meeting.  I'm

20   saying I don't recall a meeting.  We're going back quite

21   a ways.

22         Q    Granted, granted.  Three years, this month,

23   this week as a matter of fact, I believe.

24              So you didn't have any -- did you have any

25   information about how I lost my job?

Diversified Reporting Services
202-467-9200

Page 47

1        A    Well, I didn't have any firsthand information.

2    That is to say, Ms. Essex was in charge of operations.

3    She before that had been in charge of labor relations.

4    So whenever conversations were handled between her and

5    Mr. Dickerson or her and Mr. White or her and

6    Mr. Rodriguez I was not privy to those.

7            I was aware that the resident employment

8    program was being abolished, and I was -- and I remember

9    hearing at one point, well, that they had decided to

10   keep you on for a period of time past what they

11   originally had envisioned as the cutoff date, and so I

12   was aware that you were a security guard and I was aware

13   of what was going on in general terms.  I just didn't

14   have any involvement directly in signing anything or

15   giving direct advice or something.

16       **Q    At the time that you were the director of**

17   **human resources or working in that department there did**

18   **you have any information regarding the person leaving**

19   **the competitive service and going into the accepted**

20   **service as my case was?**

21       A    I wasn't involved in your case, no.

22       **Q    I mean but did you have any information about**

23   **it?**

24       A    I may have heard that you were moving -- the

25   home grounds and had taken -- you had taken a job as

Page 48

1      a -- a resident position.  I may have heard that.

2          Q      And do you know of another case of this

3      happening, of a person being a civil service guard and

4      moving onto the home to become a resident?  Do you

5      recall any other case like that?

6          A      I can't recall a case like that.  I can recall

7      the case that Mr. Rodriguez was a resident and he moved

8      off the grounds in order to take the civil service job.

9       I remember it was well known, well known, often stated,

10     but I can't recall any specific situations other than

11     that.

12         Q      Okay.  Well, did you have -- did anybody ever

13     have any discussions about whether -- did you ever have

14     any discussion with anyone about whether or not when I

15     came over and transferred out of the competitive service

16     into that excepted service position that I would remain

17     in the competitive service, I would be considered to

18     remain in the competitive service?

19         A      I don't remember any specific discussions, but

20     nor would I expect to because the issue came up fairly

21     often because we had jobs and there were residents

22     living there, had GS jobs, and so we -- I remember

23     people regularly being told, you know, if you live on

24     the home grounds you can't have a GS grade position.

25              So I don't think there would have any occasion

Page 49

1   for a lot of discussion about that particular issue in

2   your case because it was well established.

3        **Q    Okay.  Thank you, Mr. Fowler.  I don't have no**

4   **more questions, Your Honor.**

5             JUDGE COOK:  Anything else?

6             Thank you, Mr. Fowler.  I appreciate your

7   testimony.  You're excused.  Do not discuss your

8   testimony with anyone until the hearing is completed.

9   Thank you, you have a good day.

10            Okay, let's take five minutes.  Stretch your

11  legs.  We'll be back at about 10:30.  And who are you

12  calling next?

13            MS. ROY:  Eric Brown.

14            JUDGE COOK:  Mr. Brown.  Won't you have

15  Mr. Brown ready in about five minutes or so?

16            (The witness was excused.)

17            (A brief recess was taken.)

18            JUDGE COOK:  Please step behind the chair and

19  raise your right hand for me.

20  Whereupon,

21                      ERIC BROWN

22  was called as a witness and, having been first duly

23  sworn, was examined and testified as follows:

24            JUDGE COOK:  Mr. Brown, please state and spell

25  your full name for us.

Page 50

```
 1              THE WITNESS:  Eric Brown, E-r-i-c, last name
 2    is B-r-o-w-n.
 3              JUDGE COOK:  And what is your present
 4    position, Mr. Brown?
 5              THE WITNESS:  Human resources specialist of
 6    staffing and classification and the Bureau of Public
 7    Debt.
 8              JUDGE COOK:  Ms. Roy.
 9                   DIRECT EXAMINATION
10         BY MS. ROY:
11         Q    How long have you held that position?
12         A    Two-and-a-half years.
13         Q    Okay.  And you indicated that you're with the
14    Bureau of Public Debt.  What's your relationship to the
15    Armed Forces Retirement Home?
16         A    Our agency, which is actually the -- ARC,
17    Administrative Resources Center, has contracted our HR
18    staffing classification out to the Armed Forces
19    Retirement Home.
20         Q    Are you familiar with why we're here today?
21         A    Yes, ma'am.
22         Q    You're familiar with the appeal of Mr. Wilson
23    regarding his termination from his resident employee
24    position?
25         A    Yes.
```

Page 51

1      Q    Can you -- have you reviewed Mr. Wilson's

2  official personnel folder?

3      A    Yes.

4           JUDGE COOK:  Okay.  Before you go on, let me

5  make something clear for the record.

6           Mr. Brown, as I understand it you were not

7  present with Armed Forces Retirement when Mr. Wilson was

8  terminated, separated in January of 2004, is that

9  correct?

10          THE WITNESS:  That's correct.

11          JUDGE COOK:  Okay.  And your testimony is

12 going to be based on your review of his records and so

13 forth?

14          THE WITNESS:  Yes, sir.

15          JUDGE COOK:  Okay.  I just wanted to be clear

16 with that.  Go ahead.

17          BY MS. ROY:

18      Q    You've reviewed his official personnel folder?

19      A    Yes.

20      Q    And can you tell us what position Mr. Wilson

21 held when he was terminated?

22      A    Yes, he was in the accepted service, schedule

23 A position, AD 008510 security guard position.

24      Q    And you have reviewed -- can you tell us what

25 your expertise is in reduction in force?

Diversified Reporting Services
202-467-9200

Page 52

1    A    Well, we're required to go through training,

2    and I've actually been involved in three with the

3    retirement home.  We went through the whole process, the

4    notices and everything there, so I've had quite a bit of

5    exposure to it.

6    **Q    Okay.  Did you take a look at the record with**

7    **respect to the termination of Mr. Wilson's employment?**

8    A    Yes.

9    **Q    Okay.  And what competitive level would**

10   **Mr. Wilson have been in, had they run a RIF?**

11   A    Competitive levels are required by regulation

12   to be implemented.  They would be set up based on

13   positions that are the same in classification, grade,

14   qualification standards, et cetera, basically so someone

15   could come into one, be reassigned from one to the other

16   without any undue interruption.

17       The competitive level that he would have been

18   assigned to would be one specific to that position

19   within the accepted service, which would be the AD 0085

20   grade 10 security guard.  And also what you have to

21   consider when doing that is accepted service positions

22   are required to be in separate competitive levels,

23   competitive service, and that's in accordance with 5CFR

24   315-403.

25   **Q    And can you tell us what bump and retreat**

Page 53

1  **rights are accorded an accepted service employee within**

2  **the competitive level?**

3      A    Accepted service employees are not entitled to

4  assignment rights, and that goes along with the 5CFR

5  351-701.  Those assignment rights are limited to

6  competitive service employees in group one and two.

7      **Q    Was Mr. Wilson -- did he have bump and retreat**

8  **rights?**

9      A    No.

10     **Q    And have you reviewed his record with respect**

11 **to veteran's preference?**

12     A    Yes.

13     **Q    And can you tell us what your conclusion is**

14 **with respect to veterans preference as it applies to a**

15 **RIF?**

16     A    Okay.  Upon our review we did look at all the

17 information and he was entitled to veteran's preference

18 for RIF.  It would have been subgroup A, which -- that's

19 just the whole process.  Basically in terms of the RIF

20 it would not have had any effect on the outcome since

21 all positions within that competitive level were

22 abolished and accepted service employees don't have

23 those bump and retreat rights.

24          So they can't go outside of that level, so

25 basically since everyone in the level was separated it

Page 54

1    had no effect.

2    **Q    With respect to -- when a position -- are you**

3    **familiar with the regulatory provision that indicates**

4    **that when an employee -- when a position is first**

5    **assigned to the accepted service if the person is in the**

6    **competitive service they remain in the competitive**

7    **service?**

8    A    Right.  Yes, that's 5CFR 212-401, and

9    basically that portion of the law means when the

10   position itself was first converted over from

11   competitive service over into accepted service, upon our

12   review in Mr. Wilson's case he actually left his prior

13   position and applied and was selected for the new

14   position.  They had already been in the accepted service

15   prior to that action, so it would not apply to that

16   citation.

17                MS. ROY:  I have no further questions.

18                JUDGE COOK:  Just one clarification for me.

19   Are you familiar with the provisions in 5CFR 351 -- I

20   think -501 is competitive and -502 is accepted

21   service -- that restricts veteran's preference a little

22   bit more than the normal definition of preference

23   eligible and if so how did you conclude that Mr. Wilson

24   would have been entitled to veteran's preference based

25   on those regulations, how does he fit?

Page 55

1           THE WITNESS:  Yes, I'm aware that the

2    veteran's preference for RIF is a little more stringent

3    to get -- we actually have a worksheet that goes through

4    them all that we use to determine that.  I have that

5    with me but I don't have it here in the room.

6           JUDGE COOK:  Okay.  Do you recall specifically

7    how Mr. Wilson, off the top of your head, how he would

8    qualify under those limited circumstances?  If you don't

9    remember that's fine.

10          THE WITNESS:  I don't recall without looking

11   at it.

12          JUDGE COOK:  Okay.  Mr. Wilson.

13                    CROSS EXAMINATION

14          BY MR. WILSON:

15   Q    Yes.  What I would like to know, Mr. Brown, is

16   how did you conclude that I transferred for another

17   position?  How did you come to that conclusion?

18   A    Okay.  Based on the review of your official

19   personnel file, there's a notification of personnel

20   action, which is the standard form 50.  And on that 50

21   it has where you went into the accepted service and it

22   has the date, November 25, that you were selected for

23   that position off of the cert number.  And I can't

24   remember what the actual cert number is.

25   Q    But doesn't the law state that whenever your

Page 56

1    position is first taken out of the competitive service

2    and put into the accepted service that you will remain

3    in the competitive service?  It says you will be

4    considered as still being in the competitive service?

5    Isn't that what the law says?

6        A    The law does say that.  On our review it

7    wasn't applicable to your situation.

8        Q    Why not?

9        A    As stated before, that law -- the purpose of

10   that law was when the position itself not you as an

11   individual is first moved from the competitive to the

12   accepted service.

13            The position you were separated from and went

14   into at that time had been in the accepted service prior

15   to the time you entered the position.

16       Q    Well, are you sure that -- is there any reason

17   for you to know?  How do you know that I stayed in the

18   same position?  There is a position in the department

19   that I was in, and are you sure that I did not remain in

20   that position?

21       A    Yes, sir.  On this same action that we

22   referred to before it shows your transfer from the

23   competitive position, which is the GS 0085 grade five

24   position, into the new position in the accepted service.

25       Q    And what position was that?  What position did

Page 57

1    **I transfer into?**

2        A    It was a security guard, but it was the

3    administratively determined 0085 grade 10, which is --

4    they have different PD numbers.  I don't have the

5    numbers memorized.  It was a transition to a new

6    position.

7            MR. WILSON:  I don't have any further

8    questions, Your Honor.

9            JUDGE COOK:  Did you have anything further?

10           MS. ROY:  No.

11           JUDGE COOK:  I'd like to go off the record for

12   a moment, please.

13           (A brief recess was taken.)

14           JUDGE COOK:  Mr. Brown, you're still under

15   oath.  Mr. Brown, I asked you a few questions about

16   veteran's preference as it applies specifically to a RIF

17   situation and the RIF regulations.  You said you brought

18   in what you said is a worksheet.  I won't ask you to put

19   it as an exhibit, but just -- does that refresh your

20   memory in looking at that how you concluded that

21   Mr. Wilson was entitled to veteran's preference for RIF

22   purposes?

23           THE WITNESS:  Yes.

24           JUDGE COOK:  Would you just briefly tell me

25   how you came to that conclusion?

Page 58

1              THE WITNESS:  Basically, upon review of his

2      information, his DD 214, all the relevant information,

3      he was separated from the armed forces with an honorable

4      discharge.  The DD 214 doesn't show that he was retired,

5      so he had a different provision for that

6              And basically he qualifies for the five-point

7      preference for RIF because of his service from

8      February -- in the period February 1, 1955 through

9      October 14, 1976, and he also served during that period

10     for more than 180 consecutive days.

11             JUDGE COOK:  Would it change your mind if he

12     was a regular retired military, not under disability?

13             THE WITNESS:  There is separate requirements

14     for retired versus non-retired military that I would

15     look at.

16             JUDGE COOK:  Okay.  That's all I have.  Do you

17     have any questions based on that, Mr. Wilson?

18             MR. WILSON:  Yes.  Well, I don't know what 214

19     he has because I retired in 1974.

20             JUDGE COOK:  Okay.  We'll clarify that with

21     your testimony.

22             MR. WILSON:  That's good.

23             JUDGE COOK:  Yes, I don't think he can answer

24     anything further.  Based on what I asked him you can ask

25     him more questions.

Page 59

1              MR. WILSON:  No, I have no more questions.

2              JUDGE COOK:  Do you have any more based on

3      mine?

4              MS. ROY:  No.

5              JUDGE COOK:  Okay.  Thank you very much.

6      You're excused.  I appreciate your testimony.  Don't

7      discuss your testimony with anyone until the hearing is

8      completed.  You have a nice day.

9              (The witness was excused.)

10             JUDGE COOK:  Okay.  And who's next?

11             MS. ROY:  Mr. Dickerson.

12             JUDGE COOK:  Mr. Dickerson.  Okay.  We're off

13     the record, right?

14             (A brief recess was taken.)

15             JUDGE COOK:  Would you please step behind the

16     chair for me and raise your right hand?

17     Whereupon,

18                     CHARLES DICKERSON

19     was called as a witness and, having been first duly

20     sworn was examined and testified as follows:

21             JUDGE COOK:  Please be seated.  Please state

22     and spell your full name for us.

23             THE WITNESS:  My name is Charles Dickerson,

24     C-h-a-r-l-e-s  D-i-c-k-e-r-s-o-n.

25             JUDGE COOK:  And what is your present

Page 60

1    position, Mr. Dickerson?

2             THE WITNESS:  I'm the chief of resident

3    services.

4             JUDGE COOK:  Where?

5             THE WITNESS:  Armed Forces Retirement Home in

6    Washington.

7             JUDGE COOK:  Do your duties apply to the

8    entire organization Armed Forces Retirement Home or just

9    Armed Forces Retirement Home Washington?

10            THE WITNESS:  Just in Washington.

11            JUDGE COOK:  Okay.  And how long have you been

12   in that position?

13            THE WITNESS:  Six years.

14            JUDGE COOK:  And are you a competitive service

15   employee?

16            THE WITNESS:  I'm an accepted service.

17            JUDGE COOK:  And what is your grade?

18            THE WITNESS:  I'm -- well, there's no grade

19   assigned to it.  It's assigned a salary based on the

20   COO's -- and the expertise.

21            JUDGE COOK:  Oh, okay.  But you are accepted

22   service?

23            THE WITNESS:  Yes, sir.

24            JUDGE COOK:  Okay.  Ms. Roy.

25   //

Page 61

1                          DIRECT EXAMINATION

2              BY MS. ROY:

3         Q    Are you familiar with the events at the time

4    that Mr. -- you're familiar with this appeal?

5         A    Yes.

6         Q    And you're familiar with the events at the

7    time that Mr. Wilson was terminated?

8         A    Yes, ma'am.

9         Q    And what was your position in relation to

10   Mr. Wilson when he was terminated?

11        A    The chief of resident services.  Well, I was

12   the associate director of resident services at that

13   time.  They just changed my name.

14        Q    And what was your relationship to the security

15   force?

16        A    The security force fell under me for

17   oversight.

18        Q    Okay.  And what is your relationship to the

19   security forces now?

20        A    The same.

21        Q    Are you familiar with the resident employee

22   program?

23        A    Yes.

24        Q    Do you have other -- did you at the time that

25   we had a resident employee program that Mr. Wilson fell

Page 62

1    under, did you have other positions that were resident

2    employees?

3        A    I did.

4        Q    Okay.  And what positions were those?

5        A    I had floor managers, building managers.

6        Q    Okay.  And can you explain the decision to

7    abolish the resident employee program in favor of the

8    stipend program to the best of your knowledge?

9        A    Yes, ma'am.  To the best of my knowledge, at

10   the time there was a decision that was made.  There was

11   a stipend program at Gulfport and we had the resident

12   program in Washington, and it was decided that we would

13   go to the stipend program for our residents.

14       Q    Okay.  And can you describe the security force

15   prior to the abolishment of the resident employee

16   program as Mr. Wilson was employed in it and the

17   security force after that?

18       A    Yes, prior to that, going back to 2002 and

19   2003 I had approximately eight employees that were

20   resident employees.  As we moved along in time in 2004 I

21   went down -- I believe in 2004 I had Mr. Wilson and he

22   was the last resident employee prior to implementing

23   that.

24       Q    Was he the last resident employee in the

25   security force or as a whole?

Page 63

1      A    In the security force.

2           JUDGE COOK:  I'm sorry.  Just one moment.  Do

3    you have any resident employees that work for you now?

4           THE WITNESS:  No, sir.  They're all stipend.

5           JUDGE COOK:  Okay.  And when is your

6    understanding, when was that all ended for all

7    positions, not just security?

8           THE WITNESS:  Sir, that was in 2004, I believe

9    in January or February.

10          JUDGE COOK:  Mr. Wilson was separated January

11   of 2004.  Is it about that same time?

12          THE WITNESS:  It was about that same time,

13   yes.

14          JUDGE COOK:  Okay, good.

15          BY MS. ROY:

16      Q    **Can you describe the security force currently?**

17      A    Yes, I have 15 civil servants and contractors

18   at the gate.

19      Q    **Okay.  And the contractor employees, where do**

20   **they work?**

21      A    At the gate, the monitor the gate, and I have

22   one contractor employee that's at the health center

23   that's on the main desk at the health center at night.

24      Q    **Can you describe immediately afterward the**

25   **security force after Mr. Wilson was terminated?**

Page 64

1      A    Yes, I had 18 civil servants and then I'm down

2   to 15 now.  The security force, the civil servant

3   security force right now is responsible for the inside

4   of the grounds and having contact with the residents and

5   then sometimes they stay in the gate when they need help

6   for the contract.

7           MS. ROY:  I have no further questions.

8           JUDGE COOK:  Clarification, when you say prior

9   to the abolishment of all the resident employee

10  positions, how many regular civil service non-resident

11  employees did you have in the security services?

12          THE WITNESS:  Can I reference some notes?

13          JUDGE COOK:  That's not a problem.

14          THE WITNESS:  That would be great, yes.  In

15  2001, 2002 I had 26 assigned GS and eight resident

16  employees.  November 2003 I had a total of 18 assigned.

17   That was 17 civil service and one AN resident employee;

18  that was Mr. Wilson.  In October of 2004, I had 15

19  assigned civil servants.

20          JUDGE COOK:  And residents were gone?

21          THE WITNESS:  Correct.

22          JUDGE COOK:  Okay.

23          THE WITNESS:  I had a stipend employee.

24          JUDGE COOK:  Got you.  Okay.  In your duties

25  as chief of residence services what comes under your

Page 65

1    supervision other than security?  I have an idea, but

2    just for the record, what are you responsible for, what

3    services at the Armed Forces Retirement Home?

4              THE WITNESS:  Recreation, dining facilities,

5    the admissions process for the home and the security.

6    And then all of the residents in the independent living

7    side fall under my responsibility.

8              JUDGE COOK:  Okay.  And when this decision was

9    made to eliminate the resident employees did you have

10   any discussions with Mr. Cox, the COO?

11             THE WITNESS:  Actually, the decision was made

12   and I was told to implement the decision so there was

13   no -- I had no meetings with Mr. Cox, per se, that I can

14   remember about the whole -- I was normally dealing with

15   the HR section.

16             JUDGE COOK:  Do you recall Mr. Cox ever making

17   an announcement about it?

18             THE WITNESS:  Yes, sir.

19             JUDGE COOK:  Okay.  And what was the context

20   there?

21             THE WITNESS:  That the decision was made based

22   on the organization that we ran, the one total

23   organization.  That decision was made to go to the

24   stipend program for both homes to make it equitable

25   across the board, which he was being directed to do.

Page 66

1          JUDGE COOK:  Do you recall that being

2    something in writing that he sent out or did -- you call

3    it a joint, kind of a staff meeting, or do you have any

4    recollection of that?

5          THE WITNESS:  I believe it was at a town hall

6    meeting, but that's -- I can't really remember.  It's

7    pretty vague.  We were doing a lot of stuff during that

8    time.

9          JUDGE COOK:  Okay.  Mr. Wilson.

10                   CROSS EXAMINATION

11          BY MR. WILSON:

12      Q    Mr. Dickerson, you're saying that Mr. Cox, he

13    didn't put out any formal document saying that he was

14    going to abolish all the positions?

15      A    I'm not saying he didn't.  I'm saying I don't

16    remember.

17      Q    You don't know of any?

18      A    I don't remember.

19      Q    Okay.  Did the chief of security report

20    directly to you?

21      A    Yes.

22      Q    Did he ever report to you that the older

23    residents were sleeping on duty and not doing their

24    jobs?

25      A    No, not that the older residents were sleeping

Page 67

1    on duty, no.

2         Q    Right.  That's the question.

3         From your knowledge of the residents and the GS

4    guards, can you think of any reason why it would be

5    better to have a GS guard on the gate when the military

6    was using the grounds up there, you know, when they

7    brought the missiles up there, right by your house?  Was

8    there any reason why it would be better to have a GS

9    guard on the gate than a resident guard?

10        A    No.  The missile, the folks that were bringing

11   the missiles had their own security for those missiles,

12   so --

13        Q    Now, okay.  Good.  That's a good answer.

14   Presently, do the GS guards sometimes work on the gate?

15        A    Yes.

16        Q    So the gate is not -- I'll let you answer the

17   question, but just to rephrase it, the guards on the

18   gate are not exclusively contract guards, is that right?

19        A    No, the guards on the gate, I have --

20   contractors are on the gate, and that's their exclusive

21   position is on the gate.  I have one contractor down at

22   the King Health Center that monitors the main desk at

23   King Health Center at night.

24             JUDGE COOK:  As I understand your testimony

25   then, the one contractor other than the position at the

Page 68

1    desk -- the contract employees work the gate?

2            THE WITNESS:  Yes, sir.

3            JUDGE COOK:  But there also are some GS

4    security that sometimes are on the gate?

5            THE WITNESS:  Yes, sir.

6            JUDGE COOK:  Is that a regular basis or as

7    needed or what --

8            THE WITNESS:  As needed.  You know, if they're

9    on patrol at the night they'll stop by the gate.  And

10   sometimes I have -- if I have a high influx of traffic

11   coming into the gate, then they'll go assist the gate to

12   make sure that I keep the flow of traffic coming

13   through.

14           JUDGE COOK:  Okay.  I guess what I understand

15   you're testifying then is that you wouldn't say these

16   other security people were actually going to be assigned

17   to be a gate guard.  It's just as your needs require you

18   feel you need to use your resources and you move them

19   over there when needs be?

20           THE WITNESS:  That's correct.

21           JUDGE COOK:  Okay.  I understand.  Any

22   questions based on mine?

23           MS. ROY:  No, but I did have one other

24   question.

25           JUDGE COOK:  Okay.  And Mr. Wilson, based on

Page 69

1    mine -- you still were going.  I'm sorry.

2              MR. WILSON:  No, I didn't --

3              BY MR. WILSON:

4         Q    **Did you make the decision to eliminate the**

5    **resident employee program?**

6         A    No.

7              MR. WILSON:  Okay.  Your Honor, I just want to

8    show Mr. Dickerson this statement by Ms. Essex.

9              JUDGE COOK:  Okay.  What tab?

10             MR. WILSON:  I'll find it.  Oh, right to it.

11   On page 79 on Ms. Roy --

12             JUDGE COOK:  What tab?

13             MR. WILSON:  It's point 10, tab 10.

14             JUDGE COOK:  Tab 10, 79.  Okay, the first

15   affidavit?

16             MR. WILSON:  Yes, sir.  Ms. Essex's testimony.

17             JUDGE COOK:  Do you want him to read this and

18   then answer a question about it?

19             MR. WILSON:  Yes.

20             JUDGE COOK:  Okay.  Let him look at it.  Give

21   him a chance to look at it and then you can ask him a

22   question.

23             We're at agency --

24             MR. WILSON:  Right here, resident employees

25   and all employees -- program instituted for residents

Page 70

1    who wanted to work.  Okay, and this one here is not --

2    resident employees are not covered by reduction in

3    force, RIF, guidelines.

4            BY MR. WILSON:

5        Q    **The decision was made by the resident service**

6    **director, is that true?**

7        A    Okay.  The decision was made by Mr. Cox based

8    on most efficient reasons.

9            JUDGE COOK:  Before you go on, hold on just a

10    second, Mr. Wilson.  I want to make sure I got this.

11            Okay, go ahead Mr. Wilson.  Thank you.  Go

12    ahead.

13            MR. WILSON:  I don't have any more questions

14    for Mr. Dickerson, Your Honor.

15            JUDGE COOK:  Thank you, Mr. Wilson.

16            You said you had a follow up.  Go ahead.

17                    REDIRECT EXAMINATION

18            BY MS. ROY:

19        Q    **What are the ages of the security force now?**

20    **Do you have any idea?**

21        A    The ages of the security force now range

22    anywhere from between 25 to 70 years old.

23            MS. ROY:  Okay.  I have no further questions.

24            JUDGE COOK:  And when you say security force

25    you're talking about the GS employees?

Page 71

1              THE WITNESS:  Yes, sir.

2              JUDGE COOK:  Thank you very much.  Appreciate

3    your testimony.  You're excused.  You have a good day.

4    Do not discuss your testimony with anyone until the

5    hearing is over.

6              THE WITNESS:  Yes, sir.

7              JUDGE COOK:  Thank you.

8              THE WITNESS:  Thank you.

9              (The witness was excused.)

10             JUDGE COOK:  Okay.  Let's go off the record.

11             (A brief recess was taken.)

12             JUDGE COOK:  Mr. Rodriguez?

13             MR. RODRIGUEZ:  Yes, sir.

14             JUDGE COOK:  Hi, I'm Judge Cook.  Would you

15   please stand behind the chair for me.

16             MR. RODRIGUEZ:  Sure.

17             JUDGE COOK:  Please raise your right hand

18   Whereupon,

19                     RUBEN RODRIGUEZ

20   was called as a witness and, having been first duly

21   sworn, was examined and testified as follows:

22             JUDGE COOK:  Please be seated.

23             THE WITNESS:  Thank you.

24             JUDGE COOK:  Please state and spell your full

25   name for me.

Page 72

1            THE WITNESS:  Ruben, R-u-b-e-n, D, as in

2   David, Rodriguez, R-o-d-r-i-g-u-e-z.

3            JUDGE COOK:  And what's your position,

4   Mr. Rodriguez?

5            THE WITNESS:  Personally, I am a security

6   officer.

7            JUDGE COOK:  Are you a civilian employee of

8   the government or do you work for a private contractor?

9            THE WITNESS:  Civilian employee of the

10   government, GS-5.

11            JUDGE COOK:  And where do you work?

12            THE WITNESS:  The Armed Forces Retirement Home

13   security and investigations division.  Do you need the

14   address for it?

15            JUDGE COOK:  No, got that.  Is Mr. Dickerson

16   your boss?

17            THE WITNESS:  He is general command, not my

18   immediate boss.

19            JUDGE COOK:  Okay.  He's up the chain a little

20   bit?

21            THE WITNESS:  Right.

22            JUDGE COOK:  Who do you report to directly?

23            THE WITNESS:  In the absence of the chief of

24   security I would report to him, in his absence.

25            JUDGE COOK:  Okay.  But who is the chief of

Page 73

1  security then?

2          THE WITNESS:  Right now, just been assigned to

3  be Mr. Johnathan Greenstein.  Just recently I was the

4  acting chief of security, which then I would report to

5  Mr. Dickerson, just recently.

6          JUDGE COOK:  Got you.  How long have you

7  worked at the Armed Forces Retirement Home?

8          THE WITNESS:  On and off, about 15 years or

9  so, on and off.  I retired and I was asked to come back

10  and give them a hand.

11          JUDGE COOK:  Okay.  Were you ever employed

12  under the resident employee program?

13          THE WITNESS:  Yes, I was.

14          JUDGE COOK:  For what years?

15          THE WITNESS:  When I first got to the home in

16  about 1990 to about 1996 or so, I imagine, I don't have

17  the exact dates, I was a resident employee.

18          JUDGE COOK:  Okay.  And then what happened in

19  '96?

20          THE WITNESS:  Oh, there was a process of -- I

21  was going to leave, actually, and I was offered a job as

22  a civilian employee, so I took a job as civilian

23  employee.

24          JUDGE COOK:  And were you still a resident of

25  the Armed Forces Retirement Home?

Page 74

1            THE WITNESS:  No, once I became a civilian

2    employee I was not authorized to be a resident any

3    longer.

4            JUDGE COOK:  And you say that, you

5    recollection is it's about 1996, something like that?

6            THE WITNESS:  I'm guessing.  I did not know

7    that was going to come up.

8            JUDGE COOK:  Roughly?

9            THE WITNESS:  Roughly 1996, maybe later.

10            JUDGE COOK:  Okay.  I understand.

11       Mr. Wilson, you called him.  You get to

12    question him first.

13                    DIRECT EXAMINATION

14       BY MR. WILSON:

15       Q    Mr. Rodriguez, going back to the question we

16    went over the other day, did the security investigation

17    division have some position for civil service guards and

18    some for resident guards or did they just work all -- do

19    the same job?

20       A    We all did the same job.

21       Q    Okay.  Did you have some resident employees

22    who were in supervisory positions from time to time?

23       A    Yes.

24       Q    Okay.  Was the appellant, myself, Theodore

25    Wilson, was my position categorized any different from

Page 75

1    **any of the other civil service guards or resident**

2    **guards?**

3        A    Yes, they did the same duties.  Categorized --

4    we had resident employees and we had GS employees.

5        **Q    Right, but myself, was mine different from the**

6    **other resident guards or -- civil service -- my --**

7        A    If I may go back over it.  I mean not go back,

8    but I believe you started out as a GS employee first.

9    And then you resigned from that position and became a

10   resident and then became a resident employee who did the

11   same stuff.

12           JUDGE COOK:  Before you go on, Mr. Wilson, one

13   clarification.

14           You said you were a GS-5 security guard.  Is

15   that your official title, position?

16           THE WITNESS:  Right now it is, yes.

17           JUDGE COOK:  And is that competitive service

18   or accepted service or do you know?

19           THE WITNESS:  It is accepted service, I

20   believe.

21           JUDGE COOK:  If you don't know, that's fine.

22           THE WITNESS:  I am not an expert in that.

23           MR. WILSON:  I think he's in competitive

24   service, Your Honor.

25           JUDGE COOK:  Can I just -- you're not

Page 76

1  testifying right now.  I just want to know what he knew.

2   Go ahead.

3           MR. WILSON:  Okay, sorry, Your Honor.

4           BY MR. WILSON:

5      Q    Okay.  Did the security and investigations

6   division there have a designated position?  Was there,

7   within the civil service guards, the resident guards,

8   was there any such thing as a gate guard in that,

9   like --

10     A    We had no gate guard.  All the guards did.

11  They took turns at the gate and took turns patrolling

12  and took turns investigating, whatever had to be done.

13     Q    Okay.  When you were in the position as the

14  operations sergeant, which is what you occupied the

15  whole time I was in the security department and you were

16  there --

17     A    Yes, I did.

18     Q    -- did you ever have any report that the --

19  have occasion to report to chief of police or do you

20  know of any occasion on which he reported to his boss or

21  to any higher authority that the guards were not doing

22  their jobs, the older guards were not doing their jobs?

23     A    This is kind of hard to answer in so far that

24  through my office and up the chain there were occasions

25  where people were accused of -- but that didn't mean

Page 77

1    they were older or younger.  It was just --

2       Q    Okay.  Well, specifically the older guards not

3    doing their jobs?

4       A    No, sir, not specifically that I can recall.

5       Q    Okay.  What about sleeping on duty?  Was there

6    a case that reports that the older guards collectively,

7    that there was a problem with the older guards sleeping

8    on duty?

9       A    No, specifically no.  I don't recall.

10      Q    Okay.  Now do you know of any reason why when

11   the military was using the home grounds to put their

12   missiles up there on the hill by -- statutory circle up

13   there or whatever they call that where GEN Scott's

14   statue is, was there any reason why it would be better

15   not to have resident guards on the gate?

16      A    I don't know that.  I wouldn't know.

17      Q    Okay.  Good.

18           MR. WILSON:  I don't have any further

19   questions.

20           JUDGE COOK:  Go ahead.

21                      CROSS EXAMINATION

22           BY MS. ROY:

23      Q    Sir, can you state your age for the record?

24      A    My age?  I'll be 69 on the 4th of July.  I

25   mean I'll be 70 on the 4th of July, correct.

Page 78

1       Q     Oh, 70.  Okay, I have no further questions.

2              JUDGE COOK:  Thank you very much for your

3    testimony, sir.  I appreciate it.  Don't discuss your

4    testimony with anyone until the hearing is over and have

5    a good day.  Thanks very much.

6              THE WITNESS:  Thank you very much.

7              JUDGE COOK:  You're excused.

8              (The witness was excused.)

9              JUDGE COOK:  Okay.  We're off the record.

10             (A brief recess was taken.)

11             JUDGE COOK:  Mr. Wilson, come up to the

12   witness stand please and raise your right hand for us.

13   Whereupon,

14                      THEODORE WILSON

15   was called as a witness and, having been first duly

16   sworn, was examined and testified as follows:

17             JUDGE COOK:  Please be seated.

18             As we were talking, Mr. Wilson, this is your

19   opportunity to tell me what you want me to know.  If you

20   want to refer me to any records and documents you can

21   certainly point that out.  I'd appreciate it if you make

22   specific designation like at a tab or something.  And if

23   you want to say something about any other witness

24   testimony this is your time to do that also.

25             And then when you're done, I may have a

Page 79

1   question and then Ms. Roy will question you.  But go

2   ahead.  It's your time.

3                       DIRECT STATEMENT

4            THE WITNESS:  Your Honor, I was in the

5   accepted, I was a GS-5 -- first thing, let's go back to

6   my history, my military history.  You wanted to know

7   about that.

8            JUDGE COOK:  Yes, tell me about that.

9            THE WITNESS:  In 1950 I enlisted in the United

10  States Air Force on September 8.  That's 1950, I

11  enlisted in the United States Air Force and the Korean

12  War just getting under full swing.

13           About that time they were running pictures of

14  the American soldiers having their hands tied behind

15  them over in Korea and being shot by the North Koreans.

16  And I think that eventually the Chinese came into the

17  war and that stopped.  But anyway, that's the time I

18  enlisted in the service.

19           I stayed in the Air Force from 1950 to 1965.  I

20  got out and joined the Army.  I wanted to be a Green

21  Beret.

22           JUDGE COOK:  Did you have a break in service

23  or did you just move over?

24           THE WITNESS:  I had a break in service, sir.

25  Actually, I had a one-day break in service on

Page 80

1   September 8, 1954, one day.  I was out one day and

2   then -- so I stayed in from September 9, 1954 until

3   April 8, 1965.

4              I did fourteen years and eight months in the

5   Air Force; I got out.  I got out of the Air Force, I

6   intended to join the Army and become a Green Beret.  And

7   I joined the Army I think on July 22, 1965 and I retired

8   from the Army on July 1, 1974.  So I got 23-and-a-half

9   years of military service for pay purposes.

10             Throughout that whole time in the Air Force --

11  after I completed basic training I was an air policeman,

12  a military policeman for the Air Force, in other words.

13   They called us air policemen then.

14             When I got into the Army I became a military

15  policeman.  They sent me out of basic training, was

16  going to make me a chemical equipment repair specialist,

17  but when I got to my first duty station they say, well,

18  the Army let you enlist as a specialist fourth class, so

19  you're going to have to be an MP," and so I became an MP

20  again.

21             I stayed an MP for -- up until -- from 1965.

22  I went to Vietnam, stayed 16 months, came back.  And I

23  couldn't get promoted. I was a buck sergeant, couldn't

24  get promoted, and I got out and became a decontamination

25  specialist because I was -- in Maryland and they seemed

Page 81

1    to promote everybody, they tried to promote everybody

2    they could see.  So I jumped out of there and I got over

3    into the chemical MOS.

4              JUDGE COOK:  What year was that?

5              THE WITNESS:  1968.

6              JUDGE COOK:  Okay.

7              THE WITNESS:  Went to chemical technical

8    escort school.  That's where you learn how to nerve gas

9    and biological agents and explosives and chemical agents

10   around the world and maybe nuclear stuff, too.

11             But anyway -- and I came out of that and

12   stayed in the middle of -- I was out there by July '68

13   around about December.  They got a vacancy over in

14   the -- company for promotion.  And so I went for the

15   promotion board and I got the other contestant out and I

16   got promoted -- on the list for promotions.

17             JUDGE COOK:  You became an E6?

18             THE WITNESS:  I was an E6 there, sir.

19             JUDGE COOK:  You were already an E6?

20             THE WITNESS:  I'm sorry.  When I got over

21   there in about July of '68 they promoted me in December.

22    Like I say, the promoted everybody they could see, so

23   they got me.  So then I got a staff sergeant.  And then

24   about six months later, round about July maybe of '69,

25   this promotion comes up, vacancy comes up for a platoon

Page 82

1  sergeant over the -- MPs platoon.  And I went before the

2  promotion board and I got selected for promotion.

3          And meanwhile they sent us over the Okinawa on

4  Project Red -- and while I was over there, on the first

5  day of my twentieth year of service I got my orders

6  promoting me to sergeant first class, and that's what I

7  retired as maybe five years later, in '74.

8          JUDGE COOK:  Okay.  Before you go on, let me

9  ask you this.  With the discussions that we've had and

10  my comments and my summaries to you, have you had a

11  chance to look over the RIF regulations about preference

12  eligibility and veteran's preference?

13          THE WITNESS:  Yes, sir.  I did.

14          JUDGE COOK:  And what is your view of that?

15  Do you feel you fit those standards or because of your

16  retirement do you think maybe you don't?  What's your

17  opinion?

18          THE WITNESS:  I do not, sir.  I'm over

19  20 years service.  According to that, I think it's 351-

20  501.

21          JUDGE COOK:  Okay.

22          THE WITNESS:  And it says that I'm not a

23  preference eligibility because I retired with over 20

24  years of service.

25          JUDGE COOK:  And it's not based on disability?

Page 83

1          THE WITNESS:  And I don't have -- I'm not

2    30 percent disabled.

3          JUDGE COOK:  Right, your pay is not based on

4    that.

5          THE WITNESS:  Not based on disability.

6          JUDGE COOK:  And you don't have a

7    combat-inflicted wound of some sort or anything like

8    that?

9          THE WITNESS:  I have such a thing, sir, but

10   I'm not getting paid for it.  I have such a thing, but

11   I'm not getting paid for it.  It's not really -- like my

12   friend right there has three Purple Hearts, shot three

13   times and jumped out of an airplane 1,868 times as a

14   parachutist, but I don't have that kind of --

15         JUDGE COOK:  I understand.  I appreciate your

16   candor, and I would just -- I understand that you --

17         THE WITNESS:  Thank you.

18         JUDGE COOK:  Okay.  Go on to what you wanted

19   to tell me.  I appreciate your background.

20         THE WITNESS:  Well, the agency -- first thing

21   that the agency did was -- and I was in the competitive

22   service.  When I went to come into the home to live -- I

23   see that document I signed right there, but I don't have

24   any knowledge about whether or not I'm signing something

25   about -- signing away my rights or anything.  They just

Page 84

1   told me to sign the thing because I was coming into the

2   home to be a resident there.

3        Now meanwhile the home had a pamphlet they

4   sent out to the people, potential residents -- which I

5   had one, and I had just gotten mine.  I knew a person

6   who got his as late as the middle of 2003 at the same

7   time that Mr. Cox is writing to the residents telling us

8   he's going to -- a job, and this thing says that -- the

9   brochure from the soldiers' home is telling the

10  residents if they come to the home they can work and

11  that their jobs will be published in -- all they have to

12  do is go to personnel and apply for them.  This is this

13  brochure the home was putting out at that time.

14       So there's no reason for me to believe that

15  I'm going to into that home there and be told that I'm

16  going to lose my job.  And I don't think the home -- I

17  think the home had an obligation to publish a RIF

18  document and formally announce it was going to do a RIF.

19       And with that reorganization that Mr. Cox

20  did -- if he was going to do a reorganization he was

21  supposed to publish a formal reorganization document.  I

22  think it's title 5903, that he's supposed to do a

23  reorganization document.  He didn't do any of that

24  stuff, and he's talking about he abolished the positions

25  of the residents up there.  Well, he did not abolish the

Page 85

1    position that I held.

2            When I left out of that position on the 3rd of

3    January -- now one of the residents -- I beg your

4    pardon, not residents, one of the civil service

5    employees, a GS-12, Mr. Lorenzo Clark, came into the

6    department of security and investigations on the

7    fifteenth of January, and I believe that Mr. Jenkins --

8    his name is Lorenzo Clark.  Mr. William Jenkins came

9    right along with him, and Mr. Robert Thompson came in

10   right behind them or right with them, too.  There's

11   three of them that came in there right behind me.

12           Now Mr. Clark, if they had done a RIF -- and I

13   was entitled to be a RIF -- Mr. Clark is not eligible

14   under any circumstance to take my place in that security

15   department because he was a GS-12.  Mr. Thompson was not

16   eligible to take my place unless he was a -- because he

17   was a GS-9 unless he had that 30 percent disability, he

18   was a 30-percent disabled veteran.

19           Mr. Jenkins, I believe, was a wage board

20   employee and he was being paid $22 an hour.  So I hardly

21   believe that he was eligible to take it.  But in any

22   case, all three of those employees went into the

23   security and investigations division, which they call

24   the security department there.  At the soldiers' home

25   they call it the security investigations division.  And

Page 86

1    all three of them went in there immediately after I came

2    out.

3            So the position was not abolished.  That is

4    what I want to say about it.

5            JUDGE COOK:  This is in January time frame of

6    2004?

7            THE WITNESS:  Yes, sir.  They came in there in

8    January 2004, immediately after I came out.  I came out.

9     They came in.

10           JUDGE COOK:  You've remained a resident, is

11    that right?

12           THE WITNESS:  Yes, sir.  I'm still a resident

13    today.

14           JUDGE COOK:  Okay.

15           THE WITNESS:  I lost my train of thought.

16           JUDGE COOK:  I'm sorry to interrupt you.  You

17    had just finished telling me that you thought they

18    didn't abolish the position.

19           THE WITNESS:  Right, right.  Okay.  Mr. Cox

20    .had made these statements about -- number one, it was

21    better not to have a resident on the gate during periods

22    of heightened security.  So in other words, he's saying

23    that the residents aren't doing as good a job of

24    security as the GS employees.

25           Or, heaven forbid, those contract guards down

Page 87

1    there -- now I had an incident that I was down there at

2    the gate about -- probably a year ago, and someone came

3    up trying to get directions to the VA hospital down

4    there.  And there's these two contract guards there and

5    a supervisor.  And the two contract guards, the guards

6    couldn't even offer to give the person directions to the

7    VA hospital.

8            And the thing about the VA hospital, it's

9    like -- they were right -- say this pad is the soldiers'

10   home, and they are right here, and what the person has

11   got to do is go up here and turn and come down here, and

12   go down here and make a turn and come into the VA

13   hospital.  It's right on the other end of the soldiers'

14   home, and they couldn't even give those directions.

15           And so there's no -- and I'm a retired

16   military MP.  I have run MP outfits.  At that time when

17   I told you I got promoted to platoon sergeant, I was the

18   platoon sergeant of a separate platoon, and so I -- and

19   I would fire that supervisor if I had been there because

20   he didn't give -- the directions he gave was to go down

21   to Michigan Avenue, which is, you turn off before you

22   get there to get to the VA hospital.  Anyway, that's

23   just an example of the kind of work they did, the

24   residents -- I mean, those contract guards down there.

25           When I'm on the gate down there I give the

Page 88

1   kind of signal, hand signal for a person to come through

2   the gate that the MP gives like this right here, and I

3   put my hand up there and give the person this kind of

4   signal here, which is quite beneficial if you are in the

5   dark or in the near dark.  Like there was one time there

6   for about a quarter of a mile there -- maybe not a

7   quarter of a mile, let's say about an eighth of a mile.

8    There's only one light between the buildings and the

9   gate down there, so people have a hard time seeing your

10  signal.

11          In the meantime, some of those contract guards

12  are putting their hand up and giving this kind of a

13  signal.  Another thing is, if I'm on the gate down there

14  and a resident -- someone comes and inquires about a

15  resident, well, I'm familiar with a great number of

16  residents, so I know where they are and can tell them

17  where -- you know, in fact, I've had people come up

18  there, and I tell them, well, he's gone.

19      And then so I know how the home is run, and I know

20  the history of the home.  For instance, when Mr. Cox was

21  giving his testimony today he said something about how

22  GEN Scott had gotten the money for the home in 1850.

23  Actually it was in 1847 when he went into Mexico City

24  there and charged them the money not to -- he said in

25  lieu of pillage, but what he meant was not let the

Page 89

1    troops loot the city, and so on.  So I know probably a

2    lot about that.

3          Now another thing that comes up here that he

4    mentioned about is we're doing this thing here --

5    talking about why he had to make us pay.  Well, the

6    thing about that is -- there's two things that I want to

7    say about that.

8          Number one, here in 1957 there's this colonel

9    who had been deputy director of the home there wrote

10   this book called United States Soldiers' and Airmen's

11   Home, and he felt like the reason they had not initiated

12   this stipend program in his -- if you look on page 200

13   and 201 on that book there, the reason they had not done

14   the stipend program for the soldiers' home was because

15   the soldiers' home, the money for the soldiers' home was

16   paid for by the soldiers, that money, the $150,000 that

17   GEN Scott got from Mexico down there, and the money for

18   the Navy home was appropriated for it.

19          And he said he felt like the soldiers

20   shouldn't have to buy the home and then pay for it, too.

21    So -- I need a minute.

22          JUDGE COOK:  Sure.

23          THE WITNESS:  Well, I guess I'll have to skip

24   it.  So I think that the other things that I -- now

25   Mr. Cox, getting back to his testimony -- let's go for

Page 90

1    Ms. Essex's testimony here, the part where she said --

2              JUDGE COOK:  The affidavit?

3              THE WITNESS:  Yes, the affidavit.  She's

4    saying that this decision was made at resident services,

5    but what is really going on and what I think is really

6    going on when she makes that statement is she's covering

7    up or telling this -- fabricating why it is that all

8    those -- that my SF 50 said that I resigned.

9              See, they put on there that I resigned.  And

10   then they waited.  They put on the SF 50 that I resigned

11   and then they waited over 30 days before they even gave

12   it to me just in case I did want to protest.

13             And so he's not telling the truth.  And here

14   is Mr. Fowler here.  He was the director of personnel.

15   When he made that -- his affidavit out -- he's director

16   of personnel.  He's telling the investigators that he

17   doesn't have any firsthand information about how it is

18   that I lost my job.  Well, how could he be the director

19   of personnel and not have any firsthand information,

20   specific firsthand information.  He's got to have

21   firsthand information if he's director of personnel, if

22   he's even there.  He's got to know how I lost my job,

23   but he said he didn't.

24             Now let's go -- Mr. Cox, he states that

25   Congress mandated that our home be operated on a model

1    of others.  I don't know how you got that information

2    there, that law there.  The United States code 24-411

3    talks about running the home.  It says the two homes

4    will be run as -- I'm not sure how it's phrased in

5    there, but separate administrative entities is what it

6    says.

7            So he feels like that told him to eliminate

8    the paper for the employees, and of course the only way

9    that he could save money by that -- there's another

10   document in there.  And I'll -- if you need to see it,

11   I'll show you.  It says that the stipend -- that the

12   paying residents is through the GS employees.  And there

13   were probably more than there was then, but they were

14   saving half a million dollars a year by doing that.

15           So how -- there's one way for him to save

16   money then, in my estimation, and that is to force these

17   old employees like myself and Mr. Victor if we want to

18   work to -- and some of them don't have any income, so

19   they want to get into the stipend program and do all

20   this work for $120 a month.  So the only rate he can do

21   it at is to force them to work for that $120 a month

22   because you can save money that way.  I guess -- I mean

23   so could General Motors save money if they could have a

24   way to force people to work for $120 a month and work

25   them for, say, 100 hours a month.

Page 92

1          So it's not -- but I think that what he did

2     might be legal, but I don't think it's very moral in my

3     estimation.  And also he made these statements about the

4     employees not doing -- like I say, the older workers not

5     doing their jobs.  He told --

6          MS. ROY:  I'd like to object to that, the term

7     'older workers.'

8          JUDGE COOK:  Overruled.  Go ahead, Mr. Wilson.

9          THE WITNESS:  He made a statement about the

10    older workers not doing their jobs and sleeping on duty,

11    which was really not true.  The older workers were doing

12    their job.

13         Now I questioned Mr. Rodriguez whatever day

14    that was that we did it, maybe Monday.  I found out that

15    he didn't want to say anything against the home.  But

16    when I -- this issue came up about me and that worker,

17    that -- that I was forward with on the gate down there

18    and Mr. Cox tried to fire me, which -- by the way, he

19    was the person who wanted to fire me and his statement

20    says that he saved my job.

21         And I really wanted to ask Mr. Dickerson about

22    that, but I really forgot.  But anyway -- okay, anyway,

23    when Mr. Cox made that -- make those statements about

24    the guards, all of the guards not doing their jobs on

25    the gate down there -- made those statements.  He made

Page 93

1    the statement about that I was a gate guard and my

2    position was categorized differently.  That was not

3    true.  He made a statement about it was better to have

4    the GS guard working on the gate than the resident

5    guards.

6           These are just statements that he's making

7    about the age of the employees, the older employees

8    aren't doing their jobs, which really wasn't true.  But

9    he was trying to justify his removing them.  And I felt

10   like that he removed us unlawfully, that he didn't have

11   the -- and I guess I should be saying this in my final

12   statement, so I'll save that for that.

13          But what I want to say is it seems like to me,

14   just to me as a witness here, that it's almost like a

15   conspiracy to explain away the firing of the residents

16   here, like Mr. Brock not giving -- when the EEO

17   investigators come by, he doesn't give any evidence,

18   Ms. Essex gives false evidence and Mr. Cox gives false

19   evidence.  And it seems like there's a conspiracy.

20          I happen to know the day that I put my EEO

21   complaint in we -- Mr. Victor and our friends, we play

22   pinochle now; I'm in the same building I'm in.  It just

23   happened that at 5:00 that day I left out of there and

24   there's all these cars out there, no one has gone home.

25   Mr. Fowler, Mr. Cox, Ms. Essex and Mr. Blackwell, I

Page 94

1    mean their cars were still there, I know.  And so I

2    figure they were figuring out how they were going to

3    field this problem they got, me.

4            Now they -- and then I think that this is the

5    meeting -- another thing -- I may not be -- I forgot all

6    about it, is those two -- what do you call them there?

7    Exhibits, A and B.  You got these two exhibits and these

8    two EEO documents there, one from Mr. Cox and one from

9    CPT Ulmer.  Now the one from Mr. Cox, I don't know

10   that -- it's only posted in two buildings.  It's not

11   posted on -- there's a main building up there, the one

12   that I live in; that's probably 500 people living in

13   that building.  Let's say 400.  There's another one over

14   there; there's another 400 living in there.

15           That document, that EEO document signed by

16   Mr. Cox for 2003 is nowhere in that building.  It's

17   nowhere in my building.  It's not even in the --

18   building.

19           Can I show you this on the map, Your Honor?

20           JUDGE COOK:  Sir, you can just tell me.

21           THE WITNESS:  Okay.  There's a building down

22   there, the -- building.  This building has been vacated

23   for about a year.  There's one posted in there.

24           JUDGE COOK:  Okay.

25           THE WITNESS:  But I couldn't find these

Page 95

1    documents when I was going through these things back in

2    2004 and 2005.  And he didn't post -- the one signed by

3    Mr. Cox in 2003 is dated May 30, 2003; you can't find it

4    anywhere in any of these buildings, okay.

5           You go back to the one from CPT Ulmer, it's

6    dated April 16, 2004.  The thing about that one is that

7    it's identical to the one that CPT Smith signed on

8    January 8, 2003.  It's identical, word for word, except

9    for the signature block.

10          But the thing about it is it tells you if you

11   got a complaint you still take that complaint down to

12   the administrative building with the EEO worker down

13   there when the -- at that time, I had already made my

14   complaint up to those two up there in West Virginia who

15   was handling the EEO matters for the soldiers' home.

16          And so I think I've said too much, as a matter

17   of fact, Your Honor.

18          JUDGE COOK:  Okay.  I appreciate your

19   comments.

20          Did you have any questions?

21          MS. ROY:  No.

22          JUDGE COOK:  Okay, Mr. Wilson, you can resume

23   your seat.  And Ms. Roy can go first, brief comment, and

24   this will be -- I'll refer to them as closing

25   statements.

Page 96

1          (The witness was excused.)

2                AGENCY CLOSING STATEMENT

3          MS. ROY:  The agency acknowledges that for the

4    position that Mr. Wilson occupied that they should have

5    followed RIF procedures and that they should have

6    conducted a RIF.  The agency further acknowledges that

7    the agency did not give Mr. Wilson his appeal rights to

8    the Merit Systems Protection Board following his

9    termination.

10         The agency however believes that it has

11   presented bona fide reasons for having abolished the

12   resident employee program.  That program was replaced by

13   the resident stipend program.  Therefore, with respect

14   to the appellant's comments that residents can't work,

15   they can work through the resident -- the stipend

16   program.

17         In addition, the agency believes that had it

18   conducted a RIF in accordance with the RIF regulations

19   for accepted service employees that as Mr. Brown

20   testified the result would not have been different since

21   Mr. Wilson was an accepted service employee.

22         Resident employees were schedule A under the

23   OPM consolidated list of exceptions to the competitive

24   service.  Resident employees were accepted service

25   employees.  All resident employees were accepted service

Page 97

```
 1   employees.  All resident employee positions, as it
 2   operated at the home, were abolished and replaced by the
 3   stipend program, therefore there were -- the agency had
 4   no obligation to provide bump and retreat rights or
 5   assignment rights, and even had the agency provided
 6   assignment rights that since the entire competitive
 7   level was abolished that Mr. Wilson's position would
 8   have been abolished and he would not have had assignment
 9   rights to any other position.
10            The evidence indicates, and I believe
11   Mr. Wilson has admitted that he signed a resignation
12   dated November 2002 upon his becoming a resident of the
13   home.
14            The agency would submit that there was no --
15   there is no evidence of discrimination based on age,
16   that the current security force is made up of
17   individuals whose ages -- and we had one testify here
18   today, age 70, about to turn age 70.
19            The agency acknowledges that Mr. Wilson had a
20   long and honorable record with the military and his
21   qualifications for the position were really not at
22   issue.  What was at issue was Mr. Cox's job to run the
23   home in a more efficient and financially stable manner
24   following Inspector General reports that indicated that
25   the home was suffering financially.
```

Diversified Reporting Services
202-467-9200

Page 98

1          And I believe the agency has shown that -- as

2    I said, the agency acknowledges that it should have

3    followed RIF procedures but the agency also I believe

4    has shown that had they followed those procedures the

5    result would not have been different.

6          Thank you.

7          JUDGE COOK:   Thank you, Ms. Roy.

8          Mr. Wilson, you have the final word, sir.

9                APPELLANT'S CLOSING STATEMENT

10         MR. WILSON:   Okay, Your Honor.

11         The agency is saying that I was -- the

12   appellant was not in the accepted service.  I believe

13   that I was in -- that I should have remained in accepted

14   service.  I mean they're saying I was not in the

15   competitive service.  I believe I should have remained

16   in competitive service because that is what the law

17   requires, and it doesn't make any provisions for you to

18   resign that provision.

19         It's not like you can say, "oh, well I don't

20   want to be in the competitive service."  The law says

21   you will remain in it if you were in it to begin with

22   and your position has not changed.

23         Now my position was not abolished.  I mean he

24   abolished all -- he abolished people.  He's supposed to

25   abolish positions.  The law requires him to abolish

Page 99

1    positions.  It doesn't make any provisions for

2    abolishing people, and that is what he did.

3            And that's not just with my case.  It's also

4    with the case of George Lausund that I gave you, who

5    provided an affidavit on here that his position over in

6    the guest house was filled by a GS employee.  And he

7    states that in his thing there, in his position right

8    there.

9            But let's just -- now, that's assuming that I

10   was in that -- they were able to put me in that

11   position, but I just want to suggest that maybe the

12   Congress might have -- in that United States code 24-411

13   there, where it talks about the soldiers' home, the

14   employees that it refers to are part-time or

15   intermittent employees.

16           I have -- there are five SF 50s in these

17   documents that pertain to me.  All of those say that I

18   was a full-time employee.  Now looking back on the laws

19   that I have become familiar with -- incidentally, if I

20   had ever seen a United States code before I became

21   involved in this affair, I don't know it.  Even if I had

22   ever seen a book, I'm not sure that I have ever seen the

23   outside of the book, much less the inside of one.  But

24   in going through this United States code here, I don't

25   see where there have been many mistakes or omissions.

Page 100

1          And the United States code we're talking

2     about, 24-411, refers to the director of the board --

3     and if you get a final version of that -- all that

4     authority is transferred from that director of the board

5     to the chief operating officer.

6          He can -- it refers to his ability to hire

7     intermittent or part-time employees.  There is no

8     reference to full-time employees.  And so I want to

9     believe that the full-time employees were exempt from

10    those restrictions that is places on that.

11         The agency has shown a really -- disregard for

12    the law.  The chief operating officer decided he was

13    going to abolish these positions.  He didn't find it

14    necessary to follow any of the procedures, didn't tell

15    the residents anything about their rights.  He didn't

16    tell -- didn't publish any kind of document saying he

17    was going to abolish the positions.

18         And then when it finally got around to the

19    point where the EEO officers and that lawyer comes to

20    investigate the firing of the residents -- myself, not

21    all of them, just myself.  Then he starts making these

22    statements there, talking about that we were not --

23    suggesting that we were not doing the job.  And I just

24    want to make, and I don't know for whatever good, that

25    if a company -- this is a decision.  If a company

Page 101

1  targets the older workers for layoffs, firings, a case

2  of age discrimination can be established, and they

3  definitely targeted the older workers there.

4          Not only did he target them, then when he was

5  asked about it that's what -- his statement, his

6  statement was this, "you didn't come here to work; you

7  came here to retire." That's the statement that he

8  made. And so what I want to ask the court, the board,

9  to consider is -- is that the kind of statement you make

10  to, let's say, 23-year-olds or 30-year-olds; "you didn't

11  come here to work, you came here to retire"?

12          So he is talking to older workers and he's

13  referring to their age. And when he talks about the

14  older workers, the older workers were sleeping on duty

15  and not doing their jobs, I don't think that that --

16  quite frankly I don't think that was a report of

17  somebody sleeping on the gate, but that's what he said.

18          I don't believe that that report occurred that

19  way. And as you heard Mr. Rodriguez's testimony there,

20  there was no report forwarded to higher headquarters

21  that the older workers weren't doing their job. And

22  Mr. Dickerson didn't have any information about that.

23  So it seems that the chief operating officer, when he

24  was asked a question that was -- how shall I -- I

25  believe that the truthful answer would indicate his --

Page 102

1    is it culpability?

2            Well, anyway, whenever he was asked these

3    questions there, he would just say whatever happened to

4    come off the top of his head, without thinking about

5    really what the question was and what the truthful

6    answer was.

7            And here, let's go have another decision here

8    that -- targets older workers with layoffs, firings, a

9    case of age discrimination can be established.

10   That's -- versus Unova Industrial Automative Systems

11   Incorporated in the Sixth Circuit Court.

12           Then there's another one -- includes this

13   dismissal of a discrimination claim.  A teacher of 30

14   years was fired after her vice principal told a student

15   that she was too old to be in the classroom.  Because

16   the vice president was involved in the decisionmaking

17   process, the case could not be dismissing on summary

18   judgment, whatever that means.

19           But in any case, the chief operating officer

20   here, he did target older workers.  He did make

21   statements indicating he felt like they weren't doing

22   their jobs.  And I feel like that I personally was

23   severely damaged.  I think that I should be -- the

24   judgment should be rendered in my favor, and I think

25   that there should be a penalty assessed because this is

Page 103

1  something that was -- I'm the person who was here that's

2  protesting the case, but there are other older men out

3  there who would be protesting the case if they weren't

4  afraid.

5          And let me just say this here.  Mr. Cox has

6  never done anything that threatened me in any way or

7  neither has anyone else about -- I heard one unkind

8  comment from one employee there at that soldiers' home.

9  But he has never done anything.  He's been as nice to

10  me as he can be as far as being threatened.

11          But most of those older men there are afraid

12  if they say something about their treatment that they

13  are going to be kicked out of the home.  There are some

14  that want to go to the papers right now with this thing

15  here or the way they feel like they're being treated by

16  the medical situation there.  They're all afraid that if

17  anything comes up and they get kicked out of that home

18  up there, which is a real possibility, I guess, that

19  they are not going to be -- that they won't have any

20  place to live.

21          So I really feel like I have been harmed by

22  this action right here and I hope that the judgment will

23  be decided in my favor.  And I don't have anything else,

24  Your Honor.

25          JUDGE COOK:  Thank you very much, Mr. Wilson.

Page 104

1    I appreciate it.  We'll go off the record.

2              (A brief recess was taken.)

3              JUDGE COOK:  Back on the record.  Before we

4    went off the record I forgot that I was going to deal

5    with the agency's motion for summary judgment.

6              Ms. Roy, I did look at the statute briefly,

7    5USC 7702, and the judicial review I think is 5USC 7703.

8    And given that Mr. Wilson has filed a civil action in

9    the Federal District Court which is a de novo review, I

10   don't think it's appropriate for me to give any kind of

11   reclusive effect to the earlier decisions on his EEO

12   complaint.  So I'll deny the agency's motion for summary

13   judgment at this time.

14             That closes the record.

15             (The hearing was concluded at 12:14 p.m.)

16

17

18

19

20

21

22

23