# Theodore R. Wilson

## v.

# Timothy Cox, Chief Operating Officer, Armed Forces Retirement Home -Washington et al.,

## Civil Action No. 06-1585 (HHK)

# Exhibit A

UNITED STATES OF AMERICA

MERIT SYSTEMS PROTECTION BOARD

WASHINGTON REGIONAL OFFICE

- - - - - - - - - - - - - - - - x

ORIGINAL

:

THEODORE R. WILSON,                  :

:

        Appellant,                  :

:

    v.                  :

: Docket No.:

ARMED FORCES RETIREMENT HOME,   : DC-0752-06-0831-I-1

:

        Agency.                  : Judge Cook

:

- - - - - - - - - - - - - - - - x

Merit Systems Protection Board

1800 Diagonal Road, Suite 205

Hearing Room

Alexandria, Virginia

Friday, March 16, 2007

THE HEARING in the above-entitled matter

commenced at 9:30 a.m., pursuant to notice.

BEFORE:

    THOMAS P. COOK, Administrative Judge

Page 2

APPEARANCES:

On Behalf of the Appellant:

THEODORE R. WILSON, PRO SE
3700 North Capitol Street, NW,
Number 128
Washington, DC  20374

On Behalf of the Agency:

THERESE ROY
Armed Forces Retirement Home
c/o Department of the Navy
614 Sicard Street, SE
Suite 100
Washington Navy Yard
Washington, DC  20374

* * *

Page 3

C O N T E N T S

|  |  |  |  |  | VOIR |
| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS | DIRE |
| Timothy Cox | 11 | 27 |  |  |  |
| Steve Fowler | 39 | 46 |  |  |  |
| Eric Brown | 50 | 55 |  |  |  |
| Charles Dickerson | 61 | 66 | 70 |  |  |
| Rubin Rodriguez | 74 | 77 |  |  |  |
| Theodore Wilson | 79 |  |  |  |  |

Page 4

1           JUDGE COOK:  This is March 16 at approximately

2      9:30 a.m.  My name is Thomas P. Cook, and I'm the

3      administrative judge from the Merit Systems Protection

4      Board Washington Regional Office.  I have been assigned

5      to hear the appeal of Theodore R. Wilson versus the

6      Armed Forces Retirement Home.

7           The agency, Armed Forces Retirement Home is

8      represented by Therese Roy, Esquire, who is an attorney

9      for the Department of the Navy -- who is representing

10     the agency.  Mr. Theodore Wilson, the appellant is

11     present and will represent himself and he is accompanied

12     at the table by his friend.

13          Mr. Wilson, would you please identify your

14     friend for the record?

15          MR. WILSON:  My friend here is Mr. Julius

16     Victor.

17          JUDGE COOK:  Okay.  Spell that, please.

18          MR. WILSON:  J-u-l-i-u-s  V-i-c-t-o-r, Julius

19     Victor.

20          JUDGE COOK:  Thank you very much, Mr. Wilson.

21          Before we came on the record today we spent a

22     few minutes talking about some of the procedural issues

23     that were still pending on the appeal.  One issue is

24     Mr. Wilson has proposed and I have accepted that he

Page 5

1    redesignate his exhibits from -- as Appellant's Exhibits

2    1 and 2, and we will change that.  Those become

3    Appellant's A and B.  The proposed Exhibit Number 3 was

4    not admitted as an exhibit, but as I said, I would

5    accept it into the record, but it's just not considered

6    and entry exhibit.

7         The agency has withdrawn its proposed Exhibit

8    Number 1.  That was the retention register created based

9    on some of the records, and I said I would defer ruling

10   on that until the hearing until I heard the evidence,

11   and the agency has withdrawn that exhibit.  So that is

12   withdrawn and will not be considered.

13        Before we went on the record we also discussed

14   the agency's proposed stipulations of fact.  We've had

15   some discussion and the agency proposed stipulations of

16   fact in its February 27, 2007 prehearing submission and

17   the appellant states that he agreed to stipulations 1,

18   2, 3, 7 and 8.

19        We've had some discussion, and we've clarified

20   some of the other proposed stipulations.  Stipulation

21   number 4, the appellant does not stipulate to.  That's a

22   contested issue as to whether Mr. Wilson's status

23   changed from competitive to accepted service.  That is

24   not subject to a stipulation, I will have to decide

25   that.

Page 6

1          Stipulation number 5, the parties agreed to

2    that stipulation with the following change.  It will now

3    read, Stipulation of Fact Number 5, "appellant resigned

4    his position effective November 30, 2002."

5    .          Stipulation number 6 has been agreed to by the

6    parties with the following changes and it will now read

7    as follows, Stipulation of Fact Number 6, "on

8    November 4, 2003, the agency provided appellant with a

9    letter stating that his security position would be

10   abolished on or about January 4, 2004."

11          With that discussion, does either party have

12   any objection or comments about the stipulations of fact

13   1 through 3?

14          MR. WILSON:  No.

15          JUDGE COOK:  Okay, when I ask you, for

16   example, you're going to have -- especially with this

17   noise, I would appreciate -- say like, "no objection,"

18   or "the agency agrees to that."

19          MS. ROY:  The agency agrees.

20          JUDGE COOK:  And Mr. Wilson, do you agree to

21   those conditions.

22          MR. WILSON:  I agree, Your Honor.

23          JUDGE COOK:  Thank you very much.  Okay, and I

24   apologize to the parties.  We have this obnoxious

25   jackhammer going on that we're going to have to try to

Page 7

1    deal with.  My apologies about that.

2            The other thing we addressed before we went on

3    the record was the agency proposed a stipulation of

4    expected testimony from a witness I approved for

5    Mr. Wilson.  That was Ms. Patty Adams.  And after some

6    discussion the parties have reached an agreement on

7    stipulation of expected testimony and it would be as

8    follows.

9            If Patty Adams were called to testify she

10   would testify under oath as follows, that she completed

11   the counseling report, dated June 25, 2004, which is

12   found at the agency file, tab 3, subtab 1.  She would

13   also testify that the comments she attributed to

14   Mr. Cox -- I note that it's incorrectly identified as

15   Mr. Fox in the report, but she would testify that the

16   comments she attributed to Mr. Cox are paraphrased,

17   except that -- she would also testify that the comments

18   in quotes were the actual words used by Mr. Cox.

19           Does either party have any comments, concerns,

20   or do you agree to that stipulation of expected

21   testimony?

22           MR. WILSON:  I agree to it, Your Honor.

23           MS. ROY:  The agency agrees.

24           JUDGE COOK:  And I note that I have informed

25   Mr. Wilson that if, based on the testimony of Mr. Cox or

Page 8

1    another witness, he believes that Ms. Adams actual live

2    testimony is significant to his appeal, that he can

3    renew his request and I will consider it at that time.

4            I think I mentioned on those stipulations

5    Mr. Wilson, one, does not agree that he's accepted

6    service employee.  He also, I would point out that in

7    agreeing to those stipulations he was clear that he does

8    not agree that his security guard position was actually

9    abolished.  I forgot to mention that.

10           Okay.  And at this time, the agency call its

11   first witness.  Before you go -- how this is going to

12   work, Mr. Wilson, is since Mr. Cox, I believe, is a

13   joint witness, correct?

14           MR. WILSON:  Yes, he is, Your Honor.

15           JUDGE COOK:  Okay.  I'm going to allow you

16   both a fair amount of leeway with questionings but

17   normally when the agency calls their witnesses, she'll

18   ask her questions first.  Then you can ask questions.  I

19   don't know how much experience you have doing this in

20   other forms.

21           Just a caution; you seem that you're a very

22   intelligent, articulate person based on what I read and

23   my discussions with you, so I don't think you should

24   have any problem with this.  And it's not really an

25   opportunity to argue or debate the case with the

Page 9

1    witness.

2          MR. WILSON:  Yes, Your Honor.

3          JUDGE COOK:  I'm going to give you your chance

4    to testify and then you can also make arguments so that

5    if you think a witness testifies to something that you

6    disagree with you certainly are going to have the

7    opportunity to respond to that.

8          MR. WILSON:  Yes, Your Honor.

9          JUDGE COOK:  But it's basically you're

10   opportunity to get information from that witness.  And

11   some of it you may just disagree with, but it's not your

12   time to argue, just to point that out.

13         With that, let's call Mr. Cox.

14         Can we go off the record for a second?

15         (A brief recess was taken.)

16   Whereupon,

17                TIMOTHY COX

18   was called as a witness and, having been first duly

19   sworn, was examined and testified as follows:

20         JUDGE COOK:  Please state and spell your full

21   name.

22         THE WITNESS:  My name is Timothy Cox; that's

23   T-i-m-o-t-h-y  C-o-x.

24         JUDGE COOK:  And what is your present position

25   Mr. Cox?

Page 10

1                    THE WITNESS:  My present position is the chief

2    operating officer of the Armed Forces Retirement Home.

3                    JUDGE COOK:  And how long have you held that

4    position?

5                    THE WITNESS:  For four years.

6                    JUDGE COOK:  And you started when?

7                    THE WITNESS:  I started in September of '02 as

8    a result of the National Defense Authorization Act of

9    '02 that created the position I hold.

10                   JUDGE COOK:  And what kind of a civilian -- do

11   you have a civilian grade or are you SES or is it a

12   different system?

13                   THE WITNESS:  Actually appointed by the

14   Secretary of Defense.

15                   JUDGE COOK:  Okay.

16                   THE WITNESS:  An appointee, I serve at the

17   Secretary's pleasure.

18                   JUDGE COOK:  At the Secretary's pleasure.  And

19   are you aware of the basic circumstances of the appeal?

20                   THE WITNESS:  Yes, I am.

21                   JUDGE COOK:  Okay.  And you know Mr. Wilson?

22                   THE WITNESS:  I do.

23                   JUDGE COOK:  Okay.  And you were -- from your

24   dates here, you were present and you were the chief

25   operating officer at the time that Mr. Wilson was

Page 11

1    separated from his position?

2              THE WITNESS:  Yes.

3              JUDGE COOK:  Okay.  Ms. Roy, questions.

4                        DIRECT EXAMINATION

5              BY MS. ROY:

6        Q    **Can you describe your position as chief**

7    **operating officer?**

8        A    Yes.  One of the main reasons why I was hired

9    is the home was run -- in the '90s we run off of a trust

10   fund.  So we don't take appropriations.  My budget goes

11   through the Office of Management and Budget to get

12   approved, but it is just authorized for us to spend

13   money out of the trust fund.  And the trust fund had

14   gone from $156 million down to $94 million over a period

15   of about nine years.

16             So Congress stepped in and said we need to

17   reevaluate how the home is operating.  We need someone

18   with retirement housing background.  They have to have

19   fiscal -- proven themselves fiscally in turnaround

20   situations and they have to know how to run a retirement

21   home.

22             So the Secretary's office actually hired

23   Kornferry International.

24             JUDGE COOK:  Say that again.  Who is that?

25             THE WITNESS:  The Secretary of Defense's

Page 12

1   office hired a search firm, Kornferry.

2           JUDGE COOK:  Spell that name.

3           THE WITNESS:  It's K-o-r-n-f-e-r-r-y.

4           JUDGE COOK:  Okay.  And that's a search firm?

5           THE WITNESS:  A search firm, yes,

6   international search firm.

7           So my background of now 22 years in retirement

8   housing, I've done everything from nonprofit to for-

9   profit, running continuing care retirement communities,

10  which is what the Armed Forces Retirement Home is, and

11  was elected to take the job.

12          JUDGE COOK:  And at this point there's

13  still -- there's no appropriated funds that support the

14  Armed Forces Retirement Home?

15          THE WITNESS:  No, no.  We are funded through

16  fines and forfeitures from the branches of service, 50

17  cents from all active duty enlisted.  We receive what

18  our residents pay, which is 35 percent of their income

19  up to a cap, and then it's interest off the trust fund.

20          JUDGE COOK:  Just, without going into a lot of

21  detail, where was that -- was that trust fund originally

22  established by Congress or where did it come from?

23          THE WITNESS:  It's actually booty from the

24  Mexican-American War back in the 1850s.

25          JUDGE COOK:  Really?

Page 13

1              THE WITNESS:  Yes.

2              JUDGE COOK:  Very interesting.

3              THE WITNESS:  $150,000, GEN Winfield Scott,

4    who is our founder, brought back money.  Instead of

5    burning Mexico City he brought back booty because he

6    knew most of his soldiers were immigrants and they would

7    have family here to take care of.  So that's how long

8    the home in D.C. has been around.

9              JUDGE COOK:  What year was that when the

10   Mexican-American War?  My history is --

11             THE WITNESS:  That was late 1840s.  The home

12   was established in 1851.

13             JUDGE COOK:  And it had a different name

14   before, right?

15             THE WITNESS:  It was the Soldiers' Asylum way

16   back then, then Soldiers' and Airmen's Home and then in

17   1991 Congress brought together the Naval Home that was

18   in Mississippi and the Soldiers' Home as one entity

19   called the Armed Forces Retirement Home.

20             JUDGE COOK:  Okay.  Thank you.  Go ahead.

21             THE WITNESS:  You're welcome.

22             JUDGE COOK:  Appreciate it.

23             BY MS. ROY:

24        Q    **Upon taking your position what was the**

25   **financial situation at the home?**

Page 14

1       A       Financial situation was we receive qualified

2    audit opinions in the past, we only did, which are bad.

3     You want to get an unqualified opinion because it means

4    the auditor can't stand on the numbers.

5               We had an accounting system that for six weeks

6    I couldn't find what our profit and loss was, where we

7    were against our budget.  You know, and I was told by

8    the Secretary's office that I had two years to turn

9    around the finances to stop the bleeding.

10              JUDGE COOK:  Which Secretary of Defense

11   selected you?

12              THE WITNESS:  Secretary Donald Rumsfeld.

13              JUDGE COOK:  Mr. Rumsfeld, okay.  Go ahead.

14              THE WITNESS:  And with that, we also have --

15   we've been inspected by Inspector Generals every three

16   years, and that rotates among the branches of service,

17   so I reviewed those reports.

18              Once of the things that they talked about was

19   we had a category of resident employees at D.C. that

20   were paid fair market wage, which is a different

21   category than civil servant, and we had a category of

22   resident employee in Gulfport that was a stipend

23   program.  And the recommendation from that 99 report was

24   you need to be consistent since you're one agency

25   operating as one model, which should be the same on how

Page 15

1   you treat different classifications of jobs, whether

2   it's in D.C. or Mississippi.

3           BY MS. ROY:

4       Q    **Can you explain the stipend program, please?**

5       A    Yes.

6           JUDGE COOK:  Before you answer that, when did

7   the stipend program start in Gulfport, do you know?

8           THE WITNESS:  Gulfport?  Way before '91.  But

9   when they came together in '91, the stipend program was

10  there in '91 as a resident employment process, resident

11  stipend program.

12          JUDGE COOK:  All right.  So it existed a long

13  time in the Naval --

14          THE WITNESS:  Right, and they were

15  independent, so they didn't really share information

16  until '91.  They didn't share very well after '91

17  either.

18          JUDGE COOK:  Go ahead, thanks.

19          THE WITNESS:  So with that, the stipend

20  program is run where residents are -- pay $120 a month

21  and they do various jobs to really help support the life

22  of the other residents, whether it's in activities,

23  whether it's in resident services, whether it's in

24  health care.  There are various spots that we look at

25  that don't replace civil servants but that they add and

Page 16

1    they also are a way to help keep residents busy,

2    occupied if they want to do something else.

3           BY MS. ROY:

4    **Q    Will you describe the resident employee**

5    **program in the Washington home when you took over?**

6           A    Yes.  The resident employee program here was,

7    again, not civil servants.  They were paid an hourly

8    wage, but they didn't receive benefits like a regular

9    civil servant would because they weren't considered

10   that.  So -- and we also didn't include that income in

11   their 35 percent of what they have to pay to us.  You

12   know, it's a cap.  Now the cap is $1,144, but a resident

13   pays 35 percent of their income.  It excluded that

14   payment to the resident from their income.

15           So I began to evaluate where our resident

16   employee program was in D.C., which costs us over a

17   million dollars a year compared to the couple hundred

18   thousand that we were spending for -- in D.C.  It was

19   evaluated by me and my staff to say that, okay, one, we

20   have residents doing primary functions that civil

21   servants should be doing, so they should be civil

22   servants and getting benefits, so we want to evaluate

23   that and say, okay, we need to evaluate where we have

24   these positions because they're probably not as

25   appropriate to go to a resident category of employment

1    as opposed to the stipend.  We preferred the stipend.

2    That was more of a supportive role.

3         Q    Can you tell us the salaries of the resident

4    employees at the Washington home at the time you took

5    over or approximately?

6         A    Probably ranged from $30,000s to -- we had

7    some that were doing it a long time, so they could have

8    been in the $60,000 and $70,000.  Obviously we spent a

9    million dollars a year, we were obviously paying decent

10   salaries.

11        Q    And how did you -- when you decided to take

12   over the home, when you were appointed to take over the

13   home, what were some of the changes that you made to

14   address the financial situation?

15        A    We addressed several things.  One, I looked at

16   how we operated just from a civil servant perspective.

17   We had 14s supervising and 13s supervising and 12s

18   supervising the 11s, who did the work.  So we had RIFs

19   throughout our organization really to right us.  For

20   close to 1,000 residents we had 877 employees.  We were

21   heavily overstaffed, and we also --

22             JUDGE COOK:  Okay.  Let me make sure I

23   understand what you just said.  You said you had 1,000

24   veteran residents who were lawful residents apart from

25   any employment and then 877 of those were actually

Page 18

1    resident employees?

2            THE WITNESS:  No, no, no.  No, no, a thousand

3    residents but we had 877 employees.

4            JUDGE COOK:  Total?

5            THE WITNESS:  Total, correct.

6            JUDGE COOK:  Okay, got you.

7            THE WITNESS:  So what I'm saying is we almost

8    had one for one.  In the retirement home industry where

9    three-quarters of your population is independent you're

10   more like one to twenty on the independent side, and

11   then of course in nursing and assisted living you staff

12   according to your census.

13           JUDGE COOK:  Okay.  Go ahead.

14           THE WITNESS:  So we looked at not just the

15   resident employee program but we looked at what we

16   didn't do well, which transportation was an area.  We

17   had old buses, Bloomberg buses, that didn't have

18   bathrooms and the air conditioning didn't work.  We

19   evaluated that through a streamlined study to look at,

20   okay, we really want to concentrate on providing the

21   residential care for our residents.  What else do we

22   need to evaluate?

23           Transportation, we don't have to do well, we

24   just have to contract with somebody who does that well

25   if it gives us a better service and probably is in a

Page 19

1    better cost, which it was.  So we've added many other

2    areas, and resident employees were not just in security.

3           We had resident employees who were the

4    equivalent of floor managers responsible for checking on

5    residents' well being.  To me, as a retirement housing

6    specialist being in the field for 22 years, it really

7    wasn't appropriate to have a fellow resident have the

8    burden of checking on a resident, perhaps seeing that

9    person who had died the night before of a heart attack

10   in the room.  That really is our responsibility as the

11   organization.

12          JUDGE COOK:  How many resident employees did

13   you have when you were appointed?

14          THE WITNESS:  At least -- I'm not sure, but

15   more than a few dozen because, again, we were spending

16   about a million dollars on that program.

17          BY MS. ROY:

18   Q    **And when you determined to -- your**

19   **determination to make the two programs consistent, to**

20   **cost savings, how did you go about doing that?**

21   A    Cost savings, but also to reply to findings in

22   our IG reports that said, you're inconsistent in how you

23   do this; we'd like you to be able to be able to evaluate

24   it and also look at why do you have a group that looks

25   like a civil servant but isn't treated like a civil

Page 20

1  servant because you already have a resident stipend

2  program.  And it's clearly a benefit to get residents to

3  be involved, to have some responsibility -- but yet

4  doesn't take away from their enjoyment of living in a

5  retirement home.

6           So when we evaluated all that we gave notice,

7  60-day notice.  So we tried to follow the best practice

8  that we had, which in other RIFs that we had -- we could

9  have given a 30-day; we chose to give a 60-day.  You

10  know, so looking at this, okay, not classified as a

11  civil servant, we don't have to follow that, we still

12  wanted to get all of our resident employees a 60-day

13  notice.

14      **Q    And if I understand your testimony correctly,**

15  **the entire resident employee program, as it was run in**

16  **Washington, was changed?**

17      A    That's correct.  The resident employee program

18  was effectively abolished as a wage -- current wage

19  payer.  We looked at those spots and said, are some of

20  them ones that we should have civil servants in?  Yes,

21  perhaps.  Are they things that we could contract out --

22  and that we wanted to adopt the resident stipend

23  program, which was effective.

24           We had a few hundred residents that were

25  participating in that in Gulfport.  They enjoyed it.

Page 21

1  The staff enjoyed that, and it also was very cost

2  effective for us to do that.

3          JUDGE COOK:  In January 2004 is when

4  Mr. Wilson was separated.  At that point or around that

5  time, how many resident employees remained, and how many

6  remain if any now?

7          THE WITNESS:  We don't have any resident

8  employees.  The whole program was abolished to go to the

9  resident stipend program.

10         JUDGE COOK:  It was abolished effective in

11 January?  When was the date you actually ended up with

12 no resident employees, do you know?

13         THE WITNESS:  Without -- here?

14         JUDGE COOK:  Not exact dates, but just around

15 that time?  Was it in the first of 2004?

16         THE WITNESS:  Probably around that time, too.

17  Yes, it was around that time, because we treated that

18 program not just for security purposes, we treated that

19 program since we had them throughout the campus,

20 resident employees, we treated them all the same.

21         JUDGE COOK:  Go ahead, Ms. Roy.

22         BY MS. ROY:

23     Q    Do you recall making a statement regarding

24 individuals having come to the retirement home to

25 retire?

Page 22

```
 1      A     Yes, I did.  In fact, I was very up front with

 2  all of the residents.  We had an all-resident meeting to

 3  talk about why were changing this because, again, they

 4  were affected from the post office to security to

 5  resident services to health care.  And I told them, you

 6  know, our primary function here is a retirement home.

 7              What I don't want is to look at residents

 8  working the equivalent of full time and, one, not

 9  getting benefits, but also in jobs that really are the

10  responsibility of the agency to have as a civil servant

11  in them.  And that was some of the findings of the IG.

12  He said, you're using this but you're not paying

13  benefits; it's a way to pay a wage but not pay fully for

14  it, and could it be civil servant?"  So we really

15  righted what we needed to do.

16              I explained that to everyone, explained that

17  our job is really to be a retirement home and do the

18  best we can.  And if there's employment possibilities

19  that would be secondary as in the stipend program to us

20  rather than a primary function of what we're supposed to

21  be.

22      Q     Do you recall about when you did that, about

23  when you had that meeting?

24      A     I'm sure it was before we gave the notice or

25  it could have been right after the notice, but it was in
```

Page 23

1    that time frame of, I'm sure, the 60-day transition, so

2    it was all relevant to what was going on at the time.

3         Q    **Do you recall having a concern about security**

4    **guards sleeping at the gate?**

5         A    Yes, I had a concern about, whether it's

6    security, whether it's nursing, nursing assistants, any

7    person who's supposed to be part of their job that's

8    supposed to be alert and awake as their job, if they're

9    found asleep at their job that is a disciplinary action.

10    That's really the action of sleeping not an action of

11   anyone's age or function, but if they're supposed to be

12   awake and doing a job they need to be awake and doing

13   that job.

14        Q    **Can you state your age for the record?**

15        A    Yes, my age is 46.

16        JUDGE COOK:  Excuse me, Mr. Cox.  You said you

17   had concerns about this.  Why did you have specific

18   concerns about someone sleeping at the guard gate and so

19   forth?  What caused you to have this concern?

20        THE WITNESS:  Well, the concern is, first of

21   all, security is supposed to be awake at the guard gate

22   because it's our single point of access to where over

23   1,000 people live inside.

24        JUDGE COOK:  Did you have any experience that

25   caused you to be concerned about that?

Page 24

1          THE WITNESS:  Yes, we have gunshots right

2     outside our facility.  We have had people try to get on

3     the facility.

4          JUDGE COOK:  Well, how about with sleeping on

5     the job?  Had you had employees that had --

6          THE WITNESS:  Yes, it was reported to me that

7     we had a guard in the evening that had been found asleep

8     in the guard shed.

9          JUDGE COOK:  Okay, go ahead, Ms. Roy.

10         BY MS. ROY:

11    **Q   Were there any other circumstances about this**

12    **time that caused you to question the resident employee**

13    **program?**

14    A     Yes, as far as security.  One of the things

15    that I was concerned about is NORAD uses our site as a

16    place to put -- NORAD is the national defense program --

17    and NORAD uses our site when we go to level orange to

18    bring in hummer-launched missiles to protect everything

19    from the Capitol to the White House.

20         So knowing that there is actually ammunition

21    on our site and knowing that we have only one

22    penetration point, which is our gate that is manned by

23    security, it was also a concern to make sure that we had

24    the best trained individuals to be out there.  And they

25    needed to stay awake to be able to make sure that they

Page 25

1    could do that job appropriately.

2            JUDGE COOK:  How many acres is the --

3            THE WITNESS:  272 acres.

4            JUDGE COOK:  272, and that's all enclosed,

5    controlled access, one gate only?

6            THE WITNESS:  That's correct.

7            JUDGE COOK:  Go ahead, Ms. Roy.

8            BY MS. ROY:

9        Q    **Currently on the gate what type of employees**

10   **do you have?**

11       A    We did a study to look at our whole security

12   force and security internally.  It came out that it was

13   cost effective for us to still run but the gate it was

14   cost effective to have a private contractor do that.  So

15   at this time of transition we went to a private

16   contractor to run our gate for us, and to this point

17   still have a private contractor running that.

18       Q    **And at the time that you made those decisions**

19   **you had a resident employee program that was the stipend**

20   **program?**

21       A    That's correct.

22       Q    **So basically volunteers?**

23       A    Volunteers who get that $120, correct.

24       Q    **Correct.  So if I understand your testimony,**

25   **you determined that it perhaps made more sense to have**

Diversified Reporting Services
202-467-9200

Page 26

1    **trained security guards on the gate, contractor guards**

2    **than volunteers basically?**

3         A    Correct. So we didn't look at looking at

4    stipend positions at the gate because we really thought

5    it was critical to have secured access and people who

6    are trained to do that.  And because we looked at our

7    main job is not security, our main job is to provide the

8    residential services for our residents, contracting that

9    out to a group that is trained to do that made economic

10   sense.

11             JUDGE COOK:  What's the contractor's name?

12             THE WITNESS:  I'm not sure.

13             JUDGE COOK:  Okay.  That's just the gate

14   guards?

15             THE WITNESS:  Those are just the gate guards.

16             JUDGE COOK:  So you still run security -- are

17   those civil service employees?

18             THE WITNESS:  Those are civil servants, yes.

19             JUDGE COOK:  And what other security do you

20   have?

21             THE WITNESS:  That's it.

22             JUDGE COOK:  No, I mean what -- you said you

23   have other security, what do they do?

24             THE WITNESS:  Security on campus?

25             JUDGE COOK:  Yes.

Page 27

1          THE WITNESS:  They check the buildings.  They

2    roam in the car to make sure if someone is walking

3    outside that they have the correct badge.  They check

4    exterior doors to make sure they're stuck, to make sure

5    they're locked.

6          JUDGE COOK:  Are they armed?

7          THE WITNESS:  No.

8          JUDGE COOK:  So they don't have to qualify

9    them.  How many of them do you have approximately, do

10   you know?

11         THE WITNESS:  I think we have 12 to 15.

12         JUDGE COOK:  Thank you.  Go ahead.

13         MS. ROY:  I have no further questions.

14         JUDGE COOK:  Mr. Wilson, do you have any

15   questions?

16         MR. WILSON:  Yes, Your Honor.

17         JUDGE COOK:  Go ahead.

18                    CROSS EXAMINATION

19         BY MR. WILSON:

20    Q    **Mr. Cox, just a moment ago I heard you say**

21   **that you gave the residents 60 days notice.**

22    A    Yes.

23    Q    **And that you didn't have to do that.  Why are**

24   **you saying that?**

25    A    Well, we didn't have to do that because they

Page 28

1    weren't considered civil servants, so they weren't in

2    RIF procedure because they weren't considered civil

3    servants because they were resident employees.  That's a

4    special category.  My HR department told me that we

5    didn't have to give a notice, but we all felt that it

6    was appropriate to give a notice.

7         Q    **Before you decided to dismiss the residents --**

8    **actually, you fired them, is that true?  You actually**

9    **fired the residents?**

10        A    We did a reduction in force, the equivalent of

11   reduction in force.  So those positions were abolished.

12        Q    **Well, did you check with your personnel, human**

13   **resources manager before you did that?**

14        A    Yes.

15        Q    **And he said it was okay?**

16        A    Yes.

17        Q    **Did he not advise you that you were supposed**

18   **to do a RIF, that you do a RIF, to do that?**

19        A    They told me not to do a RIF, so we did the

20   equivalent of that with a 60-day notice because, again,

21   the resident employees weren't considered civil

22   servants.  You know, they didn't get the benefits, they

23   weren't classified as a civil servant.  It was a

24   separate category.

25        Q    **Well, one of those resident employees had been**

Page 29

1    **a civil servant and had been brought into the accepted**

2    **service, and the law said that he was supposed to remain**

3    **in the competitive service, in that case you would have**

4    **had to do a RIF to remove him from the job.  Nobody told**

5    **you about that?**

6           MS. ROY:  Objection.  I'd like to object to

7    this line of questioning because the agency has conceded

8    that employees, that resident employees were in the

9    accepted service and that the agency should have

10   conducted a RIF and given them appeal rights.  There's

11   no argument about that.

12          JUDGE COOK:  Well, I think -- I think what

13   you're trying to just ask him though is -- and I think

14   I've already heard the answer, and that is he did not

15   consider those employees in the competitive service.

16          THE WITNESS:  That's correct.

17          JUDGE COOK:  Now whether that's a mistake or

18   not, that's for me to decide, but I think the record is

19   pretty clear they didn't treat you as a competitive

20   service employee and that they considered you an

21   accepted service, as Ms. Roy just said, I think they

22   concede that they did not run a RIF.

23          So I get the result of that, but I don't think

24   asking -- he is certainly not the personnel expert.  He

25   runs the place, but he did rely on his guidance

Page 30

1    apparently, and if that guidance is wrong, then it's up

2    to me to decide what the result is, but I don't think he

3    can answer other than to say, no, he didn't consider

4    them competitive service.

5           MR. COX:  Correct, which I didn't.

6           JUDGE COOK:  And that's because of what he was

7    advised.

8           MR. WILSON:  Okay.

9           JUDGE COOK:  What he should have done is

10   probably for me to decide if that --

11          BY MR. WILSON:

12   **Q    Okay.  Mr. Cox, the law that Congress passed**

13   **here, Title XXIV, 411 about the management of the**

14   **retirement home, did you say that it told you to operate**

15   **the two homes on the same principle, same model?**

16   A    It told me to look for efficiencies and

17   ineffectiveness and to come up with how we should

18   operate the most consistency.  So yes, we actually do

19   operate under one model.

20   **Q    I want to just read this one line here.  So**

21   **it's on this home here, and it says --**

22          JUDGE COOK:  Would you identify where you're

23   reading from more specifically?

24          MR. WILSON:  I'm reading from Title XXIV.

25   Title XXIV, it's an except from Title XXIV.

Diversified Reporting Services
202-467-9200

Page 31

1          JUDGE COOK:  Is it in the record?

2          MR. WILSON:  Yes, sir.

3          JUDGE COOK:  Can you tell me --

4          MR. WILSON:  It's -- go to tab 4F on the first

5   page, paragraph C -- D, paragraph D2.

6          BY MR. WILSON:

7     **Q     It says, "each facility of the retirement home**

8   **shall be maintained as a separate establishment of the**

9   **retirement home for administrative purposes," and that**

10  **seems to contradict your statement that it asks you to**

11  **run them on the same model.**

12    A     Actually, I don't think it contradicts at all,

13  Mr. Wilson.  What it says is from a budgetary standpoint

14  that each one should have its own operating budget, it

15  should stand on its finances by itself, but that the

16  economy of scale is how we do admissions, how we hire.

17  The classification of employees shall be the same

18  because running a retirement in Mississippi vice running

19  a retirement home in D.C., there's no difference in

20  that.

21          So the homes were spending much more money

22  than they were bringing in.  All that's saying is they

23  have to be legally separate entities, which means they

24  have their own budget.  Yes, they have their own

25  classification system for an employee but by no means

Page 32

1   was that -- if you look back at the IG reports, at the

2   direction that I've received from the Secretary, there

3   were many forms of guidance to say programs at one home

4   were better and should be adopted at the other home and

5   vice versa as well.

6          Administratively it does not mean that they

7   should keep programs that were not as cost effective.

8   And if they had a better working program at one of the

9   homes, they should share that with their sister home.

10   **Q    Okay.  Well, then in other words, I just**

11   **wanted to suggest that maybe the home in Washington,**

12   **D.C. had a better system in so much as you were paying**

13   **employees for their work.  So did you -- well, you did**

14   **not conduct a RIF, and you were required to conduct one.**

15   **But had you conducted a RIF, could you have abolished a**

16   **group of people as opposed to positions?**

17          **Is not a RIF supposed to abolish positions as**

18   **opposed to people?**

19   A    The people are in those positions, so again,

20   like with security we abolished all of the resident

21   positions, the resident employee positions, just like we

22   did in transportation, we abolished all those positions

23   because it went out to contract.

24          So again, the point is that we did do it by

25   position, by each department, so it's not personal.  It

Page 33

1    was all of security.  There is no security at the gate

2    that's a civil servant anymore.  They're all contracted.

3    So it has been by the whole department.

4        Q    The contractors on the gate, Mr. Cox, are the

5    same ones that were there when I was there.

6             JUDGE COOK:  You have to ask a question,

7    though, okay?  You're starting to tell him things.

8    You've got to ask him.

9             BY MR. WILSON:

10       Q    Okay.  Well, maybe I'll ask, did you -- the

11   civil service guards on the gate, did you hire more

12   contractors after I was let go, after the appellant,

13   myself, was let go?  Did you hire more contractors or

14   did you keep the same amount of contractors on the gate

15   down there?

16       A    I don't recall because it's outsourced.  It's

17   a specific contract amount of money, and however they

18   use that, whether it's ten part-time people to get to

19   the equivalence, but they have to cover the gate 24/7.

20   So however the contractor does it for his performance-

21   based contract based on fee.

22       Q    Okay.  But you didn't hire more contractors,

23   you didn't hire more contractors.  In other words, the

24   contract people who were on the gate has not changed,

25   has it?  Do you know if it has changed or not, the

Page 34

1    **number of contractors you have on the gate?**

2    A    Not to my --

3         JUDGE COOK:  One contractor, right?

4         THE WITNESS:  Yes, that's right.

5         JUDGE COOK:  One contract, the number of

6    employees --

7         BY MR. WILSON:

8    **Q    So the same employees -- there are two**

9    **contractors down there, which is the same as it was**

10   **before.**

11   A    Okay --

12        JUDGE COOK:  It sounds like you want to tell

13   me that.  You have to ask him a question.

14        MR. WILSON:  Okay, I'll do that.  I'll do

15   that.

16        Did it cost more to hire -- we're talking

17   about the -- how much did you pay the people that you

18   replaced the appellant, myself with on the gate?  I was

19   replaced in the department of security services.  Did

20   you not hire some more people into civil service

21   positions?

22        MS. ROY:  Objection.  I object to that.

23        JUDGE COOK:  Okay.  Hold on a second.  What's

24   your objection?  He's saying if they saved money by

25   separating him, I think that's his question.

Diversified Reporting Services
202-467-9200

Page 35

1          MS. ROY:  If that's his question, that's fine.

2     If he's asking about replacing, we've already covered

3     that and he's assuming facts not in evidence.

4          JUDGE COOK:  I mean inferentially it's how did

5     you replace him, but what he's saying is, you cut me

6     loose and you have another method; did it save money?

7          THE WITNESS:  Is that the question?

8          JUDGE COOK:  I think that's your question, is

9     it not?

10         MR. WILSON:  Well, yes.  I'm asking, did

11    you -- did replacing me, since you were supposed to -- I

12    mean are you supposed to replace -- in other words, are

13    you supposed to replace the positions or are you

14    supposed to replace people?

15         THE WITNESS:  What we're doing, Mr. Wilson, is

16    the resident employee program was abolished.  It wasn't

17    just security, all right.  That was costing the home

18    over a million dollars a year, okay?  It's not just

19    security.  We did away with that resident employee

20    program and went to the stipend program, all right.

21         So security is a totally different issue than

22    the resident employee issue, and I don't want us to

23    confuse the two because at the gate you are not the only

24    resident employee.  We went through resident employee

25    program and in health care and residential service, all

Page 36

1    those residential employees at the same time.  Those

2    positions were abolished.

3         So that million dollars we saved because we

4    went to resident stipend program, okay.  And the stipend

5    program does not have spots at the gate because we

6    contracted that out because doing a streamlined A76

7    study it was more cost effective to have that gate done

8    by a contractor than by civil servants.

9         BY MR. WILSON:

10   **Q    But you have civil servants on the gate today.**

11   **Do you have civil servants on the gate today?**

12   A    No, we don't.  We do not.  They're all

13   contract employees.

14   **Q    Well --**

15        JUDGE COOK:  Again, Mr. Wilson, if you

16   disagree you have to do it another way.

17        MR. WILSON:  Okay, Your Honor.  That's good.

18   That's good.  I don't think I have any more questions

19   for Mr. Cox.

20        JUDGE COOK:  Anything else?

21        MS. ROY:  I have no further questions.

22        JUDGE COOK:  Thank you, Mr. Cox.  You're

23   excused.  I appreciate your testimony.

24        THE WITNESS:  My pleasure.

25        JUDGE COOK:  Don't discuss your testimony with

Page 37

1    any other witness until the hearing is completed.

2             THE WITNESS:  I won't.

3             JUDGE COOK:  Thank you.  Have a good day.

4             THE WITNESS:  You're welcome.  You, too.

5             (The witness was excused.)

6             JUDGE COOK:  Who's your next witness.  Let's

7    go ahead and take --

8             MS. ROY:  Mr. Fowler.

9             JUDGE COOK:  Pardon me?

10            MS. ROY:  Mr. Fowler.

11            JUDGE COOK:  Mr. Fowler, okay.  Let's call

12   Mr. Fowler.

13            Mr. Wilson, what I suggest is when a witness

14   makes a statement that you disagree with, a lot of times

15   it's better to write your notes, say, "I don't think

16   that's right," and you can cover it with your testimony

17   or if you think there's a document which conflicts, then

18   write yourself a little note and then you can point that

19   out to me.  That's the way to handle that.

20            MR. WILSON:  Okay, Your Honor.

21            JUDGE COOK:  I'm Judge Cook.  Mr. Fowler,

22   would you please step behind the chair for me.

23   Whereupon,

24                        STEVE FOWLER

25   was called as a witness and, having been first duly

Page 38

1    sworn, was examined and testified as follows:

2              JUDGE COOK:  Please state and spell your full

3    name for me.

4              THE WITNESS:  My full name is Steve Broxson

5    Fowler, S-t-e-v-e  B-r-o-x-s-o-n, Fowler, F-o-w-l-e-r.

6    Professionally I usually go by Brock Fowler, B-r-o-c-k

7    Fowler.

8              JUDGE COOK:  And what's your present position,

9    Mr. Fowler?

10             THE WITNESS:  Currently I work as a consultant

11   for consulting firms at two different agencies,

12   Transportation Security Administration and the Armed

13   Forces Retirement Home.

14             JUDGE COOK:  And you are not a federal

15   employee, you work for a federal contractor?

16             THE WITNESS:  That's right, I retired.

17             JUDGE COOK:  Okay.  And when did you retire

18   from federal service?

19             THE WITNESS:  January 3, 2006.

20             JUDGE COOK:  And what contractor do you work

21   for now?

22             THE WITNESS:  I work for this -- for the home

23   I work for PSA Incorporated in West Virginia,

24   Professional Services of America, Incorporated.

25             JUDGE COOK:  Okay.  And are you familiar with

Page 39

1    the basic issues of this appeal?

2            THE WITNESS:  Yes.

3            JUDGE COOK:  Were you employed at the Armed

4    Forces Retirement Home when Mr. Wilson was separated?

5            THE WITNESS:  I was.

6            JUDGE COOK:  And that's in January of 2004?

7            THE WITNESS:  Right.

8            JUDGE COOK:  What was your position then?

9            THE WITNESS:  Human resource analyst.

10           JUDGE COOK:  What was your grade?

11           THE WITNESS:  It was administratively

12    determined pay.

13           JUDGE COOK:  Okay.  Ms. Roy.

14                  DIRECT EXAMINATION

15           BY MS. ROY:

16      **Q**    **Your position was -- I'm sorry, could you --**

17      A    Human resources analyst.

18      **Q**    **Human resources analyst, at the time of the**

19    **separation of Mr. Wilson?**

20      A    Yes, ma'am.

21      **Q**    **Can you explain the resident employee program**

22    **and how they were categorized in terms of**

23    **classification?**

24      A    Yes, there was -- the resident employee

25    program was administered separately by our staffing

1   section branch and they used different forms and

2   different procedures.  Jobs were posted.  They were not

3   posted on USA Jobs, they were posted within the home,

4   and they were classified as AN or AD positions rather

5   than GS -- they were on a different pay scale, and we

6   had different forms for referring a certificate and

7   different application forms and so forth.

8       Q    And what was the appointing authority for the

9   resident employees?

10      A    We used the Armed Forces Retiring Home Act as

11  the appointing authority.  It clearly says schedule A

12  OPM authority,.

13          JUDGE COOK:  Schedule A accepted service?

14          THE WITNESS:  Yes, sir.

15          BY MS. ROY:

16      Q    And where did you find that authority?

17      A    It was -- it's posted in the federal register

18  every year.  It originally was granted April 1, 1989.

19      Q    So resident employees were a schedule A

20  accepted service?

21      A    That's correct.

22      Q    Okay.  And at the time there was a

23  determination to abolish the resident employee program,

24  what was your understanding of the rights that they were

25  due?

Page 41

1      A    My understanding was that they were -- that

2   because they were in a different category -- they're

3   accepted service, but in addition to that, as being

4   residents of the institution, it was my understanding

5   that there were no appeal rights or RIF procedure

6   rights.

7      **Q    And how long had you been with the Armed**

8   **Forces retirement home?**

9      A    At that time, about maybe -- well, I left the

10  home twice.  I first went to work for the home in

11  February of 1982.  So I had been -- I had gone to work

12  elsewhere a couple times.  But I've worked there a total

13  of about 15 years.

14     **Q    And to your knowledge did Mr. Wilson apply for**

15  **a resident employee position?**

16     A    The records show that he did.

17     **Q    And when individuals working at the home moved**

18  **into the home what was the procedure to handle that?**

19     A    Well, there was -- because of the

20  classification act of 1949, somebody who was a resident

21  of the home, they couldn't hold a position of the

22  classification of general schedule wage grade.  So if

23  somebody was in the home that wanted to work for that

24  job, a job like that, they had to move off campus in

25  order to be selected.

Page 42

1          And if they were off campus and they were

2    working a GS job and they moved on campus, became

3    residents or members of the home, then they had to --

4    they would not be eligible to hold that GS job anymore

5    and they could apply for a resident position.

6        **Q     And the resident positions were -- never mind.**

7    **I'll withdraw the question.  I have no further**

8    **questions.**

9              JUDGE COOK:  Are you familiar with RIF

10   procedures in general?

11             THE WITNESS:  Yes.

12             JUDGE COOK:  Have you ever been involved in

13   RIFs when you were there?

14             THE WITNESS:  Yes, we had a series of RIFs,

15   yes.

16             JUDGE COOK:  Okay.  The position that

17   Mr. Wilson held when he was separated, as I understand

18   the record was a security guard AD position?

19             THE WITNESS:  That's correct.

20             JUDGE COOK:  And that was a schedule A

21   accepted service position.  Do you happen to know what

22   if any other positions would have been in his

23   competitive level or how many other positions were in

24   his competitive level when he separated?

25             THE WITNESS:  Right.  There was -- the

Page 43

1    decision was made to abolish the resident employee

2    program and stop the program, and when that happened

3    there were some people who, you know, once they found

4    that out, resigned or some people who -- you know, their

5    jobs ended.  But there were a few people who were kept

6    on after the initial group.

7              As I recall, Mr. Wilson was one -- the only

8    one of two or three that were kept on after that time.

9              JUDGE COOK:  In total resident employees or

10   just security guards?

11             THE WITNESS:  Total resident employees.

12             JUDGE COOK:  Okay.  Go ahead.

13             THE WITNESS:  And so when -- at the time

14   Mr. Wilson went out there were no resident employees

15   left and the positions were abolished.

16             JUDGE COOK:  So there really was -- so you're

17   saying at the time he was separated there were no other

18   resident employee positions whatsoever?  Is that your

19   understanding?

20             THE WITNESS:  Right.

21             JUDGE COOK:  The positions were gone, but were

22   the people also gone?

23             THE WITNESS:  Yes.

24             JUDGE COOK:  As you understand it.

25             THE WITNESS:  The day after -- that's the day

Page 44

1    after he left.

2              JUDGE COOK:   Okay.   How about -- the exact

3    date, his separation date was January 4, 2004.   Were

4    there any other resident employees that also separated

5    that day?

6              THE WITNESS:   There might have been one other.

7     I'm not sure about that.

8              JUDGE COOK:   Do you happen to know -- and just

9    to the best of your recollection, if you don't know

10   that's fine.   Do you know if it was a security guard or

11   another position?   Do you happen to know?   If you don't

12   recall, I can understand that.   It's a few years.

13             THE WITNESS:   I talked to -- in trying to

14   figure it out, because we changed personnel data

15   systems.   So Some historical data that would be normally

16   easy to obtain is not available to us -- I talked to a

17   guy that I think may have left the same day to work at

18   the post office.

19             JUDGE COOK:   And again, as we've heard some

20   earlier testimony, and it's your understanding, too,

21   that as of that day, the day after Mr. Wilson left,

22   there was no resident employee program.   Is that your

23   understanding?

24             THE WITNESS:   Yes, that's correct.

25             JUDGE COOK:   And you were still an employee

Page 45

1   there, so you would have known?

2                THE WITNESS:  That's correct.

3                JUDGE COOK:  Was your position physically

4   located at the Armed Forces Retirement Home?

5                THE WITNESS:  Yes, it was, and I was in --

6                JUDGE COOK:  Was it like the personnel office

7   or human resources office or how is it?

8                THE WITNESS:  What happened was I came to work

9   there in September of 2002 again. You know, I'd worked

10  there along the way before that; I just came back, gone

11  away, came back.  So the first time -- when I came back

12  on that time I came back as the human resources officer

13  in September of 2000.

14                And then that was at the U.S. Soldiers' and

15  Airmen's Home level.  Then when a headquarters was

16  established over all of the homes, at that time I was

17  given a pay raise and the whole organization was -- HR

18  was of course elevated to corporate level.  I became a

19  human resource analyst and Ms. Essex became the human

20  resources officer handling day-to-day operations.  And

21  then there was a point in there where I took over

22  staff --

23                JUDGE COOK:  Okay.  Thank you.  Any questions

24  based on that?

25                Mr. Wilson.

Page 46

1                        CROSS EXAMINATION

2          BY MR. WILSON:

3      Q    You said you were a human resource analyst.

4 Didn't you, when you gave your statement to the EEO

5 investigators, Mr. Fowler, didn't they -- didn't you say

6 that you were the director of human resources?

7      A    I said I at one time had been.  I said at the

8 time I was -- the statement I was, at the time -- and I

9 explained about the split --

10     Q    Okay.  Did you -- whenever they decided to --

11 no, let's go to the date that I entered my first EEO

12 complaint.  Did you attend a meeting with Mr. Cox and

13 Ms. Blackwell and Ms. Essex regarding my complaint, my

14 EEO complaint?  Do you recall?  Did you attend those

15 meetings?

16     A    I don't recall a meeting.

17     Q    You never attended a meeting in regard to my

18 EEO complaint?

19     A    I'm not saying I didn't attend a meeting.  I'm

20 saying I don't recall a meeting.  We're going back quite

21 a ways.

22     Q    Granted, granted.  Three years, this month,

23 this week as a matter of fact, I believe.

24          So you didn't have any -- did you have any

25 information about how I lost my job?

Page 47

1       A     Well, I didn't have any firsthand information.

2    That is to say, Ms. Essex was in charge of operations.

3    She before that had been in charge of labor relations.

4    So whenever conversations were handled between her and

5    Mr. Dickerson or her and Mr. White or her and

6    Mr. Rodriguez I was not privy to those.

7              I was aware that the resident employment

8    program was being abolished, and I was -- and I remember

9    hearing at one point, well, that they had decided to

10   keep you on for a period of time past what they

11   originally had envisioned as the cutoff date, and so I

12   was aware that you were a security guard and I was aware

13   of what was going on in general terms.  I just didn't

14   have any involvement directly in signing anything or

15   giving direct advice or something.

16      **Q     At the time that you were the director of**

17   **human resources or working in that department there did**

18   **you have any information regarding the person leaving**

19   **the competitive service and going into the accepted**

20   **service as my case was?**

21      A     I wasn't involved in your case, no.

22      **Q     I mean but did you have any information about**

23   **it?**

24      A     I may have heard that you were moving -- the

25   home grounds and had taken -- you had taken a job as

Page 48

1    a -- a resident position.  I may have heard that.

2        Q    And do you know of another case of this

3    happening, of a person being a civil service guard and

4    moving onto the home to become a resident?  Do you

5    recall any other case like that?

6        A    I can't recall a case like that.  I can recall

7    the case that Mr. Rodriguez was a resident and he moved

8    off the grounds in order to take the civil service job.

9    I remember it was well known, well known, often stated,

10   but I can't recall any specific situations other than

11   that.

12       Q    Okay.  Well, did you have -- did anybody ever

13   have any discussions about whether -- did you ever have

14   any discussion with anyone about whether or not when I

15   came over and transferred out of the competitive service

16   into that excepted service position that I would remain

17   in the competitive service, I would be considered to

18   remain in the competitive service?

19       A    I don't remember any specific discussions, but

20   nor would I expect to because the issue came up fairly

21   often because we had jobs and there were residents

22   living there, had GS jobs, and so we -- I remember

23   people regularly being told, you know, if you live on

24   the home grounds you can't have a GS grade position.

25            So I don't think there would have any occasion

Page 49

1   for a lot of discussion about that particular issue in

2   your case because it was well established.

3        **Q    Okay.  Thank you, Mr. Fowler.  I don't have no**

4   **more questions, Your Honor.**

5            JUDGE COOK:  Anything else?

6            Thank you, Mr. Fowler.  I appreciate your

7   testimony.  You're excused.  Do not discuss your

8   testimony with anyone until the hearing is completed.

9   Thank you, you have a good day.

10           Okay, let's take five minutes. Stretch your

11  legs.  We'll be back at about 10:30.  And who are you

12  calling next?

13           MS. ROY:  Eric Brown.

14           JUDGE COOK:  Mr. Brown.  Won't you have

15  Mr. Brown ready in about five minutes or so?

16           (The witness was excused.)

17           (A brief recess was taken.)

18           JUDGE COOK:  Please step behind the chair and

19  raise your right hand for me.

20  Whereupon,

21                    ERIC BROWN

22  was called as a witness and, having been first duly

23  sworn, was examined and testified as follows:

24           JUDGE COOK:  Mr. Brown, please state and spell

25  your full name for us.

Page 71

1          THE WITNESS:  Yes, sir.

2          JUDGE COOK:  Thank you very much.  Appreciate

3    your testimony.  You're excused.  You have a good day.

4    Do not discuss your testimony with anyone until the

5    hearing is over.

6          THE WITNESS:  Yes, sir.

7          JUDGE COOK:  Thank you.

8          THE WITNESS:  Thank you.

9          (The witness was excused.)

10          JUDGE COOK:  Okay.  Let's go off the record.

11          (A brief recess was taken.)

12          JUDGE COOK:  Mr. Rodriguez?

13          MR. RODRIGUEZ:  Yes, sir.

14          JUDGE COOK:  Hi, I'm Judge Cook.  Would you

15    please stand behind the chair for me.

16          MR. RODRIGUEZ:  Sure.

17          JUDGE COOK:  Please raise your right hand

18    Whereupon,

19                    RUBEN RODRIGUEZ

20    was called as a witness and, having been first duly

21    sworn, was examined and testified as follows:

22          JUDGE COOK:  Please be seated.

23          THE WITNESS:  Thank you.

24          JUDGE COOK:  Please state and spell your full

25    name for me.

Page 72

1          THE WITNESS:  Ruben, R-u-b-e-n, D, as in

2  David, Rodriguez, R-o-d-r-i-g-u-e-z.

3          JUDGE COOK:  And what's your position,

4  Mr. Rodriguez?

5          THE WITNESS:  Personally, I am a security

6  officer.

7          JUDGE COOK:  Are you a civilian employee of

8  the government or do you work for a private contractor?

9          THE WITNESS:  Civilian employee of the

10 government, GS-5.

11         JUDGE COOK:  And where do you work?

12         THE WITNESS:  The Armed Forces Retirement Home

13 security and investigations division.  Do you need the

14 address for it?

15         JUDGE COOK:  No, got that.  Is Mr. Dickerson

16 your boss?

17         THE WITNESS:  He is general command, not my

18 immediate boss.

19         JUDGE COOK:  Okay.  He's up the chain a little

20 bit?

21         THE WITNESS:  Right.

22         JUDGE COOK:  Who do you report to directly?

23         THE WITNESS:  In the absence of the chief of

24 security I would report to him, in his absence.

25         JUDGE COOK:  Okay.  But who is the chief of

Page 73

1    security then?

2              THE WITNESS:  Right now, just been assigned to

3    be Mr. Johnathan Greenstein.  Just recently I was the

4    acting chief of security, which then I would report to

5    Mr. Dickerson, just recently.

6              JUDGE COOK:  Got you.  How long have you

7    worked at the Armed Forces Retirement Home?

8              THE WITNESS:  On and off, about 15 years or

9    so, on and off.  I retired and I was asked to come back

10   and give them a hand.

11             JUDGE COOK:  Okay.  Were you ever employed

12   under the resident employee program?

13             THE WITNESS:  Yes, I was.

14             JUDGE COOK:  For what years?

15             THE WITNESS:  When I first got to the home in

16   about 1990 to about 1996 or so, I imagine, I don't have

17   the exact dates, I was a resident employee.

18             JUDGE COOK:  Okay.  And then what happened in

19   '96?

20             THE WITNESS:  Oh, there was a process of -- I

21   was going to leave, actually, and I was offered a job as

22   a civilian employee, so I took a job as civilian

23   employee.

24             JUDGE COOK:  And were you still a resident of

25   the Armed Forces Retirement Home?

Page 74

1          THE WITNESS:  No, once I became a civilian

2    employee I was not authorized to be a resident any

3    longer.

4          JUDGE COOK:  And you say that, you

5    recollection is it's about 1996, something like that?

6          THE WITNESS:  I'm guessing.  I did not know

7    that was going to come up.

8          JUDGE COOK:  Roughly?

9          THE WITNESS:  Roughly 1996, maybe later.

10         JUDGE COOK:  Okay.  I understand.

11         Mr. Wilson, you called him.  You get to

12    question him first.

13                   DIRECT EXAMINATION

14         BY MR. WILSON:

15    Q    Mr. Rodriguez, going back to the question we

16    went over the other day, did the security investigation

17    division have some position for civil service guards and

18    some for resident guards or did they just work all -- do

19    the same job?

20    A    We all did the same job.

21    Q    Okay.  Did you have some resident employees

22    who were in supervisory positions from time to time?

23    A    Yes.

24    Q    Okay.  Was the appellant, myself, Theodore

25    Wilson, was my position categorized any different from

Page 75

1    **any of the other civil service guards or resident**

2    **guards?**

3       A    Yes, they did the same duties.  Categorized --

4    we had resident employees and we had GS employees.

5       **Q    Right, but myself, was mine different from the**

6    **other resident guards or -- civil service -- my --**

7       A    If I may go back over it.  I mean not go back,

8    but I believe you started out as a GS employee first.

9    And then you resigned from that position and became a

10   resident and then became a resident employee who did the

11   same stuff.

12           JUDGE COOK:  Before you go on, Mr. Wilson, one

13   clarification.

14           You said you were a GS-5 security guard.  Is

15   that your official title, position?

16           THE WITNESS:  Right now it is, yes.

17           JUDGE COOK:  And is that competitive service

18   or accepted service or do you know?

19           THE WITNESS:  It is accepted service, I

20   believe.

21           JUDGE COOK:  If you don't know, that's fine.

22           THE WITNESS:  I am not an expert in that.

23           MR. WILSON:  I think he's in competitive

24   service, Your Honor.

25           JUDGE COOK:  Can I just -- you're not

Page 76

1   testifying right now.  I just want to know what he knew.

2    Go ahead.

3            MR. WILSON:  Okay, sorry, Your Honor.

4            BY MR. WILSON:

5       Q    Okay.  Did the security and investigations

6   division there have a designated position?  Was there,

7   within the civil service guards, the resident guards,

8   was there any such thing as a gate guard in that,

9   like --

10      A    We had no gate guard.  All the guards did.

11  They took turns at the gate and took turns patrolling

12  and took turns investigating, whatever had to be done.

13      Q    Okay.  When you were in the position as the

14  operations sergeant, which is what you occupied the

15  whole time I was in the security department and you were

16  there --

17      A    Yes, I did.

18      Q    -- did you ever have any report that the --

19  have occasion to report to chief of police or do you

20  know of any occasion on which he reported to his boss or

21  to any higher authority that the guards were not doing

22  their jobs, the older guards were not doing their jobs?

23      A    This is kind of hard to answer in so far that

24  through my office and up the chain there were occasions

25  where people were accused of -- but that didn't mean

Page 77

1    they were older or younger.  It was just --

2         Q    Okay.  Well, specifically the older guards not

3    doing their jobs?

4         A    No, sir, not specifically that I can recall.

5         Q    Okay.  What about sleeping on duty?  Was there

6    a case that reports that the older guards collectively,

7    that there was a problem with the older guards sleeping

8    on duty?

9         A    No, specifically no.  I don't recall.

10        Q    Okay.  Now do you know of any reason why when

11   the military was using the home grounds to put their

12   missiles up there on the hill by -- statutory circle up

13   there or whatever they call that where GEN Scott's

14   statue is, was there any reason why it would be better

15   not to have resident guards on the gate?

16        A    I don't know that.  I wouldn't know.

17        Q    Okay.  Good.

18             MR. WILSON:  I don't have any further

19   questions.

20             JUDGE COOK:  Go ahead.

21                       CROSS EXAMINATION

22             BY MS. ROY:

23        Q    Sir, can you state your age for the record?

24        A    My age?  I'll be 69 on the 4th of July.  I

25   mean I'll be 70 on the 4th of July, correct.