UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED
APR 2 2 2008
NANCY MAYER WHITTINGTON, CLF
U.S. DISTRICT COURT

THEODORE R. WILSON
3700 North Capital St. NW, #128
Washington, D. C. 20011-8400
Tel. (202) 291-5968
        Plaintiff,

v.

TIMOTHY COX
Chief Operating Officer
Armed Forces Retirement Home-Washington
3700 North Capitol St. NW
Washington, D. C. 20011-8400
        Defendants.

Civil Action No. 06-1585 (HHK)

## PLAINTIFF'S RESPONSE TO DEFENDANT'S "FACTS" IN SUPPORT DEFENDANT'S MOTION TO DISMISS OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT

The Plaintiff has found the Defendant's material facts and adjunct facts not to be facts at all. Some of Defendant's presented facts are contradicted by the Defendant's own testimony and exhibits which are identified below.

### PLAINTIFF'S ADMINISTRATIVE REMEDIES

The Plaintiff has exhausted his known administrative remedies. When the Plaintiff initially complained to the Agency regarding his firing, the Agency advised the Plaintiff to file his objections with the EEO office at Parkersburg, WV, which the Plaintiff did. When the Plaintiff failed to get his desired results at the EEOC, he started preparing to file a complaint in Federal District Court. A pro bono lawyer assisting the Plaintiff made a casual remark that the case should have been heard by the Merit Systems Protection Board (MSPB). That was the Plaintiff's very first knowledge of that board. However, the Agency had an obligation to have informed the Plaintiff of the MSPB when it fired him in

January 2004 which it failed to do. Plaintiff filed a complaint with the MSPB with unfavorable results. Plaintiff has seen on the internet that the Office of Special Counsel (OSC) will not enter a case that has previously been heard by the MSPB. Nevertheless Plaintiff wrote to the OSC and briefly explained the facts of his case. Without comment on the Plaintiff's case, the OSC sent the Plaintiff a OSC Form 11.

> OSC Form 11. ..."If you have already filed an appeal about your prohibited personnel practice allegations with the MSPB, or a grievance about those allegations under the collective bargaining agreement, OSC lacks jurisdiction over your complaint and cannot investigate it."

When the Plaintiff initiated his first complaint in March 2004, the Plaintiff complained of being wrongfully terminated from employment. It was an AFRH-W official who directed the Plaintiff to the EEO office. For these reasons, the Plaintiff has exhausted his administrative remedies. **See Plaintiff's exhibit 1, page 2, last paragraph.**

### PLAINTIFF'S KNOWLEDGE OF COMPETITIVE SERVICE AND EXCEPTED SERVICE

The Plaintiff became a government employee in May 2001. 18 Months later, in December 2002, the Plaintiff signed a letter dictated to him by someone in personnel finance regarding withdrawing his money from the retirement fund. The Agency had informed the Plaintiff that the Plaintiff could not remain in the retirement fund as a resident employee. If the letter that was being dictated to the Plaintiff had any other purpose other than to withdraw funds, the Agency neglected its responsibility to so inform the Plaintiff of that purpose. There is nothing in the Plaintiff's letter regarding waiving a right. Even if it were, the Plaintiff was unaware of waiving any rights.

> (B)ut if he (the employee) did not know of the right he was waiving, or if the

waiver did not reflect an "intentional relinquishment of, those rights, the waiver is not effective and cannot be enforced." Chavies v. Department of the Navy, 104. M.S.P.B. 81, (2006).

It has been pointed out that 'Courts indulge every reasonable presumption against waiver' of fundamental constitutional rights. A waiver is ordinarily an intentional relinquish or abandonment of a known right or privilege. Johnson v. Zerbst, 304 U. S. (1938).

There was never—that is **never**—any discussion with anyone concerning competitive service or excepted service by the Plaintiff prior to his being fired, to his recollection. The Agency has no evidence that the Plaintiff had any personal information regarding the meaning of competitive service as opposed to excepted service. When the Agency claims that the Plaintiff did have this knowledge it hardly meets the standard of idle speculation. Since the Agency neglected its moral responsibility and legal obligation to inform the Plaintiff and other residents of their rights, the Agency has added another act of bad faith to its record in this case. It is unreasonable to credit the Agency or Agency's representative with knowing what is in the Plaintiff's mind. Plaintiff's affidavit affirming that he did not know anything about different services, that is competitive service and excepted service, should settle that issue. The Agency can produce no affidavit nor any other evidence that the Plaintiff did know that difference. Consequently the Plaintiff lawfully remained in the competitive service for administrative purposes pursuant to 5 U.S.C. 3301, Part I, Rule I. 1.3 (d) Definitions.

<u>DEFENDANT'S CLAIM THAT THE RESIDENT EMPLOYMENT
WAS COSTING "OVER A MILLION DOLLARS A YEAR"</u>

On the surface, the statement that the resident employment program was costing over a million dollars a year appears to be a play on words and an insidious deception. Most of the resident employees who were fired were replaced by another worker. In every known instance, the replacement employee was hired at a higher salary than the resident employee was paid. The plaintiff, a $12.29 an hour employee, was replaced by a worker, William Jenkins, who was being paid approximately $22.50 an hour. One contract guard told the Plaintiff that his pay was approximately $18.00 an hour, which means, that the Agency was probably paying in excess of $25.00 an hour for his services and that of other contract guards. Lets suppose: suppose a person finds a car a necessity. If that person goes out a buys a $55,000.00 Cadillac and trades in his $22,000.00 Ford, he can hardly truthfully state that the Ford was costing him $22,000.00. That, however, is essentially what the Chief Operating Officer (COO) did. The Plaintiff was paid about $2.00 less per hour as a resident employee than he was paid as a civil service employee. See Plaintiff exhibit 11, affidavit of Theodore R. Wilson, par. 3.

Defendant's "Memorandum of points…for Summary Judgment" states at footnote 17,

> "In September 2002, when Timothy Cox was appointed, the salaries of the resident employees at AFRH-Washington 'ranged from $30,000 to $60,000 and $70,000.'" Exhibit A at p. 17.

This statement derives from the COO's sworn testimony and has nothing to recommend it. The probability of it being true is negligible. A $65.000 salary is similar to what would have been paid to a highly paid supervisory nurse or probably more. For example a Vacancy Announcement still posted at AFRH-W on April 3, 2008:

> Vacancy Announcement: Opening date: 2/11/05, Closing date: 9/30/05; Clinical Nurse, GS-0610-10, GS-10. Salary Range, $22.05 -- $28.66 per. hour.

4

This nurse's annual salary would have been a maximum of approximately $59,612.80. Resident's positions were not nearly as high as that of clinical nurse. This announcement appears three years later than the period of the resident employee salaries addressed above. Plaintiff pro se has questioned several residents regarding their hourly wages, the highest paid resident the plaintiff questioned stated that his hourly pay was less than $17.00.

## RESIDENT STIPEND PROGRAM AND HOW IT FAILS TO BE VOLUNTARY

The Defendant describes the "resident stipend program." "This program is strictly voluntary." Defendant's supporting "Facts", April 20, 2008, page 4. There are two reasons why the program is not strictly voluntary.

Reason #1: Residents routinely get scheduled to work beyond the 12 hours for which they will be paid. Further, there have been and still are residents in the program who would prefer to be paid for all of their work. Once the Defendant schedules one resident to work for one hour for which the resident would prefer to be paid, and the Defendant does not pay him or her for that work, the program is no longer "strictly voluntary." Certain residents have expressed their desire to be paid for all of their work to the Plaintiff. **See Plaintiff's exhibit 2, Affidavit of George I. Lausund (deceased). Also see Plaintiff's exhibit 11, affidavit of Theodore R. Wilson, par. 4.**

Reason #2: Agency officials call and ask, approach or otherwise ask resident workers to perform tasks without regard to whether they have completed their "voluntary" 12 hours or not. The Plaintiff has witnessed it a number of times with George I. Lausund (deceased) or William Seeley (no longer a resident) and others. It doesn't take much

imagination to visualize a scene when a senior Agency official approaches a "Volunteer" and asks, "Can you help us?" as has been done . These residents get pressured into providing free labor and it happens many many times---some witnessed by the Plaintiff.

## DEFENDANT'S MOTIVE FOR INSTITUTING THE STIPEND PROGRAM

It has been shown that the defendant did not save any money by replacing resident employees with civil service or contract workers. This raises the question of why did the Defendant fire the resident employees? The reason; to put the resident employees in a position to provide free labor. Residents were informed of the intent for them to work in the stipend program and provide free labor with the very first information to them in July/August 2003 (Agency claimed not to have a copy of the letter that was sent out during EEO discovery). Immediately upon completion of the firing all residents in January 2004, the stipend program was started. **See Defendant's exhibits D (page 2) and E (page 2)**. The COO's "economically favorable" condition was that of having the AFRH-W residents provide free labor.

## DUE PROCESS

The Plaintiff proposes to assert a statutory right—the right of due process. The Plaintiff respectfully requests the court to render him due process to which he is entitled under the Fifth Amendment to the Constitution of the United States of America as a **citizen** of the United States of America. Due process was violated when the Chief Operating Officer enacted his plan to wrongfully terminate the employment of the Plaintiff and all other resident employees at Armed Force Retirement Home-Washington (AFRH-W) ignoring mandated administrative procedures in order to create conditions

under which the resident employees would provide unpaid labor to AFRH-W.

> In 1934, the United States Supreme Court held that "Due process is violated if a practice or rule offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." Snyder v. Massachusetts, 291 U. S. 97, 105 (1934).

Resident employment, for pay, is a tradition at AFRH-W that had existed for 150 years. The Chief Operating Officer ignored that tradition as practiced by senior military officers over those 150 years; to force the residents at AFRH-W to donate their labors.

Labor is property. The Agency acted to insidiously deprive the AFRH-W residents of their labor—their property—without due process of law. That is, the Agency acted to position the AFRH-W residents administratively so that the residents must donate one part of their labor in order to benefit from another part of their labor.

Due process is fairness. Many AFRH-W residents have stated a recognition of an act of unfairness for the Agency to provide a brochure that promised that there was employment opportunities at AFRH-W and then attempt to force the residents to provide free labor. That act also constitutes illegality for failure to keep a formal promise.

> ("To say to these appellants, 'The joke is on you. You shouldn't have trusted us,' is hardly worthy of our great government."); Menges v. Dentler, 33 Pa. 495 500 (1859). (Men naturally trust in their government, and ought to do so, and they ought not to suffer for it." See Giglio v. United States, 405 U. S. 150, 154-155 (1972).

Due process was further violated when the AFRH-W resident employees, including the Plaintiff, were wrongfully terminated from employment without following lawful administrative procedures. The Agency claims to have conducted a de facto R-I-F. That is not the case. The Agency did not act in compliance with R-I-F procedures. Further the Agency boldly states that it "...believed that resident employees of AFRH-Washington were not governed by 5 C.F.R. (Par.) 315, and did not have the right to appeal such an action to the board" (and acted accordingly). As a consequence of Agency's attitude, the Agency removed the residents, particularly the Plaintiff, from employment recklessly ignoring pertinent federal laws and regulations, particularly 5 C.F.R. 351, and its own EEO policy. A person's interest in a benefit is a "property" interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing. Perryman v. sinderman, 408 U.S. 593 (1972).

> Agency's EEO Policy: "Everyone at the Armed Forces Retirement Home-Washington has the right to work in an environment where there is opportunity for them to reach their fullest potential and be free from reprisal." **See Plaintiff exhibit 5, par. 1.**

Plaintiff is asking the Court to base its decision on what the Agency did, not on what the Agency officials thought nor on what the Agency claims that maybe it should have done. The Plaintiff is requesting the Court to render due process in this complaint as is required by the Constitution of the United States of America.

The Agency failed to inform the residents of their right to protest their firing to the Merit Systems Protection Board or of any other administrative remedy in violation of 5 U.S.C. 2302.

> 5 U.S.C. 2302, (b): Any employee who has authority to take, direct others to take, recommend, or approve any personnel action, shall not with respect to such authority—
> (4) deceive or willfully obstruct any person with respect to such person's right to compete for employment; and,
> (12) take or fail to take any other personnel action if the taking of or failure to take such action violates any law, rule, or regulation implementing, or directly concerning the merit system principles contained in section 2301 of this title.

When the Plaintiff attempted to file a complaint regarding his wrongful termination from employment with the Agency, the Agency informed the plaintiff to file his complaint with the EEO office at Parkersburg, WV instead of telling the Plaintiff to complain to the Merit Systems Protection Board or the Office of Special Counsel as it should have. This failure violated 5 U.S.C. 2302 above. **See Plaintiff's exhibit 1, page 2, last par.**

## EQUITABLE TOLLING

Plaintiff pro se understood that his complaint had been **equitable tolled** in the EEO and MSPB which led to his ability to be heard in Federal District Court. If equitable tolling is not already in force, the Plaintiff pro se is requesting it now. If the Agency had fulfilled its responsibility to inform the Plaintiff and other resident employees of their rights, the Plaintiff would have not missed any filing deadlines.

> In holding that the filing deadline in lopez was subject to equitable tolling, we applied in a straightforward manner the rule stated long ago by the Supreme Court in Holmberg v. Armbrecht, m 327 U. S. 392 (1946) that the equitable tolling doctrine 'is read into every federal statute of limitation.' United States v. Lopez, 514 U.S. 549 (!995).

## AGENCY'S AGE DISCRIMINATION IN EMPLOYMENT

The Agency removed all resident employees from employment at the end of 2003 and the beginning of 2004 and is explaining that it was cost effective. **See Agency Exhibit D,**

9

page 2. In the Plaintiff's case, the Plaintiff who was being paid $12.29 per hour was specifically replaced by an employee who was being paid approximately $22.50 per hour. One contract guard stated to the Plaintiff that he was being paid $18.00 per hour and civil service guards were being paid approximately $2.00 per hour more than resident guards were being paid when the Plaintiff was fired from employment at AFRH-W. Further, the Agency paid no benefits to resident employees other than their hourly wages and leave time. If civil service employees and contract employees are being paid more per hour than resident employees, then that term "cost effective" needs to be explained, thoroughly explained. The only figures to support the Agency's claim of "cost effective" is the very questionable figures of …salaries of resident employees…"ranged from $30,000 to $60,000 and $70,000. **See Agency's "Facts", page 18, footnote 17.** In order to show its "cost effective(ness)," the Agency should have shown some comparable figures of what was saved by replacing resident employees, which it pointedly failed to do. Agency's "facts" are lacking. Agency's footnote 16 on page 17 refers to 877 resident employees. **Defendant's Exhibit A, page 18,** lines 2 thru 6 states 877 total employees at AFRH not 877 resident employees. Defendant professes a need for the best trained individuals in these (security) positions at AFRH-W. **Defendant's "Facts" footnote 18, page 19.** The Plaintiff was a former Supervisory Military Policeman, a senior Non-commissioned-officer, with experience supervising and training these activities: guarding atomic weapons, guarding Strategic Air Command aircraft and facilities, guarding VIPs, guarding prisoners of war, a criminal investigator for the United States Air Force, a provost marshal investigator for the United states Army, a platoon sergeant for a separate

military police platoon, military police and private police duty in foreign countries. The Plaintiff had a total of approximately 50 years of police experience, the kinds of qualifications needed to perform security guard duties at AFRH-W. **See defendant's exhibit L, page 2, items 16a & 16b. See Defendant's exhibit O, page 1.**
The plaintiff was replaced, with all due respect, by people who have failed to meet those qualifications. About defendant's assertion about one penetration point at AFRH-W. **See Defendant's "Facts" footnote 18, page 19**. Contrary to the sworn testimony of the COO **(Defendant's Exhibit A, page 23 and page 26)** (1) the main (Eagle) gate was not the single point of access when the Plaintiff was fired, Scale gate (access to N. Capitol St.) was being opened mornings for 1 ½ hours and in the afternoon too; and (2) the Agency did attempt to get residents to work security at the gates (**See Agency exhibit E, page 2, Affidavit of Theodore R. Wilson**). Agency official's statements throughout this process are contaminated with misstatements.

Defendant's claim of saving money by replacing residents is a pretext. What Defendant intended was for the residents to provide the free labor (addressed above). In a discrimination claim it is the employer's motivation and intent which is at issue, not his business judgment. Wrenn v. Gould. 808 F.2d 493, 502 (6th Cir. 1987).

When questioned about why he moved the residents from employment, the COO made a statement to residents, "You didn't come here to work, you came here to retire." Later the COO would tell an EEO investigating officer discussing Plaintiff's complaint, older guards "was that they were not doing their jobs properly, as from time to time they would be found asleep, which was not safe for a government agency in DC, what with all the

threats since 9/11." If a company targets older workers for layoff (firing), a case for age discrimination can be established. Cichewicz v. Unovanduc. Automotive Sys. Inc (6th Cir.

When the COO made each of these statements, he was not describing the kinds of days he was having, he was discussing why he had fired all the residents in the former statement and why he had fired the Plaintiff in the later instance. A teacher of 30 years was fired after her vice principal told a student that she was "too old to be in the classroom." Because the V. P. was involved in the decision making process, the case could not be dismissed on summary judgment. Ferrell v. Leake & Watts Servc. Inc., 2003 U.S. App. Lexis 23727 (2nd Cir. 11/20/03).

Defendant's claim that the resident employee program was costing AFRH-W one million dollars (per year) appears to be an exaggeration of the first dimension. Defendant has produced no figures to support that claim.

## PROMISSORY ESTOPPEL

The Plaintiff moved to AFRH-W after it had been stated orally and in writing that the Plaintiff would be able to work at AFRH-W and be paid for his work. When the COO stated, "You didn't come here to work, you came here to retire," he was ignoring the information provided to potential residents, particularly the Plaintiff, who did come to AFRH-W to work. AFRH brochure:

> ..."**Chores/jobs:** ...For those interested in on-campus employment, the AFRH-Washington typically have several openings in a variety of capacities...

AFRH-Washington officials promised the plaintiff that he could remain fully employed

if he moved to AFRH-W. Plaintiff moved to AFRH-W expecting to be employed. After the Plaintiff moved to AFRH-W he was removed from employment severely damaging his ability to earn income and fulfill other financial obligations. In attempting to defend its actions, Agency officials have misstated a number of relevant facts material to the issue. We have previously defined "affirmative misconduct" to mean a "deliberate lie" or "a pattern of false promise." Oscar Socop-Gonzalez v. Immigration and Naturalization service, 793 F.2d 1006, 1008 (9th Cir. (2001). Agency officials have failed to testify truthfully numerous times concerning the facts surrounding the Plaintiff's wrongful termination from employment. To assert estoppel against the government, a party must point to some "affirmative Misconduct." Michigan Express, Inc. v. Unite States, 374 F.3d 424, 427 (6th Cir. 2004). Some examples of affirmative misconduct by the government is the Statements by the COO above that there was only one access point to AFRH-W or that no attempt was made to get residents to work on the gates in the stipend program. A statement by the Director of Personnel that he had no firsthand information about how the Plaintiff lost his job. Another senior personnel person said that the decision to fire the Plaintiff was made at Resident Services when she herself had signed a document saying that the position was abolished by the COO, a person senior to resident services.
**See Plaintiff's exhibit 10, affidavit of Sherba Essex, next to last par.** The
COO said that the Plaintiff was in a different category and that the Plaintiff was a gate guard. The Plaintiff was in the same category as all other AFRH-W security persons and there was no such position as "gate guard" per se. Plaintiff was in the same category as all other residents and residents an civil service guards had identical side by side duties. **See Agency exhibit A, pages 74 & 76, testimony of Reuben Rodriguez.**

> As long ago as Mooney v. Holohan, 294 U.S. 103, 112 (1935), this court made clear that deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with "rudimentary demands of justice," This was reaffirmed in Pyle v. Kansas, 317 U.S. 213 (1942). In Napu v. Illinois, 360 U.S. 264 (1959) we said "(t)he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." Id 296. [Thereafter Brady v. Maryland 373 U.S., at 87, held that suppression of material evidence justifies a new trial "irrespective of the good faith or bad faith of the prosecution. **See Giglio v. United States, 405 U.S. 150, 154-155 (1972)**

Other examples of AFRH-W officials affirmative misconduct are issuing a SF 50 falsely saying that the Plaintiff resigned from employment and the waiting more than 30 days after the Plaintiff resigned before giving the SF 50 to the Plaintiff. Another affirmative misconduct act was failing to give the Plaintiff one single word concerning his right to appeal his firing. Still another act of affirmative misconduct was failing to tell the Plaintiff to make his complaint to the MSPB where it properly belonged —The Agency told the Plaintiff to make the complaint to the EEO office at Parkersburg, WV that was serving AFRH-W. These examples are not all that exist of the defendant's affirmative misconduct but clearly establishes that the Defendant engaged in affirmative misconduct randomly, recklessly and often.

<u>PLAINTIFF'S VETERAN'S RIGHTS</u>

Plaintiff concurred during AJ Cook's hearing that he did not have veteran's rights in this matter. **See Agency exhibit A, page 82, lines 18 thru 25.**

<u>PLAINTIFF'S TRIAL DE NOVA</u>

Plaintiff pro se is entitled to a trial de nova. Plaintiff pro se would respectfully prefer to reach that circumstance unfettered by the rulings of Administrative Judge Thomas Cook, which is not to say that the Judge did not rule fairly considering the evidence

Cook, which is not to say that the Judge did not rule fairly considering the evidence presented. However the Plaintiff pro se is of the impression that he was ineptly represented, as he might be again, and lost his case to some very questionable testimony. After proceeding administratively, a claimant is entitled to a trial de nova in federal court, meaning a trial on the merits; not de nova review of an administrative record. Chandler v. Roudebush, 425 U. S. 840, 96 S. Ct. 1949, 48 L.Ed, 2d 416 (1976).

## CONCLUSION

The following facts show that the Defendant's motion should be denied.

Defendant's claim of firing the Plaintiff and other residents because it was costing AFRH-W one million dollars a year and saving AFRH-W that amount of money is both a pretext and a fabrication. The Defendant has never offered one comparison figure of evidence and there is nothing in the records to support that claim. The Defendant's false testimony and numerous other incidents of affirmative misconduct shows that its facts cannot be accepted without verification. Defendant has no grounds to request dismissal of the Plaintiff's complaint and no reasonable grounds to request summary judgment. Plaintiff respectfully requests the court to deny these requests of the defendant.

Respectfully Submitted,

*Theodore R. Wilson*
Theodore R. Wilson
3700 North Capitol St. NW, #128
Washington, D.C. 20011-8400
Phone (202) 291-5968
Plaintiff pro se

Enclosures:
Affidavit of Sherba Essex, 21 January 2005.
Affidavit of Theodore R. Wilson, April 22, 2008.