# THEODORE R. WILSON
# v.
# TIMOTHY COX, et al.

## Civil Action No. 06-1585 (HHK)

## Exhibit A

# Mr. David F. Lacy
## Chief Executive Officer/Chairman of the Board

accompanied by

Dr. Laurence G. Branch, Vice Chairman of the Board
MG Donald C. Hilbert, USA, Ret, Director, U. S. Soldiers and Airmens Home

The Armed Forces Retirement Home (AFRH) continues to fulfill its mission as defined by the law which created it - to provide a continuum of care and service in a retirement community for retired and former members of the Armed Forces, enabling them to live their remaining years among friends in an atmosphere of personal dignity and shared camaraderie; to provide the highest quality of residential, social and health services to residents, emphasizing a holistic approach toward each individual; and to retain the unique identity, atmosphere and tradition of these historic institutions. The two facilities of the AFRH are the U. S. Soldier's and Airmen's Home (USSAH) in Washington, DC, and the U. S. Naval Home (USNH) in Gulfport, MS. This continuum of care provides a support system for the majority of the residents who can reside in an independent living status, continues to the next progressive level of assisted living for those residents needing some additional assistance with personal needs or medications, and to the final level of dedicated 24-hour nursing care for those whose condition requires this for either a short time or long-term. The Armed Forces Retirement Home stresses the importance of excellence of services to meet the needs and expectations of all current and future residents from the ranks of the former members of the Armed Forces of the United States.

The AFRH is a truly unique agency, unlike any other in the Federal government. It more closely resembles the private sector Continuing Care Retirement Communities (CCRCs). The AFRH was created in 1991 by legislation merging the U.S. Soldiers= and Airmen=s Home and the U.S. Naval Home. These Homes are venerable institutions of our great Nation, dating back to 1851 and 1834, respectively. These institutions are not young upstarts of recent vintage; they are truly national treasures which have provided a home and a continuum of care for a century and a half to former soldiers, sailors, marines, and airmen who laid their lives on the line in military service to our country.

The Armed Forces Retirement Home Act of 1991 (Public Law 101-510) incorporated the two historical Homes into a single independent establishment in the Executive Branch of the Federal Government. This Act specified that each of the homes would be operated and maintained as a separate

establishment of the AFRH. Hence, although the AFRH itself is a relatively young Federal agency, its roots are a century and a half deep in our Nation=s history of supporting our Armed Services as they care for their own. In fact, the Homes are the best example I know of the military taking care of its own.

Budgets for AFRH are approved by Congress, but the funding for operating and maintaining the Homes and for capital improvements that are required come exclusively from a separate AFRH Trust Fund. This Trust Fund receives no general revenue receipts -- no direct tax dollars. The origin of the Trust Fund, like the Homes themselves, is rooted in American History. In the war with Mexico, as the victorious United States expeditionary force approached Mexico City, a delegation from the government of Mexico offered General Winfield Scott, the Commander of U.S. forces, a large sum of money not to enter and ransack Mexico City. General Scott agreed, and after paying the obligations of his command, he approached the Congress offering the remainder of the money for the establishment of a home for the care of old and disabled warriors.

The Congress agreed and authorized the establishment of the Old Soldiers= Home. The original legislation established a separate Trust Fund with a funding mechanism which is largely intact today. The initial corpus of the Trust Fund was the money brought back from the Mexican War by General Scott, and the original legislation put into effect a mechanism to perpetuate that Trust Fund, including a monthly pay deduction from all enlisted personnel, fines and forfeitures from violations of military justice, and interest on the Trust Fund balance.

Today=s sources of income to the Trust Fund are fines and forfeitures from violations of the Uniform Code of Military Justice by active duty personnel; a fifty cents per month pay deduction from all active duty enlisted members; monthly fees from the residents of the homes; gifts and bequests to the homes; and interest gained on the investments of the Trust Fund.

As is obvious from an examination of the Trust Fund income mechanism in public law, annual income to the Trust Fund is highly proportional to the size of the active duty military forces. Therefore, as a result of the downsizing of those active duty forces in the past decade, annual income has declined significantly.

The reduction in income has created an annual deficit situation, as income is insufficient to cover essential costs. This situation was foreseen even as the AFRH was created. Analyses in the early 1990s projected that the Trust Fund would be insolvent by 1998. However, the Armed Forces Retirement Home Board working with the local Boards of Trustees and the senior leadership of the two Homes have developed and initiated a set of actions to reduce expenditures and enhance revenues. These initiatives have been successful in

reducing the annual deficit to $8-10 million, and delaying the projected year of potential insolvency until Fiscal Year (FY) 2005. These initiatives include the following:

CThe number of veterans served by the Home is being reduced from a traditional level of 2,300 residents to about 1600 residents. This has imposed hardship on those eligible through the mechanism of a waiting list.

CThe staff of the U.S. Soldiers= & Airmen=s Home has been reduced by 24% and two dormitories have been closed.

CFrom historical fees of 25 % or less of military retirement income, resident fees have been increased to 40% of total income, including Social Security and Veteran=s disability payments as well as all other income, for dormitory residents, and to 65% of total income for health care residents versus

CAn Armed Forces Retirement Home Foundation has been established through the auspices of the Air Force Sergeants Association and in 1998 was listed in the National Capitol Region Combined Federal Campaign.

CA voluntary military retiree payroll deduction program was established in 1997.

CLegislative authority to increase the active duty payroll deduction from 50 cents to one dollar was enacted by the Congress in 1995. However, to date this authority has not been exercised.

CA business plan was developed to leverage real property assets of the U.S. Soldiers' & Airmen's Home in order to generate income for the Trust Fund.

We appreciate the opportunity provided by this hearing to address this last initiative in some detail, and seek this Committee's support for a process that will permit the Armed Forces Retirement Home Board to obtain the greatest value for the sustainment of the U.S. Navy Home and the U.S. Soldiers= & Airmen=s Home.

First, I should state emphatically that the initiative of the AFRHB to even consider disposing of assets is driven only by the necessity to generate income and the shortage of options available to accomplish that objective. Second, we did not embark on this initiative with any preconceived outcome as to whether it would be better to sell, lease or otherwise dispose of the land. Our driving concern and commitment are to determine the disposition of AFRH assets that would best assist in helping our Trust Fund to achieve long-term solvency, so that the Homes will be available not only for today=s resident veterans to live

out their lives in an environment of dignity and care, but also that the Homes will be available to continue the legacy of care for men and women of today=s Armed Forces when they age.

We set out to determine what would constitute the best and highest economic use of the land. Our intent was to analyze the options and develop recommendations . We have understood throughout the process our responsibility to present to the Congress the results of our study. We seek from the Congress the legislative authorities necessary to dispose of the land in the way that best supports our overall goal of achieving long-term solvency and ensuring that those aging veterans who need the Homes will not be disenfranchised.

Throughout the process, the most obvious and highly visible option was sale of the 49 acres of USSAH land which lie east of North Capitol Street. Our fiduciary responsibility to our distinguished veterans drove us to explore the following questions: (1) what was the value of the land if it were sold, and (2) whether any disposition option other than sale would likely produce as much income and value to support our Trust Fund and the Homes for the long run.

Therefore, we commissioned an extensive study designed to determine the answers to those questions using a best business practices approach. Adapting models employed by the U.S. Postal Service, the National Institute of Health, and the General Services Administration, a team of more than 25 respected private sector corporations was brought together, providing expertise in architectural planning and design, engineering, construction, market analysis, historic preservation, financing, and the legal disciplines of tax increment funding, land use, and environmental policy. This team was tasked to produce a business plan for a 49 acre parcel of land east of North Capitol Street and to review all U.S. Soldiers= & Airmen=s Home real property assets for opportunities to enhance income or reduce operating expense. We pursued the business plan approach consistent with this Committee=s language in the the National Defense Authorization Act for Fiscal Year 1997 which said that we Amay convey by sale or otherwise@ our interest in this parcel. We acknowledged, and by correspondence with the Chairman of the Committee, affirmed our statutory mandate to report back to this committee our proposed plan of action prior to implementation.

The Armed Forces Retirement Home Board accepted the business plan on February 10, 1999. This plan addresses a proposed highest and best economic use of the 49 acre parcel. The plan is based on market analysis and enjoys the support of multiple letters of commitment. The range of land use consists of a university village, student housing, hotel/conference center, institutional/professional office space, senior housing, and retail/commercial

space supporting site occupants. The land use plan is sensitive to the surrounding community through the employment of buffering, the enhancement and preservation of the vista toward the Basilica of the Shrine of the Immaculate Conception and the maintenance of building heights below that of the adjoining Pope John Paul II Cultural Center.

The business plan incorporates a strict set of design guidelines and standards developed by the firms of Stil & Svitchan Associates and RTKL Associates, Inc. The guidelines include standards for building form, massing, facade treatment, materials, signage and entry expression. By way of example, the standards prohibit imitation stone, concrete block, aluminum, plastic or vinyl siding, galvanized steel or other bright metal. Land use plans and standards have been produced as a result of meetings with members of the National Capitol Planning Commission (NCPC) and planning has been conducted in a manner so as to fulfill the vision of the NCPC Legacy Plan. The Armed Forces Retirement Home has worked through a recently established Ad Hoc Neighborhood and Campus Improvement Committee, chaired by the President of Children=s Hospital, and drawing representation from all neighboring institutions. The Armed Forces Retirement Home Board, intends to seek, on behalf of the U.S. Soldiers= & Airmen=s Home, the perpetuation of the design guidelines and standards by their conveyance as covenants to any future grantee/lease holder, or buyer.

The long-term ground lease option identified in the business plan as the best and highest economic use of the land provides a thirty-five year income stream to the Armed Forces Retirement Home Trust Fund with assets (improvements) reverting to the Armed Forces Retirement Home at the end of the leasehold period. The net present value of the income stream is $48.9 million. The net present value of reverting assets is $53 million. The plan is particularly attractive as the reverting asset, senior housing as an example, constitute capital assets that can support the Armed Forces Retirement Home mission in the future. The role of the Armed Forces Retirement Home in the execution of the business plan would not be that of developer, builder or market speculator. Given the requisite legislative authority, the Armed Forces Retirement Home Board would lease the land for its highest and best economic use and would look to the private sector for bearing the risks of the market place.

In the midst of our study of this issue, there was an amendment to Public Law that imposed restrictions on how we might dispose of the 49 acres. Specifically, Section 1043 of the Strom Thurmond National Defense Authorization Act for FY 1999 directs that the land be sold, and the provisions of Section 1043 of that Act appear to restrict the buyer to the Catholic Archdiocese of Washington or entities related thereto. The provisions further stipulate that the purchaser pay Aan amount equal to the fair market value of the real property at its highest and

best economic use, as determined by the Armed Forces Retirement Home Board, based on an independent appraisal.@ In compliance with Section 1043 of the Strom Thurmond National Defense Authorization Act for Fiscal Year 1999, we issued a task order to the U.S. Army Corps of Engineers requesting that they solicit, award and administer a contract for the independent appraisal of the 49 acre parcel at its highest and best economic use.

The provisions of Section 1043 cause us great concern, because it appears to us that it is probable and even highly likely that a noncompetitive sale, with only a single bidder, would not produce the highest value and best income for our Trust Fund. A provision added to the Omnibus Appropriation Act for Fiscal Year 1999 directed that no sale would take place prior to April 30, 1999. This has provided time for us to complete our study and to bring before you its results.

The results of our study and the resulting business plan identify the best and highest use described earlier in this statement. Those results indicate that the best outcome for our Trust Fund is likely to be achieved by an extended ground lease arrangement, with lease payments to the Trust Fund over a period of 35-40 years and with the capital improvements on the property reverting to the AFRH at the end of the period. The financial outcomes expected from that option appear to be well estimated in the business plan, and they will be evaluated in the independent appraisal we are obtaining in accordance with existing public law.

Upon completion of the appraisal, our desire is to put the land up for competitive bids, and then to compare the bids with the present value of the income stream and residual values associated with the extended lease option, assuming the financial parameters of that option are validated by the independent appraisal. The Board would then hope to be in a position to execute whatever option produces the most long-term value for our Trust Fund and thus for the current and future veterans who are its beneficiaries.

We understand fully that to pursue this course requires some modification to current law, and the Congress would have to provide legislative authority to permit us to sell, lease or otherwise dispose of the property based on the outcome of this process. We are not opposed to a sale if that outcome will secure the best long-term viability of our Trust Fund; we believe it is our fiduciary duty to recommend the outcome which will secure the best value for our distinguished veteran residents.

Finally, we thank the Committee for providing us the opportunity to discuss these matters. The future viability of the Homes is in jeopardy until such time as a solution to the solvency problem is put into place. Although the generation

statement of Mr. David Lacy

of income from assets cannot solve the whole problem, it is a very important piece of the comprehensive solution that we believe can and must be implemented so that these Homes can continue to support our elderly veterans.