# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THEODORE R. WILSON,

                Plaintiff,

       v.

TIMOTHY COX,

    and

UNITED STATES OF AMERICA,

          Defendants.

Civil Action 06-1585 (RCL)

## MEMORANDUM OPINION

Plaintiff Theodore Wilson, proceeding *pro se*, brings this action against Timothy Cox, Chief Operating Officer of the Armed Forces Retirement Home-Washington ("the Home" or "AFRH-Washington"), and the United States, alleging violations of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq*., and the Rehabilitation Act, 29 U.S.C. § 701 *et seq*. Wilson asserts that he was unlawfully discriminated against on the basis of his age when his security guard position at the Home was converted from competitive service to excepted service status, and again when he was dismissed from that position. Before the Court are defendants' motion to dismiss and for summary judgment [Dkt. #26] and Wilson's motion for leave to amend his complaint [Dkt. #36]. Upon consideration of the motions, the oppositions thereto, and the record of this case, the Court concludes that defendants' motion should be granted and Wilson's motion should be denied.

# I. BACKGROUND

In May 2001, Wilson began serving as a security guard at the Home, whose purpose is to provide "residences and related services for certain retired and former members of the Armed Forces." 24 U.S.C. § 411(b). In December 2002, Wilson, a veteran, moved into the Home, continuing to serve as a security guard there. As a result of his move, Wilson became a "resident employee," which resulted in a change of his federal government employment status from "competitive service" to "excepted service."[1] Am. Compl. ¶ 9. Wilson claims that, at the time, he was unaware of the difference between the two statuses, or of the implications of such an adjustment. *Id.* He did, however, mail a letter to the Home's Office of Personnel Services on December 3, 2002, stating that he had "resigned [his] status as a civil service employee" on November 30, 2002. Defs.' Mem. in Supp. of Defs.' Mot. for Summ. J. ("Defs.' Mem.") Ex. H (Letter from Theodore Wilson (Dec. 3, 2002)). Wilson states that he had been told that, as a result of his move into the Home, he needed to mail the letter in order to withdraw from the civil service retirement fund, but not that any other changes related to his employment status had occurred. Am. Compl. ¶ 13; Pl.'s Opp'n to Defs.' Mot. ("Pl.'s Opp'n") at 2.

---

[1] In accordance with Federal Rule of Evidence 201(b), the Court takes judicial notice of the following description of competitive and excepted service positions from the website of the Office of Personnel Management ("OPM"): "Competitive service jobs are under OPM's jurisdiction and subject to the civil service laws passed by Congress to ensure that applicants and employees receive fair and equal treatment in the hiring process. . . . Excepted service agencies set their own qualification requirements and are not subject to the appointment, pay, and classification rules in title 5, United States Code. However, they are subject to veterans' preference." USAJobs, Federal Employment Information Fact Sheets: How Federal Jobs are Filled, http://www.usajobs.gov/Content/pdfs/HowJobsAreFilled.pdf (last visited Nov. 30, 2011). *See Hamilton v. Paulson*, 542 F. Supp. 2d 37, 52 n.15 (D.D.C. 2008) (taking judicial notice of a document from OPM's website because it was "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned" in the meaning of Federal Rule of Evidence 201(b)).

The following summer, Wilson and the other resident security guards were notified that their employment would be terminated in the coming months, and that they would thereafter have the option to work under a stipend program that would compensate them for no more than twelve hours of work per month. Am. Compl. ¶ 10. Any hours worked beyond those twelve would be uncompensated. *Id*. Home officials later explained this decision to residents as being necessitated by financial considerations. Am. Compl. ¶ 22. In November, Wilson was required to sign a "letter of notification" that designated January 4, 2004 as his last day of work. Am. Compl. ¶ 11. After January 4, Wilson ceased working as a resident security guard. Am. Compl. ¶ 12. Wilson avers that the abolishment of the resident employee program was motivated by a desire to take advantage of the residents on the basis of their ages by forcing them, through the stipend program that replaced the employment program, to work for less money. Am. Compl. ¶ 22.

Wilson subsequently contacted an Equal Employment Opportunity ("EEO") counselor and asserted that his termination had been based on his age. After the counselor failed to resolve the dispute informally, Wilson filed a formal EEO complaint, which was dismissed in June 2006. Am. Compl. ¶¶ 15–16. In September 2006, Wilson wrote to the Merit Systems Protection Board ("MSPB"), which agreed to hear his complaint. An MSPB administrative law judge conducted a hearing on March 16, 2007, and ruled against Wilson. Am. Compl. ¶¶ 17–18. Wilson appealed and was notified in September 2007 that his appeal had been denied. Am. Compl. ¶ 19. While the administrative process was underway, Wilson commenced this action. Defendants have moved to dismiss Wilson's complaint for failure to state a claim upon which relief may be granted, or in the alternative, for summary judgment. Since then, Wilson has filed a motion for

leave to amend his complaint.

## II. LEGAL STANDARDS

### A.      Failure to State a Claim Upon Which Relief May Be Granted

On a motion to dismiss pursuant to Federal Rule of Civil Procedure Rule 12(b)(6), the Court will dismiss a complaint, or a portion thereof, that fails to plead "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Thus, although a complaint need not contain detailed factual allegations, it must recite facts sufficient to at least "raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555. A "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557) (alterations in original). At bottom, a complaint must contain sufficient factual matter that, accepted as true, would allow the Court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

### B.      Summary Judgment

A motion for summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant must support its factual positions by "citing to particular parts of materials in the record,

including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the moving party meets its burden, the non-moving party must then establish that a genuine dispute as to any material fact actually exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To meet its burden, the non-moving party must show that "the evidence is such that a reasonable jury could return a verdict" in its favor. *Anderson*, 477 U.S. at 248. Such evidence must consist of more than mere unsupported allegations or denials and must set forth specific facts showing that there is a genuine dispute for trial. *See* Fed. R. Civ. P. 56(c)(1), (e); *Celotex*, 477 U.S. at 322 n.3. If the evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249–50.

## III. ANALYSIS

The Court first addresses defendants' motion to dismiss and for summary judgment. The Court then explains why Wilson's motion for leave to file a second amended complaint should be denied.

### A. Defendants' Motion to Dismiss and for Summary Judgment Must be Granted

#### 1. Wilson Has Failed to State a Claim Under the Rehabilitation Act

Defendants assert that Wilson's Rehabilitation Act claim must be dismissed because it is unexplained and unsupported by factual allegations. The Court agrees. Beyond stating that he brings his case pursuant to the ADEA and the Rehabilitation Act, Wilson makes no further mention of the latter. *See* Am. Compl. ¶ 3. Indeed, neither Wilson's amended complaint nor his

opposition brief makes any mention of a disability that could have formed the basis for a Rehabilitation Act claim. *See* 29 U.S.C. § 791(a) (prohibiting discrimination against persons with disabilities in federal agencies, programs or activities). The complaint's vague mention of the Act does not constitute "a claim for relief that is plausible on its face," *see Twombly*, 550 U.S. at 570, and must be dismissed.

## 2. Summary Judgment for Defendants is Appropriate as to Wilson's ADEA Claims

The ADEA requires that "[a]ll personnel actions affecting employees or applicants for employment who are at least 40 years of age . . . in executive agencies . . . be made free from any discrimination based on age." 29 U.S.C. § 633a(a). In the absence of direct evidence of age discrimination, the courts evaluate ADEA claims under the burden-shifting scheme articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *See Barnette v. Chertoff*, 453 F.3d 513, 515 (D.C. Cir. 2006). Under that framework, a plaintiff "bears the initial burden of establishing a prima facie case, meaning she must prove by a preponderance of the evidence 'that (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination.'" *Id.* (quoting *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999)).[2] Where, however, an employer has asserted a legitimate, non-discriminatory reason for the adverse employment action being challenged, the Court sets aside the *McDonnell Douglas* framework and asks: "Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee . . . ?" *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008); *see*

---

[2] It is undisputed that Wilson's age makes him a member of a protected class.

*Baloch v. Kempthorne*, 550 F.3d 1191, 1197 n.2, 1200 (D.C. Cir. 2008) (applying *Brady* to ADEA claims).

Wilson challenges two separate acts taken by defendants: his change in status from competitive to excepted service upon moving into the Home, and his subsequent termination as a resident security guard. The Court will address each action in turn. Because it relies on the exhibits submitted by the parties, the Court applies the summary judgment standard in its review of the two allegations.[3] *See* Federal Rule of Civil Procedure 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment . . . ."); *Rand v. Secretary of the Treasury*, 2011 WL 4600729, at *2 (D.D.C. Oct. 6, 2011).

### a.  Wilson's Conversion from Competitive to Excepted Status Did Not Constitute Adverse Employment Action

Defendants assert that Wilson's conversion from competitive to excepted status upon moving into the Home cannot constitute an adverse employment action under the ADEA because Wilson affirmatively applied for resident employee status and, upon acceptance, voluntarily relinquished his competitive service position. Wilson responds, in essence, that his resignation was not voluntary because he lacked the information needed to understand its consequences. Defendants have the stronger position.

In this Circuit, an "adverse employment action" is a "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different

---

[3] As required by Rule 12(d), plaintiff has had an opportunity to present evidence outside the pleadings in opposition to defendants' motion. *See* Fed. R. Civ. P. 12(d); *Defending Animal Rights Today and Tomorrow v. Washington Sports*, 2011 WL 5005276, at *3 n.1 (D.D.C. Oct. 20, 2011) (citing *Wiley v. Glassman*, 511 F.3d 151, 160 (D.C. Cir. 2007))

responsibilities, or a decision causing significant change in benefits." *Aliotta v. Bair*, 614 F.3d 556, 566 (D.C. Cir. 2010) (citing *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C.Cir. 2009). Plaintiffs who have ostensibly resigned voluntarily from a position cannot ordinarily show that they have suffered an adverse employment action as a result of their departure therefrom. *Id.* at 566–67. Under certain circumstances, however, "the doctrine of constructive discharge enables an employee to overcome the presumption of voluntariness and demonstrate [that] she suffered an adverse employment action by showing the resignation or retirement was, in fact, not voluntary." *Id.* at 566. In determining whether a departure was voluntary for constructive discharge purposes, the courts inquire as to whether or not the person received information about what would happen in response to the choice, the choice was free from fraud or other misconduct, and the person had an opportunity to decline. *See id.* at 566–67 (quoting *Henn v. Nat'l Geographic Soc'y*, 819 F.2d 824, 828 (7th Cir. 1987)). Applying this standard to the present case, the Court finds that Wilson has failed to establish that he was constructively discharged from the competitive service.

Wilson does not assert that his decision to move into the Home and become a resident employee was involuntary in the sense that it was coerced. Rather, Wilson argues that his resignation from his competitive service position was involuntary because he did not receive information about the impact of his decision on his civil service status. He focuses in particular on a letter he sent to the Home's Office of Personnel Services, in which he withdrew from the civil service retirement fund. *See* Defs.' Mem. Ex. H (Letter from Theodore Wilson (Dec. 3, 2002)). Wilson emphasizes that although he was told by defendants' employees that he needed to send the letter because he "could not remain in the retirement fund as a resident employee," he

was not told that he was also withdrawing from competitive service. Pl.'s Opp'n at 2–3. As the defendants argue, however, it was not Wilson's signature of this letter that effected his transition to excepted status; rather, it was the act of becoming a resident employee that did so. Thus, the essential question for purposes of identifying an adverse employment action is not whether Wilson knowingly "waived" his competitive service status by signing the letter, but rather whether his decision to move into the Home and become a resident employee was voluntary. For two principal reasons, the Court concludes that it was.

First, Wilson does not argue that his transition from civil service employee to resident employee was unintentional or unknowing. Nor could he; the exhibits provided by defendants include Wilson's application to become a resident employee and the aforementioned letter, in which Wilson wrote: "On 30 Nov. 02, I resigned my status as [a] Civil Service employee. On 1 Dec 02, I became both a home resident and a home employee." Defs.' Mem. Ex. H (Letter from Theodore Wilson (Dec. 3, 2002)). It may be that Wilson was unaware of some of the potential consequences of his successful application for resident employment, but that fact alone does not make an otherwise voluntary resignation involuntary for constructive discharge purposes, at least absent some affirmative deception or misstatement on the part of defendants. *See Veitch v. England*, 2005 WL 762099, at *9 (D.D.C. Apr. 4, 2005) ("'The presumption of voluntariness [regarding resignations] . . . can be rebutted . . . by demonstrating that the government intentionally misrepresented information relied on to the plaintiff's detriment . . . .'") (quoting *McIntyre v. United States*, 30 Fed. Cl. 207, 211 (1993)); *cf. Scharf v. Dep't of the Air Force*, 710 F.2d 1572, 1574 (Fed. Cir. 1983) ("[A] resignation will be held involuntary if obtained by agency misrepresentation or deception."). Here, Wilson does not even assert that he asked

defendants for information regarding his status and was rebuffed, let alone that they made any affirmative misrepresentations to him. On the contrary, he states that he "*never* [had] any discussion with anyone concerning competitive service or excepted service." Pl.'s Opp'n at 3. Thus, he cannot claim that the government intended to misrepresent information with regard to his changed status.

Second, and more importantly, Wilson presents no allegations or evidence that he was prompted or pressured by defendants to move into the Home and become a resident employee, let alone that he was presented with an impermissible "take-it-or-leave-it choice" between doing so and being discharged. *See Aliotta*, 614 F.3d at 567 (quoting *Rowell v. BellSouth Corp.*, 433 F.3d 794, 805 (11th Cir. 2005)) (internal quotation marks omitted). Indeed, he apparently moved into the Home on his own initiative. Thus, Wilson was not even asked to change to the excepted service position, and even if the government did pose such a question, he has not presented the necessary evidence that he lacked "an opportunity to say no," *id.* (quoting *Henn*, 819 F.2d at 828) (internal quotation marks omitted). It may be that he did not understand the consequences of his choice for his civil service status, but he has failed to show that his choice was prompted "not by its attractions but by the terror of the alternative" such that he was constructively discharged. *Id.* (quoting *Henn*, 819 F.2d at 828) (internal quotation marks omitted). Accordingly, the Court concludes that Wilson suffered no adverse employment action as a result of his transition from competitive to excepted service and thus cannot establish an ADEA claim based on that event.

### b. Wilson's Termination from his Resident Security Guard Position Does Not Give Rise to an Inference of Discrimination

Defendants challenge Wilson's ADEA claim regarding his termination from his resident

employee position on multiple grounds. They first argue that his termination, like his earlier conversion to excepted status, did not constitute adverse employment action, because "[t]he Resident Employee Program was abolished for all Resident Employees of the Armed Forces Retirement Home in Washington, D.C., not just Plaintiff." Defs.' Reply to Pl.'s Opp'n ("Defs.' Reply") at 8. The Court disagrees. Termination is a prototypical adverse employment action, *see Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998), and defendants fail to present any reason why the termination of *every* employee is *less* adverse than the termination of just one.[4] Accordingly, the Court finds that Wilson suffered an adverse employment action when he was terminated.

Defendants next assert that they are entitled to summary judgment because they have offered several legitimate, non-discriminatory reasons for Wilson's termination. First, they point to a significant decrease in the value of the trust that funds the home required defendants to undertake cost-cutting measures, including the elimination of the resident employee program. Defs.' Mem. at 18 (citing *id.* Ex. D (Aff. of Timothy Cox) at 1–2). Second, defendants assert that security concerns dictated having the "best trained" guards at the Home's gated entrance. *Id.* at 19 n.18; Defs.' Reply at 11. Third, they cite to multiple Inspector General reports that had recommended that AFRH-Washington and its naval counterpart, AFRH-Mississippi, operate consistent systems for employing residents, and the Mississippi AFRH already employed the stipend program. Defs.' Reply at 12–13. The Court agrees that these justifications for the challenged action are facially legitimate and non-discriminatory. Accordingly, it does not pause

---

[4]     Indeed, Wilson does not argue that *his* discharge was somehow discriminatory while the rest were not; rather, he asserts that the termination of the entire resident employee program was discriminatory. *See* Pl.'s Opp'n at 6.

to apply the prima facie test and proceeds directly to a review of the evidence proffered by both parties which relate to the "ultimate issue" of whether or not discrimination motivated the defendants' actions. *See Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009).

In so doing, the Court must bear in mind that a plaintiff seeking to show that a defendant's proffered explanations for a challenged employment action are pretext for discrimination must do more than simply show that those explanations are flawed or incorrect. "An employer's action may be justified by a reasonable belief in the validity of the reason given even though that reason may turn out to be false." *George v. Leavitt*, 407 F.3d 405, 415 (D.C. Cir. 2005). Accordingly, a plaintiff's "ultimate obligation" is to show "both that the explanation is incorrect *and* that the employer's real reason was discriminatory." *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1288 n.3 (D.C. Cir. 1998) (en banc) (emphasis added). With this caveat in mind, the Court will address, in turn, each explanation offered by defendants. Lastly, the Court will turn to other evidence that Wilson presents as demonstrating defendants' discriminatory intent. *See id.* at 1295 n.11 ("[T]he plaintiff is not limited to challenging the employer's explanation, but can also avoid summary judgment . . . by presenting other evidence . . . that permits an inference of discrimination.").

### i.    The Cost of the Resident Employee Program

Defendants first justify the dissolution of the resident employee program on cost grounds. The Home receives no congressional appropriations, and is largely supported by a trust fund, which had apparently declined in value from $156 million in 1995 to $94 million in 2003. Defs.' Mem. at 18. Accordingly, defendants decided to abolish the resident employee jobs, which they calculated to cost roughly $1 million per year, and replace them with civil service or contract

positions.  *Id.*  Wilson argues that this explanation must be pretextual because the dissolution of the resident employee program actually cost money rather than saved it.  Specifically, he asserts that resident employees were replaced by workers who earn higher hourly wages, belying defendants' claim that the program was cut to save money.  Pl.'s Opp'n at 4–5.  Wilson fails, however, to establish that defendants were insincere in their asserted belief that eliminating the resident employee program would save money.

The majority of Wilson's evidence regarding the cost of the program is too anecdotal to assist the Court in assessing the validity of defendants' budget-based justification.[5]  Wilson does, however, present one piece of evidence that directly addresses the cost of the entire resident employee program.  He offers a document written by a former Home personnel officer sometime around 1999 or 2000,[6] entitled "Information Paper: Resident Employment, USSAH," that discusses the savings provided by the program as a whole.  *See* Am. Compl. Ex. 4 (Information Paper: Resident Employment, USSAH).  This document states: "Based on pay period costs for resident employees for the period ending January 29, 2000, the annual salary and benefits paid to

---

[5]     For example, Wilson offers a comparison of his wages and those of the person who replaced him, which Wilson claims are higher.  *See* Pl.'s Opp'n at 10.  At most, however, this evidence goes to the relative costs of resident and contract employees in one type of position, rather than the cost of the entire program.

[6]     The parties both assert that this document was written on March 24, 1989.  The letter itself, however, bears an unsigned hand-written note that states, "This was written no later than 2000 by my predecessor.  I've not found a signed or dated version."  Further, the text of the document discusses the total costs of the resident employee program for the pay period ending on January 29, 2000.  *See* Am. Compl. Ex. 4 (Information Paper: Resident Employment, USSAH) at 2.  Thus, it is highly unlikely that this document was produced in 1989.  The parties appear to have mistaken a reference to a separate letter at the top of the document's second page for the date on which the document itself was written.  Neither party, however, disputes the accuracy or legitimacy of this document.

residents is approximately 1.47 million dollars. To replace them with outside civilian employees would cost an additional $500k per annum." *Id.* at 2. This conclusion obviously differs significantly from the one reached by defendants in 2003. Even so, Wilson has not met his burden of showing that the termination of the program was "an error too obvious to be unintentional" and therefore motivated by unlawful discrimination. *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996). Several deficiencies in Wilson's filings require the Court to arrive at this conclusion.

First, there is no way for the Court to know how the Home's financial circumstances or the administration of the resident employee program changed in the years between the paper's creation and the termination of the program in 2003 — an interval of unclear duration. Second, although the paper mentions the added cost of replacing resident employees with "outside civilian employees," it does not discuss the option of replacing them with a mix of civil service and contract employees, supplemented by a resident stipend program, as was ultimately done.[7] The paper thus does not directly address the financial wisdom of the particular action taken by defendants. Finally, defendants may have been wary of the accounting on which the paper's analysis was based. During the MSPB hearing, Cox testified that prior to his arrival as Chief Operating Officer, the Home's accounting system was so opaque and inaccurate that accountants who audited the Home's finances were unable to provide reliable results. *See* Defs.' Mem. Ex.

---

[7] In fact, Wilson himself appears to assert that terminating the resident employee program could only be cost-effective if it were replaced by a stipend program like the one currently employed by the Home. *See* Pl.'s Opp'n at 6 ("The COO's 'economically favorable' condition was that of having the AFRH-W residents provide free labor [through the stipend program].") This argument supports, rather than contradicts, defendants' cost-based justification for their actions (although, as discussed below, Wilson also challenges the legality of the stipend program itself).

A (Tr. of MSPB Hr'g, March 16, 2007) at 13–14. Thus, it may be that defendants based their decision to terminate the program on different calculations or figures.[8] In sum, this document is simply insufficient to establish that defendants could not have believed in good faith that, as of 2003, terminating the program was a financially sound decision. *See Fischbach*, 86 F.3d at 1183 ("Once the employer has articulated a non-discriminatory explanation for its action . . . the issue is not 'the correctness or desirability of [the] reasons offered . . . [but] whether the employer honestly believes in the reasons it offers.'" (quoting *McCoy v. WGN Cont'l Broad. Co.*, 957 F.2d 368, 373 (7th Cir. 1992)) (alterations and second omission in original)).

### ii. The Qualifications and Training of the Home's Security Guards

Defendants further assert that the termination of the resident employee program was prompted in part by concerns about security at the Home's main gate. During the MSPB hearing, Cox testified that security was a concern because gunshots had been fired nearby, intruders had attempted to enter the Home, and, in times of heightened national security alertness, the military uses the grounds of the home to set up missile-defense systems. *See* Defs.' Mem. Ex. A (Tr. of MSPB Hr'g, March 16, 2007) at 23–25. Wilson responds that as a veteran with decades of experience as a military police officer, he is ideally qualified for such a post. Pl.'s Opp'n at 10–11. Wilson's long record of service is commendable; even so, it does not undermine the credibility of defendants' asserted reasoning regarding the security staff in general.

---

[8]      For example, while the document gives the total cost of the program as approximately $1.47 million, defendants estimated the program's cost to be roughly $1 million at the time of its termination. Neither party addresses this discrepancy.

In its examination of discrimination claims, the judiciary does not assume the role of a "super-personnel department that reexamines an entity's business decisions." *Barbour v. Browner*, 181 F.3d 1342, 1346 (D.C. Cir. 1999) (quoting *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986)) (internal quotation marks omitted). Accordingly, the courts "defer to the Government's decision of what nondiscriminatory qualities it . . . seek[s] in filling . . . position[s]." *Stewart v. Ashcroft*, 352 F.3d 422, 429 (D.C. Cir. 2003). Thus, although Wilson's service is impressive, it is not for the Court to second-guess defendants' preference for other qualifications, "absent [a] demonstrably discriminatory motive." *Milton v. Weinberger*, 696 F.2d 94, 100 (D.C. Cir. 1982). Here, Wilson's record sheds no light on the relative qualifications of the *other* resident security guards, or those of their replacements. Moreover, Wilson presents no evidence suggesting that defendants' stated security concerns are so unreasonable that an inference of discrimination arises. *See Fischbach*, 86 F.3d at 1183 ("It is not enough for the plaintiff to show that a reason given for a job action is not just, or fair, or sensible. He must show that the explanation given is a phony reason." (quoting *Pignato v. Am. Trans Air, Inc.*, 14 F.3d 342, 349 (7th Cir. 1994)) (internal quotation marks omitted)).

### iii. Operational Consistency between Armed Forces Retirement Homes

Defendants aver that the abolition of the resident employee program was based partially on a recommendation by armed forces Inspector Generals to create more consistency in the manner in which the two AFRHs employed their residents. Defendants thus decided, in part for the cost reasons discussed above, to adopt the stipend program already employed by AFRH-Mississippi. *See* Defs.' Mem. Ex. A (Tr. of MSPB Hr'g, March 16, 2007) at 13–16. Wilson does not address defendants' argument that the stipend program was adopted in part to create

greater synergy between AFRH-Washington and AFRH-Mississippi. Accordingly, the Court finds no reason to doubt that this legitimate consideration was a factor in defendants' decision to end the resident employee program.

### iv. Other Evidence of Discriminatory Intent

In addition to challenging defendants' explanations for their decision, Wilson also points to two remarks made by Cox that, Wilson argues, demonstrate defendants' discriminatory intent. First, Cox told an EEO investigator who was looking into Wilson's complaint that resident guards would sometimes be found asleep while on duty. *See* Defs.' Mem. Ex. J (EEO Counselor's Report) at 3. Second, in explaining the decision to end the resident employment program, Cox told residents that they "didn't come [to the Home] to work, [they] came here to retire." Pl.'s Opp'n at 11. Wilson argues that these remarks show that the Home was targeting residents for discharge on the basis of their ages. The Court cannot agree.

As to the remark regarding guards found sleeping on duty, defendants respond both that Cox was describing a legitimate concern about the Home's security and that he made no reference to the guards' ages.[9] Defs.' Reply at 11. Thus, they assert, this comment provides no evidence of discriminatory intent. Defendants are correct. The remark makes no reference to the guards' ages; rather, it shows only that Cox was concerned about specific performance-related events that had occurred in the past. It does not generalize about employees on the basis of their age or otherwise deploy "stereotypes unsupported by objective fact." *EEOC v. Wyoming*, 460

---

[9] During the MSPB hearing, Cox asserted that his concern was "really the action of sleeping[,] not an action [sic] of anyone's age . . . if they're supposed to be awake and doing a job they need to be awake and doing that job." Defs.''s Mem. Ex. A (Tr. of MSPB Hr'g, Mar. 16, 2007) at 23 (test. of Timothy Cox).

U.S. 226, 231 (1983). Thus, it does not support a conclusion that defendants violated the ADEA's command to "evaluate [older] employees . . . on their merits and not their age." *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 611 (1993) (quoting *W. Air Lines, Inc. v. Criswell*, 472 U.S. 400, 422 (1985)) (alteration in original) (internal quotation marks omitted).

Similarly, Cox's remark that residents came to the Home to retire rather than to work, while potentially insensitive, does not belie defendants' proffered justifications for the termination of the resident employee program.[10] If Cox had made the comment about older persons more broadly, it might suggest that he was improperly generalizing about the inclinations and productivity of retirement-age people. When made to the residents of a retirement home, however, a suggestion that their presence there indicates an intention to retire cannot be taken as evidence of an impermissible assumption based on their ages. *See Thomas v. Gandhi*, 650 F. Supp. 2d 35, 40 (D.D.C. 2009) (stating that courts must consider the context in which references to retirement are made to determine whether they reflect age-based animus); *cf. Breen v. Mineta*, 2005 WL 3276163, at *3 (D.D.C. Sept. 30, 2005) (holding that a statement by an employer that a large portion of its employees were eligible to retire was not sufficient to show that age-based animus had motivated out-sourcing that disproportionately impacted older

---

[10] During the MSPB hearing, Cox explained his second comment as follows:

We had an all-resident meeting about why we were changing [the resident employee program] because, again, they were affected [in a variety of ways]. And I told them, you know, our primary function here is a retirement home. . . . I explained that to everyone, explained that our job is really to be a retirement home and do the best we can. And if there's employment possibilities[,] that would be secondary . . . rather than a primary function . . . .

Defs.' Mem. Ex. A (Tr. of MSPB Hr'g, March 16, 2007) at 22 (test. of Timothy Cox).

employees).

Considering these comments, defendants' proffered justifications for their actions, and Wilson's arguments of pretext, the Court finds that Wilson simply has not adduced sufficient evidence to allow a reasonable juror to conclude that the decision to terminate the resident employee program was motivated, in whole or in part, by impermissible age-based animus. As the plaintiff, Wilson bears "the ultimate burden of persuasion" in showing unlawful discrimination, *Aka*, 156 F.3d at 1289, and he is unable to carry that burden here. Accordingly, summary judgment for defendants is appropriate as to Wilson's ADEA claims.

### 3. Wilson's Newly Raised Due Process and Promissory Estoppel Claims Cannot Go Forward

In addition to his Rehabilitation Act and ADEA claims, Wilson raises, for the first time in his opposition brief, claims based on constitutional due process and promissory estoppel. *See* Pl.'s Opp'n at 6–9, 12–14. Defendants assert that because these claims were not included in Wilson's amended complaint, they are not properly before the Court and should be dismissed.[11] Defs.' Reply at 13. The Court agrees that these claims must be dismissed, but for a different reason.

Under some circumstances, courts in this circuit allow *pro se* opposition briefs that present new claims to constructively amend the original complaint. *See Richardson v. United States*, 193 F.3d 545, 548–50 (D.C. Cir. 1999); *Carter v. Dep't of the Navy*, 2006 WL 2471520, at *5–6 (D.D.C. Aug. 24, 2006). In so doing, they consider four factors: (1) the plaintiff's *pro se* status; (2) whether the plaintiff could have amended her claim by right; (3) whether the plaintiff

---

[11] In making this argument, defendants refer only to Wilson's due process claim, but the Court understands it to apply to the promissory estoppel claim as well.

was attempting to rectify a recognized deficiency in the original complaint; and (4) whether the defendant would be prejudiced by allowing an amendment. *Richardson*, 193 F.3d at 548–50. The application of these factors to this case is inconclusive.[12]

The Court need not determine whether the *Richardson* factors require amendment here, however, because it concludes that allowing Wilson to amend his complaint would be futile. As with any other request to amend a complaint, *pro se* opposition briefs that appear to add new claims should not be allowed to do so where the new claims would not survive a motion to dismiss. *See, e.g.*, *Heard v. Dep't of State*, 2010 WL 3700184, at *7–8 (D.D.C. Sept. 17, 2010). And, even when subject to the more liberal pleading standard to which *pro se* filings are entitled, *see Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (reaffirming the principle that a plaintiff proceeding *pro se* may expect that his complaint, "however inartfully pleaded, [will] be held to less stringent standards than formal pleadings drafted by lawyers"), neither of Wilson's new claims would survive a motion to dismiss.

### a. Wilson's Due Process Claim

Wilson's due process claim would not survive a motion to dismiss because he has failed to identify a judicially cognizable property interest of his own that was infringed by defendants' actions. Wilson appears to allege that his due process rights were violated by the termination of the resident employee program, Pl.'s Opp'n at 6, and by the operation of the stipend program

---

[12]     On one hand, Wilson has already amended his complaint once, such that he could not now do so by right, and his putative amendment does not seek to repair a "pleading error," as was the case in *Richardson*, 193 F.3d at 549, but rather seeks to add two entirely new causes of action. On the other hand, there is no showing that defendants would be significantly prejudiced by allowing Wilson to amend his complaint, and the federal courts employ a liberal approach to amendment requests. *See Foman v. Davis*, 371 U.S. 178, 182 (1962).

that replaced it, which, he avers, compels residents to provide unpaid labor.  Pl.'s Opp'n at 7.

Neither event, however, forms the basis for a cognizable due process claim.

> **i.** **Wilson Had No Protected Interest in His Resident Employee Position**

Wilson's claim regarding the end of the resident employee program must fail because he did not have a protected property interest in his resident employee position.  Although some government employees can have property interests in their positions, *see Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538–41 (1985), those interests "are not themselves constitutionally created; rather, they are derived from independent sources, such as statutes, regulations, ordinances, or 'existing rules or understandings . . . that secure certain benefits and that support claims of entitlement to those benefits.'"  *Doe v. Gates*, 981 F.2d 1316, 1320 (D.C. Cir. 1993) (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)) (omission in original). Wilson asserts that he has found such a source in the Home's EEO policy, which reads: "Everyone at the Armed Forces Retirement Home-Washington has the right to work in an environment where there is opportunity for them to reach their fullest potential and be free from reprisal."  Pl.'s Opp'n Ex. 6 (EEO Policy Mem. (April 16, 2004)) at 1.  This language, however, is insufficient to create the sort of expectation that underpins a protected property right.

Wilson is correct that the policies and practices of an institution can create a protected property interest in government employment.  *See Perry v. Sindermann*, 408 U.S. 593, 604 (1972).  To have that effect, though, the policy or practice in question must create an objective expectation of continued employment.  *See id.*  The Home's EEO policy does not do so.  The remainder of the quoted paragraph reads:

It is the policy of the Armed Forces Retirement Home-Washington to provide equal

> employment opportunity to all employees and applicants for employment regardless
> of race, color, religion, age, sex, national origin, physical and/or mental disability.
> As the Director, I am committed to maintaining a diverse workforce built upon solid
> EEO principles . . . . Discrimination, sexual harassment, or reprisal for previous
> participation in an EEO complaint process will not be tolerated. I expect each
> employee to join me in accepting our individual and collective responsibilities as we
> commit to a vigorous program of equal employment opportunity that will enable us
> to better understand and interact with one another."

Pl.'s Opp'n Ex. 6 (EEO Policy Mem. (April 16, 2004)) at 1. This passage neither promises that

residents can expect continued employment nor contains "explicitly mandatory language" that

constrains the Home's discretion to discharge resident employees. *Tarpeh-Doe v. United States*,

904 F.2d 719, 723 (D.C. Cir. 1990) (quoting *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 463

(1989)). Thus, it does not give rise to a property interest protected by the Due Process Clause.[13]

### ii. Wilson Has No Standing to Challenge the Stipend Program as Applied to Other Residents

Likewise, Wilson's due process claim regarding the operation of the Home's stipend

program is without merit. Wilson alleges that defendants regularly ask residents "to perform

tasks without regard to whether they have completed their 'voluntary' 12 hours or not" and

"routinely" schedule residents to work more than twelve hours in a given month. Pl.'s Opp'n at

5. This practice, he alleges, deprives residents of their liberty and property — that is, their labor

---

[13]      Wilson also makes reference to the Home's apparent failure to comply with
5 C.F.R. § 351, which governs federal government reductions-in-force (RIFs). He does not,
however, explain which portion of that section might create a protected property interest in his
continued employment, or how it might do so. Further, as the MSPB Administrative Law Judge
observed, the RIF regulations that require employees to have an opportunity to compete for
retention do not apply where, as here, the employee's "entire competitive level [is] abolished."
Defs.' Mem. Ex. K (Initial Decision of Administrative Judge Thomas P. Cook, May 11, 2007) at
15; *see* 5 C.F.R. §§ 351.401–.405 (providing for retention competition procedures). Similarly,
the Home was not required to provide Wilson, an excepted service employee, with assignment
rights under 5 C.F.R. §§ 351.701–.705. Thus, Wilson fails to establish that 5 C.F.R. § 351
created a property interest in his resident employee position.

— without due process. Wilson describes having seen this happen to other residents; nowhere, however, does he allege that this has happened to him personally. Thus, this claim, even if otherwise sound, would run afoul of the doctrine of standing, which prevents federal courts from adjudicating disputes where plaintiffs seek to vindicate the rights of third parties. Absent certain exceptional circumstances, a plaintiff in federal court must "assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). Here, Wilson makes no allegations that he personally has been or will be pressured to work in the manner described above. Accordingly, he has no standing to raise this claim, and allowing him to add it would be futile. *See O'Shea v. Littleton*, 414 U.S. 488, 494 (1974) ("It must be alleged that the plaintiff 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged . . . official conduct." (quoting *Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923)).[14]

### b. Wilson's Promissory Estoppel Claim

Finally, Wilson presents a promissory estoppel claim, asserting that "AFRH-Washington officials promised [Wilson] that he could remain fully employed if he moved to AFRH-W," and that he relied upon that promise to his detriment by moving into the Home. Pl.'s Opp'n at 12–13. In the District of Columbia, "[f]or promissory estoppel to lie, 'there must be evidence of

---

[14]     Additionally, it is doubtful that a valid due process claim could be founded upon mere *requests* to work, absent some evidence of compulsion or coercion that makes assent effectively mandatory. *See BMW of North America, Inc. v. Gore*, 517 U.S. 559, 587 (1996) (Breyer, J., concurring) ("This constitutional concern [for due process] . . . arises out of the basic unfairness of depriving citizens of life, liberty, or property, through the application . . . of arbitrary *coercion*." (emphasis added)); *cf. Collins v. City of Harker Heights*, 503 U.S. 115, 128 (1992) ("Petitioner cannot maintain . . . that the city deprived [him] of his liberty when it made, and he voluntarily accepted, an offer of employment.").

a promise, the promise must reasonably induce reliance upon it, and the promise must be relied upon to the detriment of the promisee.'" *Kauffman v. Int'l Bhd. of Teamsters*, 950 A.2d 44, 49 n.7 (D.C. 2008) (quoting *Simard v. Resolution Trust Corp.*, 639 A.2d 540, 552 (D.C. 1994)).[15] Further, the doctrine may only be invoked where injustice would otherwise be unavoidable. *Id.* (citing *Bender v. Design Store Corp.*, 404 A.2d 194, 196 (D.C. 1979)). Here, Wilson cannot establish the existence of a promise definite enough to create promissory estoppel liability.

In asserting that he was promised the ability to work if he moved into the Home, Wilson apparently relies on a brochure for the Home that states, under the heading "Chores/Jobs," "For those interested in on-campus employment, the AFRH-Washington typically ha[s] several openings in a variety of capacities." Pl.'s Opp'n at 12 (quoting Pl.'s Opp'n Ex. 5 (AFRH-Washington Policies) at 2). Although "for purposes of estoppel, a promise need not be as specific and definite as a contract . . . in the final analysis there must be a promise." *Bender*, 404 A.2d at 196 (internal citation omitted). A promise is "an expression of intention that the promisor will conduct himself in a specified way or bring about a specified result in the future, communicated in such a manner to a promisee that he may justly expect performance and may reasonably rely thereon." *Choate v. TRW, Inc.*, 14 F.3d 74, 78 (D.C. Cir. 1994) (quoting 1 CORBIN ON CONTRACTS § 13 (1963)) (internal quotation marks omitted). The language here merely describes the "typical" situation at the Home with regard to resident employment. It is

---

[15]     The Court assumes that District of Columbia law would govern this claim because the District is home to both parties, and no other jurisdiction appears to have an interest in having its law applied. *See GEICO v. Fetisoff*, 958 F.2d 1137, 1141 (D.C. Cir. 1992) (District of Columbia courts use governmental interest analysis to resolve choice of law issues); *In re Korean Air Lines Disaster of Sept. 1, 1983*, 932 F.2d 1475, 1495 (D.C. Cir. 1991) ("[C]ourts need not address choice of law questions *sua sponte*.").

simply too vague and noncommital to constitute a binding expression of intent to "bring about a specified result in the future." Accordingly, allowing Wilson to add a promissory estoppel claim based on this language would be futile.

**B.      Wilson's Motion for Leave to File a Second Amended Complaint Must Be Denied**

The foregoing discussion also requires the denial of Wilson's pending motion for leave to amend his complaint. A plaintiff may amend the complaint a second time "only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." FED. R. CIV. P. 15(a)(2). A court should grant leave to amend "in the absence of undue delay, bad faith, undue prejudice to the opposing party, repeated failure to cure deficiencies or futility." *Richardson* 193 F.3d at 548–49 (citing *Foman*, 371 U.S. at 182). An amended complaint is futile "if it merely restates the same facts as the original complaint . . . fails to state a legal theory or could not withstand a motion to dismiss." *Robinson v. Detroit News, Inc.*, 211 F. Supp. 2d 101, 114 (D.D.C. 2002) (citing 3 MOORE'S FED. PRAC. §15.15[3] (3d ed. 2000)).

After a careful review of the proposed amended complaint and Wilson's arguments in favor of amendment, the Court agrees with defendants that the new complaint neither adds any new claims nor bolsters Wilson's existing claims with new factual allegations. For the most part, Wilson simply retreads his arguments in opposition to defendants' motion to dismiss and for summary judgment. Accordingly, the claims in Wilson's proposed amended complaint would, for the reasons stated above, fail to withstand a motion to dismiss for failure to state a claim. That fact renders amendment futile, and requires the Court to deny Wilson's motion. *See In re Interbank Funding Corp. Sec. Litig.*, 629 F.3d 213, 215–16 (D.C. Cir. 2010).

## IV.  CONCLUSION

The Court is by no means unsympathetic to Wilson's desire to continue to work and serve his community; that desire, like his long record of service to this nation, is admirable.  But Wilson has neither stated a viable claim for relief nor raised a genuine issue of material fact as to defendants' discriminatory intent.  Accordingly, defendants' motion to dismiss and for summary judgment must be granted, and Wilson's motion for leave to file a second amended complaint must be denied.  An appropriate order accompanies this memorandum opinion.


Signed on December 5 , 2011 by Chief Judge Royce C. Lamberth.